Excerpts from the Deposition
of Christopher Scott Bell

August 20, 2009

Dockets.Justia.co

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Civil Action No. 8:08-cv-01227-JSM-MSS

- - - - - - - - - - - - - - - -x
                                :
KLEIN & HEUCHAN, INC.,          :
                                :
    Plaintiff,                  :
                                :
vs.                             :
                                :
COSTAR REALTY INFORMATION,      :
INC., and COSTAR GROUP,         :
INC.,                           :
                                :
    Defendants/                 :
    Counterclaim-Plaintiffs,    :     ORIGINAL
                                :
vs.                             :
                                :
SCOTT BELL and                  :
KLEIN & HEUCHAN, INC.,          :
                                :
    Counterclaim-Defendants.    :
                                :
- - - - - - - - - - - - - - - -x


VIDEOTAPED
DEPOSITION OF:    CHRISTOPHER SCOTT BELL

DATE:             August 20, 2009

TIME:             9:07 a.m. to 2:14 p.m.

PLACE:            Hill, Ward & Henderson, P.A.
                  Bank of America Plaza, Suite 3600
                  101 East Kennedy Boulevard
                  Tampa, Florida 33602

REPORTED BY:      Jean M. Wilkes, RPR-CP
                  Notary Public
                  State of Florida at Large

WILKES PROFESSIONAL REPORTING, INC.
100 North Tampa Street, Suite 2140
Tampa, Florida 33602
(813) 222-8155

1          A.     Approximately somewhere between, like, the

2     latter part of December, early part of January, of

3     '06/'07 through -- until now.  I'm still -- I still

4     have my license under their -- with their firm,

5     still.  But I'm, for the most part, just -- you have

6     to park your license there to maintain an active

7     status should I ever do come back.

8          Q.     Could you go back?

9          A.     It doesn't look -- probably not as

10    probable because I am a -- I like my job that I have

11    now and it's --

12         Q.     Right.

13         A.     -- it's fantastic, so -- the market is not

14    very well and --

15         Q.     Sure.  I guess I meant market issues aside

16    and employment preference aside, if you decided

17    tomorrow you wanted to go back, could you?

18         A.     I'm not -- I'm not sure.  I'm not sure.

19         Q.     But your license is still parked, you

20    said, with them?

21         A.     Yeah.  It's still parked with Klein, yeah.

22         Q.     So what does that mean, that it's parked

23    there?

24         A.     It remains active within the Florida Real

25    Estate Department.

1       Q.   Okay.

2       A.   So if you go inactive, then you have to

3   come back and find a new place or whatever and --

4   you have to kind of start all over again.

5       Q.   Okay.

6       A.   So most people try and stay active even

7   though they might not be actively practicing.

8       Q.   Is there a cost -- are you aware of a cost

9   to Klein and -- are you aware of a cost associated

10  with parking your license?

11      A.   No.

12      Q.   Where were you employed -- did you say

13  December, January -- December '06, January '07 --

14  where were you employed prior to that?

15      A.   It was for Coldwell Banker Commercial NRT.

16      Q.   And when did you start with them?

17      A.   It seems like it was probably September of

18  '05 through, let's say, November of 2006.

19      Q.   So there was a break between when you were

20  employed by Coldwell Banker and when you moved over?

21      A.   For a short period of time -- I guess

22  it was sort of a break.  I was at -- I went up to

23  F.I. Grey & Son, which is in New Port Richey.  And

24  I hadn't completely made a transition yet, and he --

25  he asked me if I might be interested.

1    I went up there and checked out the

2  office a few times and I kind of made my decision

3  to go with Klein & Heuchan.

4       Q.   And prior to Coldwell Banker where were

5  you employed?

6       A.   I worked for a company called Ecolab,

7  E-c-o-l-a-b.

8       Q.   Okay.  When did you start with them?

9       A.   February 1998 through -- it seems like it

10  was probably about June of -- what is that?  '95.

11  June, July-ish of '95.

12       Q.   June '05?

13       A.   '05, yeah.  Did I say '95?  Yeah.

14       Q.   And what sort of job did you have with

15  Ecolab?

16       A.   I was a territory manager for them.

17       Q.   What does that mean?  What were your job

18  responsibilities?

19       A.   I sold new business to restaurants,

20  hotels, the hospitality time industry.  Ecolab is

21  an institutional supplier of chemicals, sanitizers.

22       Q.   So it was not in the real estate industry?

23       A.   No.

24       Q.   Okay.  So Coldwell Banker was your first

25  job in the real estate industry?

1  assist the company with being helpful.

2        Q.   Can you expand on that a little bit?

3        A.   What do you mean?

4        Q.   Well, I guess my question is:  What do you

5  mean by "being helpful"?

6        A.   Answer telephones, take floor calls, maybe

7  show another associate's listing if they're not

8  there.

9        Q.   Right.  How many agents were in the office

10 when you were there, approximately?

11       A.   I would say 14, 15, possibly.  Some came,

12 some went.

13       Q.   Were they all in the same area -- did they

14 all handle commercial realty?

15       A.   Yes.

16       Q.   Okay.  Who are the owners of

17 Klein & Heuchan?

18       A.   Mark Klein and Steve Klein.

19       Q.   Were you aware -- you said you left

20 Klein & Heuchan in -- effectively in August 2008.

21 Is that correct?

22       A.   Yes.

23       Q.   Okay.  Are you aware -- were you aware of

24 the existence of this lawsuit at that time?

25       A.   Yes.

1  your thing say?" -- dah, dah, dah.

2      Q.  "Your thing" being CoStar?

3      A.  Yes.

4      Q.  So they would ask you to perform searches

5  on CoStar's --

6      A.  On a few occasions, yes.

7      Q.  So they knew you had access to CoStar?

8      A.  Yes.

9      Q.  Do you know when they became aware that

10 you had access to CoStar?

11     A.  I want to say it was probably a couple of

12 months after I joined, a few months after.

13     Q.  How did they become aware?

14     A.  I had shown them an office report, and

15 that's -- that's how.

16     Q.  And then they -- did they ask you if you

17 had access?

18     A.  Yeah, they -- they -- he did ask me.  He

19 said, you know, "Where -- how are you using that?"

20 And I said, "Well, they -- we got a subscription

21 from -- I had a subscription bought from -- while I

22 was at Coldwell Banker."

23     Q.  Do you know if Mark -- was that discussion

24 with Mark Klein or with Scott Klein or with both?

25     A.  It was with Mark and Steve.

1    a few times and just weren't -- they didn't -- they

2    didn't see a value in it, I think is exactly what

3    Mark's words were.

4         Q.    But they did ask you to run reports on

5    occasion and to conduct research?

6         A.    They would ask me to -- yes.  They would

7    ask me to look at a property or something like that

8    and see if there -- the information that was there.

9         Q.    Did you use the CoStar services --

10   did you access the CoStar services during your

11   employment with Klein & Heuchan on the premises

12   of Klein & Heuchan with their internet access?

13        A.    Yes.  I used their internet access there.

14   Right.

15        Q.    Did you pay for the internet access?

16        A.    No.

17        Q.    Who paid for the internet access?

18        A.    I'm assuming it would be Klein & Heuchan,

19   but I -- I'm not . . .

20        Q.    Did you have a Klein & Heuchan e-mail

21   account?

22        A.    Yes.

23        Q.    Who provided you with that e-mail account?

24        A.    Klein & Heuchan.

25        Q.    Tell me if you don't follow this.  What

1    sort of e-mail account was it from a technical

2    standpoint?  Internet?  Server-based?  Do you know?

3         A.    I don't know.

4         Q.    Okay.  When you wanted to find your

5    e-mails, where were they?  What sort of program did

6    you log into?

7         A.    It would be Outlook.

8         Q.    It was Outlook.  Okay.

9         A.    Yeah.

10        Q.    Is that your copy of Outlook?

11        A.    Is what copy?

12        Q.    The Outlook that -- the Outlook that you

13   logged into.  Would you log into the network at

14   Klein & Heuchan and get your e-mails, or how did

15   you get your e-mails?

16        A.    We would have to go in the office and plug

17   in or we could do it remotely.

18        Q.    Okay.  So there was a -- to your

19   understanding, there would be a server or something

20   like that that had all of your e-mails?

21        A.    Yeah.

22             MR. GIBSON:  Object to form.

23        Q.    Were there any other sorts of computer

24   programs or databases that were provided to you by

25   Klein & Heuchan?

1           A.    There was -- there's one.  It was the

2     IMAP, which was another real estate -- it's kind of

3     a -- more of a residential/a little bit commercial.

4     That's -- I just remember it being IMAP.

5           Q.    Was the Microsoft Outlook part of an

6     office suite?  Did you have Word and PowerPoint?

7           A.    Did I?

8           Q.    Um-hum.

9           A.    Yeah.  I believe so.

10          Q.    And when you -- did you have the ability

11    to save documents and images and things like that to

12    somewhere other than your hard drive?

13          A.    There was a -- at Klein & Heuchan there

14    was a place -- it was called, I think, the EDrive or

15    the IDrive or something -- where people could store,

16    like, proposals and things like that, or whatever,

17    on the server.  Yeah.

18          Q.    Did you ever use that drive?

19          A.    Very rarely.

20          Q.    You could log into that drive remotely or

21    on --

22          A.    No.  You had --

23          Q.    Only on site?

24          A.    -- you had to be on the property.

25          Q.    When you wanted to -- could you make photo

1    copies on -- did Klein & Heuchan have a photocopier?

2         A.    Yes.

3         Q.    They provided it for your use?

4         A.    For everyone's use.

5         Q.    For everyone's use.

6         A.    Yeah.

7         Q.    Did it have any notices on it or anything

8    like that?

9         A.    Not that I recall seeing.

10        Q.    Did you ever use it to make copies of

11   CoStar information?

12        A.    I think I printed -- because the reports

13   are so long, I put it -- I think I had made some

14   copies and used it on the copier, yeah.

15        Q.    So you would -- you could e-mail it

16   directly to that copier?  Was it a copier printer?

17        A.    No.  You'd have to print them out and then

18   put it through the copier.

19        Q.    Okay.  Was there a Klein & Heuchan copier

20   as well?

21        A.    Copier, yeah.

22        Q.    And a printer?

23        A.    They had print -- they had their printers.

24   We had -- everybody had their own -- everybody had

25   their own printers, and they had their own printers

1    A.    I assume so.

2         Q.    Did you ever discuss any of these reports

3    with anyone at Klein & Heuchan?

4         A.    I don't understand.

5         Q.    Did you go over -- ever sit down and go

6    over one of them with anybody?

7         A.    No.  I mean, they're pretty

8    self-explanatory.  I don't . . .

9         Q.    Okay.  And how did you come to give these

10   reports to the various people in the office?  Did

11   anyone ask for them?

12        A.    I had given them one and then -- I would

13   say primarily I would offer them to them, yes.

14        Q.    Okay.  So you gave them the first one.

15   And then after that you would say, "I've got the new

16   one" or --

17        A.    I don't remember if they asked me for

18   office report or not.  I, more or less -- it was --

19   it was a learning experience for everybody, so . . .

20        Q.    Okay.

21             MR. SAUERS:  I'll mark the next exhibit

22   as Exhibit 6.

23             (The document was marked as Bell Exhibit

24   Number 6 for identification.)

25   BY MR. SAUERS:

1    Q.   Have you had a chance to take a look at

2    that?

3        A.   Yes.

4        Q.   Is this a document that you obtained from

5    your computer --

6        A.   Yes.

7        Q.   -- and produced in this litigation?

8        A.   Yes.

9        Q.   Can you tell me what it is?

10       A.   It is a mini storage site in Pasco County.

11       Q.   Okay.  And is it a -- is this a printout

12   from CoStar Comps database?

13       A.   Yes.

14       Q.   And would you have needed to use your

15   password to obtain this information?

16       A.   Yes.

17       Q.   And I see on the bottom right it says what

18   appears to be a date of January 17th, 2007.  Is that

19   correct?

20       A.   Um-hum.

21       Q.   Is that the date you would have printed

22   this out from the database?

23       A.   Yep.

24       Q.   And that's just shortly after you started

25   with Klein & Heuchan.  Correct?

1      A.   Correct.

2      Q.   Did you ever provide this to anyone at

3 Klein & Heuchan?

4      A.   No.

5      Q.   Anyone else?

6      A.   Unh-unh.

7      Q.   Okay.  Why did you save this particular

8 document?

9      A.   This was a -- I had done a -- when I first

10 got to Klein & Heuchan, I did a large mail-out for

11 the Pasco County industrial market.

12      Q.   Um-hum.

13      A.   And this gentleman called and was in a --

14 in a mode to possibly list his property.

15      Q.   So this gentleman -- the owner of this --

16 the listed property here?

17      A.   Right.

18      Q.   Okay.  And so after you discussed the

19 property with him, you went and obtained this

20 report?

21      A.   After?

22      Q.   Or before.

23      A.   I -- most of what I obtained was from the

24 -- either the Pinellas Realtor Organization or the

25 West Pasco -- they have a co-op.  And then I used

1    A.    Their database.

2    Q.    And that's based on his prior interaction

3    with the CoStar database?

4    A.    I think when he -- when the salespeople

5    had come out and would do a demonstration, and they

6    showed him all the bells and whistles, it -- it

7    didn't do anything -- he said -- it didn't do any --

8    it didn't really serve our market.  It didn't do

9    anything.

10    MR. SAUERS:  Okay.  Let's mark the next

11    exhibit.

12    (The document was marked as Bell Exhibit

13    Number 9 for identification.)

14    BY MR. SAUERS:

15    Q.    And, again, take a minute, take a look

16    through that and let me know when you're ready.

17    All set?

18    A.    Yeah.

19    Q.    Did you obtain this e-mail and attachment

20    from your computer?

21    A.    Yes.

22    Q.    And the "from" address is from you.  Is

23    that your e-mail address, "scottbell@kleinand" --

24    A.    Yeah.  Uh-huh.

25    Q.    Okay.  And, again, "msk" is Mark Klein?

1           A.   Yes.

2           Q.   And the subject matter is CoStar report.

3     Is that correct?

4           A.   Yes.

5           Q.   Okay.  And it has a Follow Up Flag of

6     "Follow up."  Is that correct?

7           A.   Yes.

8           Q.   Okay.  And then the text of the e-mail

9     says, "Here it is.  C. Scott Bell."

10          A.   Um-hum.

11          Q.   What is "it"?

12          A.   It looks like it's a number of office

13    buildings that are in the -- down in this corridor

14    where we're at here, downtown Tampa.

15          Q.   Okay.  Is this a report that you would

16    have obtained from the CoStar database?

17          A.   Yes.

18          Q.   And the text of your e-mail is, "Here it

19    is."  Is that in response to something?  Is your

20    statement in response to a prior statement?

21          A.   Well, this is about the time -- I was -- I

22    was gathering a lot of data on my own.  And at this

23    time of the year is around August of '07.  I was

24    doing a lot of research in the office market in

25    Tampa.  And Mark had -- Mark, and I think Steve,

1   were working on some project where they were trying

2   -- they were assisting a group.  They were acting as

3   a -- not a broker but as an information-type -- they

4   were providing help to somebody else that was

5   looking to maybe buy an office building in the

6   metropolitan area.

7        Q.    So consulting?

8        A.    Consulting.  That's the word.

9        Q.    And so your e-mail stating "Here it is" --

10       A.    Um-hum.

11       Q.    -- is this in response to a request from

12   Mark Klein to work as part of that consulting work?

13       A.    Mark was -- had asked me what he -- what

14   -- based on all the research I was doing, what kind

15   of rents were we really seeing out there because

16   that drives the property value.  So these -- I just

17   sent him this and he could take a look at it.  I

18   didn't know if it helped him or not.

19       Q.    Okay.  And then you have it marked as

20   "Follow Up Flag:  Follow up."

21       A.    Uh-huh.

22       Q.    Why would you have done that?

23       A.    When I was going through all my archived

24   e-mails, I flagged all the ones that I needed to

25   prepare for the deposition.

1      A.   Yes.

2      Q.   And is that Steven Klein, one of the

3  principals?

4      A.   Yes.

5      Q.   And the text of the e-mail is "Office

6  report document."

7      A.   Um-hum.

8      Q.   And is that referring to the attachment

9  here?

10     A.   Yes.

11     Q.   Okay.  Did you obtain this attachment from

12  the CoStar database pursuant to your password?

13     A.   Yes.

14     Q.   Okay.  And this office report is different

15  than the other ones.  Am I correct?

16     A.   I don't know.  We'll have to see.

17     Q.   Let's see.  I believe the others were all

18  from 2007.

19     A.   Yes.  The other ones were from '07.  This

20  is from '06.

21     Q.   Okay.  So this is a fourth CoStar report.

22  Okay.

23          And do you recall the circumstances

24  surrounding why you gave this report to Mr. Klein?

25     A.   I offered this to Steve as a tool to

1   research and provide information to them.

2        Q.   And what did -- what did Mr. Klein say

3   when you offered it to him?

4        A.   "Thanks."

5        Q.   Did he say, "Yes, I'd like you to send it

6   to me" or --

7        A.   I don't recall.

8        Q.   Just "thanks"?  So how did you know to

9   send it to him?

10       A.   Like I'd stated earlier, I offered it

11  to him.  Because I -- I would get these and review

12  them myself.  And I said, "I have an office report.

13  Would you like to take a look?"  He said "Thanks."

14       Q.   And that's because you thought the reports

15  might be informative to him?

16       A.   Yes.  They have a lot of data in them.

17       Q.   Okay.

18            MR. SAUERS:  Let's mark the next exhibit.

19            (The document was marked as Bell Exhibit

20  Number 11 for identification.)

21  BY MR. SAUERS:

22       Q.   All set?

23       A.   Yes.

24       Q.   Great.  And is this an e-mail and an

25  attachment that you obtained from your computer?

1       A.   It looks that way.

2             MR. SAUERS:  Okay.  Let's move on to the

3  next exhibit.

4             (The document was marked as Bell Exhibit

5  Number 12 for identification.)

6  BY MR. SAUERS:

7       Q.   Have you had a chance to take a look?

8       A.   Yes.

9       Q.   Is this an e-mail from your

10  Klein & Heuchan e-mail account?

11       A.   Yes.

12       Q.   And it's to csduncan@tampabay.rr.com.

13  Is that correct?

14       A.   Yes.

15       Q.   Do you know who that is?

16       A.   That is Carol Duncan, works for

17  Klein & Heuchan.  She's an administrative assistant.

18       Q.   Not an agent?

19       A.   No.

20       Q.   And is her office at Klein & Heuchan's

21  offices?

22       A.   Yes.

23       Q.   And the subject is "OneClick.aspx floor

24  plan."  And then there's a link below.

25       A.   Um-hum.

1        Q.    What is that link?

2        A.    That is a link that CoStar -- I don't

3   know if it originated from the database or if it was

4   from CoStar.  It was a floor plan for a property.

5        Q.    Okay.  Are the floor plans from properties

6   generally available on -- as part of -- when you

7   had to log in?  Could you get pass -- could you get

8   floor plans for properties from the CoStar database

9   unless you logged in?

10       A.    I don't know.

11       Q.    Did you ever get property floor plans

12   from the CoStar database without logging in?

13       A.    I never tried.

14       Q.    Okay.  Did you get floor plans from the

15   CoStar database by logging in?

16       A.    One time, yeah.

17       Q.    Is that this one?

18       A.    Yeah.  Well, this one actually -- I sent

19   her the link and she wasn't able to -- it didn't

20   recognize this link, so it didn't work.

21       Q.    Do you have any idea why that might have

22   been?

23       A.    It's -- aspx is OneClick.aspx.

24       Q.    Is it possible that Ms. Duncan couldn't

25   access -- couldn't access the link because she

1       A.    This is a -- looks like an Excel

2    spreadsheet of proposed and existing office

3    buildings in Hillsborough County.

4       Q.    And is this a spreadsheet that you

5    obtained from the CoStar database?

6       A.    Yes.

7       Q.    Okay.  And then looking down -- and you

8    obtained it from the CoStar database using your

9    password.  Is that correct?

10       A.    Yes.

11       Q.    And then looking down below that, there's

12    an earlier e-mail from Steven Klein to you saying

13    "Thanks."

14       A.    Um-hum.

15       Q.    And then another e-mail below that that is

16    from you to Mr. Klein saying, "Steve, Office report

17    document."

18             Is that the same chain of e-mails that

19    are in Exhibit 10, the cover e-mail of Exhibit 10?

20    Or at least the bottom e-mail is.

21       A.    Yes, it appears so.  The times and the

22    date match.

23       Q.    And so Mr. Klein responded to Exhibit 10

24    with a follow-up e-mail that said "Thanks."  Is that

25    correct then?

1      A.    You're on Exhibit -- what number now?

2      Q.    Now, I'm back to 13.  I'm sort of

3   jumping --

4      A.    Okay.  You're on 13?

5      Q.    Yes.

6      A.    Yeah.  I didn't follow you there.

7      Q.    Sorry.

8      A.    Where are we?

9      Q.    We're back on 13, and I'm looking at the

10   middle e-mail on 13.  And it says, "Thanks," and

11   it's from Steven Klein to you.  Is that him saying

12   "thanks" in response to your sending him the office

13   report document that is in Exhibit 10?

14      A.    That appears to be, yes.

15      Q.    Okay.  And then the most recent, if you

16   will, of the e-mails says, "Excel file attached,"

17   and it's this Excel CoStar spreadsheet.

18      A.    Spreadsheet.  Um-hum.

19      Q.    Why did you send this spreadsheet to

20   Mr. Klein?

21      A.    He was looking for information on office

22   -- what appears -- it's pretty much in the report

23   here.  He was looking for new and proposed buildings

24   that were available in Hillsborough County.  I'm not

25   sure what project he was working on.  He just asked

1   me for this information.

2       Q.   And that was after he sent an -- was that

3   after he sent you the e-mail saying "Thanks" that he

4   asked for that information?

5       A.   Okay.  Could you rephrase that again?

6       Q.   Sure.  Sure.  The e-mail from Steven Klein

7   to you on April 4, 2007, saying "Thanks" in response

8   to your sending him the market report, do you see

9   that?

10      A.   Okay.  Let's --

11      Q.   It's the middle of the three e-mails,

12  three-part chain on --

13      A.   It may have been for both because it looks

14  like I sent him the spread --

15      Q.   That's the next day.

16      A.   -- the spreadsheet -- it looks like that

17  went first and then the report followed behind it.

18      Q.   Well, I think actually it's a different

19  day.  Right?  It's maybe the next day, April 5th as

20  opposed to April 4th.

21      A.   Oh, okay.  Yeah.  Okay.

22      Q.   Okay.

23      A.   That's how it is.  I went the other way.

24  Okay.

25      Q.   So the chain was:  You sent the office

1    report document on April 4 at 3:39.  Mr. Klein said

2    "Thank you" at 6:23.

3         A.    Um-hum.

4         Q.    And then the next day you sent him the

5    Excel sheet.  Correct?

6         A.    Right.

7         Q.    Okay.  Did the request for the Excel

8    spreadsheet come after Mr. Klein had said "Thanks"

9    to you for the office report document?

10        A.    I can't -- I don't remember.  If I were

11   looking at this e-mail, that looks -- that could be

12   it, but I'm not sure.

13        Q.    Okay.  But he did specifically ask you for

14   that report?

15             MR. GIBSON:  Object to form.

16        Q.    The -- I'm sorry -- the Excel file.

17        A.    The Excel file?

18        Q.    Yes.

19        A.    Yes.

20        Q.    Do you know if you had used the CoStar

21   database in connection with any of the properties

22   that you sold during your time with Klein & Heuchan?

23        A.    The only properties that we -- I sold

24   during the time at Klein & Heuchan was, we sold

25   1250 Rogers Street, which is a listing we've