IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KLEIN & HEUCHAN, INC.,

     Plaintiff,

v.                               Civil Action No. 8:08-cv-01227-JSM-MSS

COSTAR REALTY INFORMATION, INC.,
and COSTAR GROUP, INC.,

     Defendants / Counter-Plaintiffs

v.

SCOTT BELL and KLEIN & HEUCHAN,
INC.

     Counter-Defendants

_____/

## NOTICE OF FILING DEPOSITION TRANSCRIPT (WITHOUT EXHIBITS) OF MARK S. KLEIN IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

Plaintiff, KLEIN & HEUCHAN, INC., by and through their undersigned counsel herby files

the deposition transcript of MARK S. KLEIN (without exhibits) which was taken on August 27,

2009 in support of Plaintiff's Response to Defendants Motion for Summary Judgment.


**[Remainder of Page Intentionally Left Blank]**

RESPECTFULLY SUBMITTED on this <u>16th</u> day of October, 2009.

___/s/ Jeffrey W. Gibson___

J. PAUL RAYMOND, ESQ.
Florida Bar No. 0169268
jpr@macfar.com
JEFFREY W. GIBSON, ESQ.
Florida Bar No. 0568074
jg@macfar.com
Macfarlane Ferguson & McMullen
P.O. Box 1669
Clearwater, FL 33757
(727) 441-8966 – Phone
(727) 442-8470 – Facsimile
Attorneys for Plaintiff
Klein & Heuchan, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 16, 2009, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send notice of electronic filing to the

following participants:

| | |
|---|---|
| William J. Sauers, Esq. | Nicholas Louis Ottaviano, Esq. |
| Shari Ross Lahlou, Esq. | Florin Roebig, PA |
| Sanja Sarich Kerksiek, Esq. | 777 Alderman Road |
| Crowell & Moring, LLP | Palm Harbor, FL 34683 |
| 1001 Pennsylvania Avenue, NW | |
| Washington, DC 20004 | Randall J. Love, Esq. |
| | Randall J. Love & Associates, P.A. |
| William Cooper Geurrant, Jr. | 5647 Gulf Drive |
| Hill Ward Henderson | New Port Richey, FL 34652-4019 |
| 101 E. Kennedy Blvd, Suite 3700 | *Counsel for Counter-Defendant, Scott Bell* |
| Tampa, FL 33601 | |
| *Counsel for Defendants-Counter-Plaintiffs* | |
| *CoStar Realty Information, Inc. and CoStar* | |
| *Group, Inc.* | |

___/s/ Jeffrey W. Gibson___

JEFFREY W. GIBSON, ESQ.
Florida Bar No.: 0568074

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Civil Action No. 8:08-cv-01227-JSM-MSS

- - - - - - - - - - - - - - - -x
                                    :
KLEIN & HEUCHAN, INC.,              :
                                    :
    Plaintiff,                    :
                                    :
vs.                                 :
                                    :
COSTAR REALTY INFORMATION,          :
INC., and COSTAR GROUP,             :
INC.,                               :
                                    :
    Defendants/                   :
    Counterclaim-Plaintiffs,      :
                                    :
vs.                                 :
                                    :
SCOTT BELL and                      :
KLEIN & HEUCHAN, INC.,              :
                                    :
    Counterclaim-Defendants.      :
                                    :
- - - - - - - - - - - - - - - -x

CERTIFIED
COPY

VIDEOTAPED
DEPOSITION
OF:            MARK S. KLEIN, CCIM

DATE:          August 27, 2009

TIME:          9:25 a.m. to 1:10 p.m.

PLACE:         Macfarlane Ferguson & McMullen, P.A.
               Intervest Bank Building
               625 Court Street, Suite 200
               Clearwater, Florida 33756

REPORTED BY:   Jean M. Wilkes, RPR-CP
               Notary Public
               State of Florida at Large

APPEARANCES:

      JEFFREY W. GIBSON, ESQUIRE
      Macfarlane Ferguson & McMullen, P.A.
      Intervest Bank Building
      625 Court Street, Suite 200
      Clearwater, Florida 33756
      (727) 441-8966 phone
      (727) 442-8470 fax
      JG@macfar.com E-MAIL
          Attorney for Plaintiff

      WILLIAM J. SAUERS, ESQUIRE
          - and -
      SANYA KERKSIEK, ESQUIRE
      Crowell & Moring, LLP
      1001 Pennsylvania Avenue
      Washington, D.C. 20004
      (202) 624-2746 PHONE
      (202) 628-8844 FAX
      wsauers@crowell.com E-MAIL
      SKerksiek@crowell.com E-MAIL
          Attorneys for Defendants/
          Counterclaim Plaintiffs
          COSTAR REALTY INFORMATION, INC.
          and COSTAR GROUP, INC.

ALSO PRESENT:

      BILL WATSON - Videographer
      Watson Legal Video

      STEVEN KLEIN

## I  N  D  E  X

PAGE

Examination by Ms. Kerksiek . . . . . . . . . . .  7

## EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Defendants/Counterclaim-Plaintiffs CoStar Realty Information, Inc. and CoStar Group Inc.'s Amended Notice of Deposition to Mark Klein Pursuant to Rule 30 of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . | 7 |
| 2 | Defendants/Counterclaim-Plaintiffs CoStar Realty Information, Inc. and CoStar Group Inc.'s Amended Notice of Deposition to Plaintiff/Counterclaim-Defendant Klein & Heuchan, Inc. Pursuant to Rule 30 of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . | 8 |
| 3 | Klein & Heuchan, Inc. Realtors Office Policy and Commission Schedule For Employees and Independent Contractors . . . . . . . . . . . | 43 |
| 4 | The CoStar Office Report Year-End 2007 Tampa/St. Petersburg Office Market . . . . . | 45 |
| 5 | The CoStar Office Report First Quarter 2007 Tampa/St. Petersburg Office Market . . . . . | 47 |
| 6 | The CoStar Industrial Report Year-End 2007 Tampa/St. Petersburg Industrial Market . . . | 49 |
| 7 | Printout from CoStar COMPS database for mini storage site in Pasco County . . . . . | 50 |
| 8 | E-mail dated 6/14/07 from Scott Bell to Gus | 51 |

# EXHIBITS (Continued)

NO.                    DESCRIPTION                                    PAGE

9    E-mail dated 6/5/08 from Scott Bell
     to 'msk' . . . . . . . . . . . . . . . . . .    53

10   E-mail dated 8/16./07 from Scott Bell
     to 'msk'; subject: CoStar Report . . . . .    57

11   E-mail dated 8/4/07 from Scott Bell to
     Steven Klein with attachment, The CoStar
     Office Report, Year-End 2006, Tampa/
     St. Petersburg Office Market . . . . . . . .    59

12   E-mail dated 1/31/07 from Scott Bell to
     Tracy McMurray, Subject: 5216 Lois Avenue,
     Tampa Warehouse . . . . . . . . . . . . . .    62

13   E-mail dated 5/23/07 from Scott Bell to
     Carol Duncan . . . . . . . . . . . . . . . .    63

14   E-mail chain dated 4/4/07 and 4/5/07 from
     Scott Bell to Steven Klein; Office report
     document . . . . . . . . . . . . . . . . . .    64

15   Spreadsheet for self-storage units from
     CoStar's database . . . . . . . . . . . . .    65

16   Excel spreadsheet from CoStar's
     database containing list of office
     buildings in the metropolitan area with
     mailing addresses . . . . . . . . . . . . .    65

17   List with different owners and addresses
     of property . . . . . . . . . . . . . . . .    66

5

EXHIBITS (Continued)

NO.                    DESCRIPTION                           PAGE

18   Spreadsheet for industrial warehouses
     in the Holiday, Florida, area   . . . . . . .  68

19   Spreadsheet with office buildings in
     Clearwater and Tampa metropolitan area  . . .  69

20   Spreadsheet obtained from the CoStar
     database pertaining to developers, property
     managers and some brokers   . . . . . . . . .  70

21   Spreadsheet   . . . . . . . . . . . . . .  71-72

22   E-mail chain dated 5/27/08 from
     C. Scott Bell to Fadi Malki;
     e-mail dated 2/23/08 from
     Fadi Malki to Scott Bell  . . . . . . . . . .  72

23   Composite letters dated 4/16/08
     from Curtis Ricketts to Mark Klein;
     CoStar License Agreement Subscription Form  .  74

24   Scott Bell Commissions 2007,
     dated 1/22/2009   . . . . . . . . . . . . . .  78

25   Plaintiff Klein & Heuchan, Inc.'s
     Response to Defendant's First Set of
     Interrogatories   . . . . . . . . . . . . . .  80

26   Plaintiff's Response to Defendant, CoStar
     Realty Information, Inc.'s First Request For
     Production of Documents   . . . . . . . . .  111

27   Defendant CoStar Realty Information,
     Inc.'s Second Request For Production
     of Documents to Plaintiff-Counterclaim
     Defendant Klein & Heuchan, Inc.   . . . . .  130

28   List of K&H Associates in 2007 and 2008   .  131

The videotaped deposition, upon oral

examination, of MARK KLEIN, taken on the 27th day of

August, 2009, at the offices of Macfarlane, Ferguson

& McMullen, 625 Court Street, Suite 200, Clearwater,

Florida, beginning at 9:25 a.m., before Jean M.

Wilkes, RPR-CP, Notary Public in and for the

State of Florida at Large.

- - - - - - -

THE VIDEOGRAPHER:  This is the videotaped

deposition of Mark Klein taken in the matter of

Klein & Heuchan, Incorporated, versus CoStar Realty

Information, Incorporated, et al., held at

625 Court Street, Suite 200, Clearwater, Florida,

on August 27th, 2009, at 9:25 a.m.

Counsel please introduce yourselves,

beginning with the plaintiff counsel.

MS. KERKSIEK:  Sanya Sarich Kerksiek of

Crowell & Moring for the plaintiffs.

MR. GIBSON:  Jeffrey Gibson with the

law firm of Macfarlane Ferguson & McMullen, here on

behalf of Klein & Heuchan.

THE VIDEOGRAPHER:  Will the court

reporter please swear in the witness.

THE COURT REPORTER:  Would you raise your

right hand, please.

1                              - - - - - - -

2                         MARK KLEIN,

3       being first duly sworn to testify the truth, the

4       whole truth, and nothing but the truth, was examined

5       testified as follows:

6               THE WITNESS:  I do.

7                        EXAMINATION

8       BY MS. KERKSIEK:

9            Q.   Will you please state your name,

10      home address and work address for the record?

11           A.   Sure.  Mark S. Klein, K-l-e-i-n.

12      2736 Burning Tree Lane, Clearwater, Florida, 33761.

13               MS. KERKSIEK:  And we can go ahead and

14      mark the notices right away.  Number 1.

15               Oh, actually, let me -- yeah, that's

16      fine.

17               (The document was marked as Klein Exhibit

18      Number 1 for identification.)

19               THE WITNESS:  I got me a little screwed

20      up with this microphone, so give me a second.

21               MS. KERKSIEK:  Okay.

22               THE WITNESS:  When you get a little

23      older, you need glasses and hearing aids.

24      BY MS. KERKSIEK:

25           Q.   Will you take a look at the document?

1      A.    Okay.

2      Q.    Have you seen that before?

3      A.    No.   I don't think I have.

4      Q.    Can you tell me what it is?

5      A.    It's -- it says it's a civil action

6    between CoStar, Plaintiff -- Klein & Heuchan, Inc.,

7    as Plaintiff, versus CoStar Realty Information,

8    Inc., and CoStar Group, Inc., versus Scott Bell and

9    Klein & Heuchan.

10      Q.    And the title below that in all caps and

11    bold?

12      A.    Defendants/Counterclaim-Plaintiffs CoStar

13    Realty Information, Inc. and CoStar Group, Inc.'s

14    Amended Notice of Deposition to Mark Klein Pursuant

15    to Rule 30 of the Federal Rules of Civil Procedure.

16      Q.    Is it your understanding that you're here

17    to testify pursuant to this notice?

18      A.    Yes.

19            MS. KERKSIEK:   I'm going to mark this one

20    as Exhibit 2.

21            (The document was marked as Klein Exhibit

22    Number 2 for identification.)

23            THE WITNESS:   Okay.

24    BY MS. KERKSIEK:

25      Q.    Have you had a chance to look at it?

1       A.   Just now, yeah.

2       Q.   Yeah.  Can you tell me what it is?

3       A.   Again, it's a civil action,

4  Klein & Heuchan --

5       Q.   I'm sorry to interrupt.  You can read the

6  -- just the bold caption or -- I'm sorry -- the bold

7  in all caps title.

8       A.   Defendants/Counterclaim-Plaintiffs

9  CoStar Realty Information, Inc. and CoStar Group,

10  Inc.'s Amended Notice of Deposition to Plaintiff/

11  Counterclaim-Defendant Klein & Heuchan, Inc.

12  Pursuant to Rule 30(b)(6) of the Federal Rules

13  of Civil Procedure.

14       Q.   And is it also your understanding that you

15  are here to testify on behalf of Klein & Heuchan

16  pursuant to this notice?

17       A.   Yes, it is.

18       Q.   Thank you.

19       A.   You're welcome.

20       Q.   Have you ever been deposed before?

21       A.   Yes.

22       Q.   When was that?

23       A.   I have -- I have no -- I can't remember.

24       Q.   How many times have you been deposed

25  before?

1     A.   I can't remember exactly but a number of

2   times.   Two or three.

3     Q.   Is it more than five?

4     A.   I can't say with certainty.

5     Q.   So is it more than ten?

6     A.   I doubt that it was more than ten.

7     Q.   Okay.   Somewhere between two and three and

8   ten, possibly?

9     A.   Yes.

10     Q.   Do you remember any of the matters that

11   you were deposed in?

12     A.   No.   No, I do not.

13     Q.   Do you remember anything about the cases

14   at all?

15     A.   No.

16     Q.   Were you named as a party in any of those

17   cases?

18     A.   Well, if I was deposed, I assume I was

19   named as a party, yes.

20     Q.   That's not necessarily the case, but --

21     A.   Well, I believe any of the depositions

22   were as a witness.

23     Q.   But you don't remember whether you were

24   named as a party in any of those cases?

25     A.   I'm pretty certain I was not.

1    Q.   Okay.  Did they involve personal matters

2    or business matters?

3        A.   Business matters.

4        Q.   Business matters relating to

5    Klein & Heuchan?

6        A.   I don't remember any -- yes, I think they

7    were.  Yes.

8        Q.   And do you remember what the nature of the

9    dispute was?

10       A.   No.

11       Q.   Did you testify in your individual

12   capacity or on behalf of Klein & Heuchan?

13       A.   I can't remember.

14       Q.   Do you remember what the subject matter of

15   your testimony was about?

16       A.   No.  I really --

17           MR. GIBSON:  Object to form.  Asked and

18   answered.

19       A.   I really don't.

20       Q.   Have you ever testified in court as a

21   witness?

22       A.   Yes, I have.

23       Q.   Do you remember what those matters were?

24       A.   Real estate related.

25       Q.   Related to Klein & Heuchan?

1     A.   No.

2     Q.   Were the matters in which you were deposed

3  the same as the matters in which you were a witness?

4     A.   Yes.  I believe they were.

5     Q.   And you -- I thought you testified that

6  some of the matters in which you were deposed did

7  relate to Klein & Heuchan.

8     A.   I really can't recall.

9     Q.   Do you remember the subject matter of your

10  testimony in court?

11     A.   Which testimony in court?

12     Q.   Any of it.

13     A.   One case I do as an expert witness, yes.

14     Q.   What did the subject -- what -- what

15  subject matter were you testifying as an expert?

16     A.   It was about the value of a hotel.

17     Q.   And what was the nature of the dispute in

18  that case?

19     A.   It was between a buyer and a seller.

20     Q.   And did you offer your opinion as to what

21  the value of the hotel was?

22     A.   If that was the nature of my expert

23  witness -- reason for being a witness -- expert

24  witness.  It was quite a long time ago and I really

25  don't recall.

1   Q.   Do you remember how long ago?

2   A.   At least 10 years.

3   Q.   When was the last time that you were

4   deposed -- deposed in a case?

5   A.   It would have been -- you know, as -- I

6   was not deposed in that case, as I think about it,

7   so --

8   Q.   When was the last time that you were

9   deposed in any case?

10  A.   I don't know.  It must have been

11  20, 25 years ago.

12  Q.   And you -- but you had been a witness

13  in a case approximately 10 years ago?

14  A.   Yes.

15  Q.   Okay.  Is that the last time you testified

16  as a witness in a case?

17  A.   I believe so, yes.

18  Q.   What court was that case in?

19  A.   It was in -- I guess here in Pinellas

20  County Court.

21  Q.   Were all of the cases in which you

22  testified as a deponent and a witness here in

23  Florida?

24  A.   Yes.

25  Q.   If you need a break at any time today, let

1    me know.  And, likewise, please let me know if you

2    don't understand any of my questions.

3         A.    I certainly will.

4         Q.    Okay.  Did you prepare for this

5    deposition?

6         A.    Yes.

7         Q.    What did you do to prepare for it?

8         A.    I read my file.

9         Q.    Did you do anything else?

10        A.    No.

11        Q.    Did you meet with your attorney?

12        A.    Briefly.

13        Q.    Did you discuss this deposition with him?

14        A.    Yes.

15        Q.    What files did you read?

16        A.    The file that I had relating to this case.

17        Q.    Did you read any other files?

18        A.    No.

19        Q.    What -- what documents are in the file

20   that you have relating to this case?

21             MR. GIBSON:  Let me just object.

22   First of all, if -- and I don't know -- but if that

23   document contains communications between us, don't

24   say anything about those communications.

25        A.    No.  Really, the -- that file contains a

1  letter from Mr. Ricketts at CoStar and, you know,

2  the interrogatories and all that stuff, so . . .

3      Q.   Your interrogatory responses.  Right?

4      A.   Yes.

5      Q.   And the document request responses?

6      A.   Right.  But I didn't -- I didn't

7  review those.  I just reviewed the letter from

8  Mr. Ricketts.

9      Q.   Is the complaint to this case in that

10  file?

11      A.   No.  I don't believe it is.

12          MR. GIBSON:  I'm also going to object

13  because there's two complaints.

14  BY MS. KERKSIEK:

15      Q.   Is -- well, are either of the complaints

16  in the file?

17      A.   I'm not sure.  I can't remember.

18      Q.   Do you recall reading either of the

19  complaints related to this case?

20      A.   I did not.  When you say, "did I recall,"

21  in preparation for this deposition, I did not.

22      Q.   But you have read them previously?

23      A.   Yes.

24      Q.   Mr. Klein, where are you currently

25  employed?

1    A.    Klein & Heuchan, Inc.

2    Q.    And what is your position there?

3    A.    I'm the President and CEO.

4    Q.    How long have you held that position?

5    A.    30 -- since 1983.

6    Q.    What did you do before you were the

7    President and CEO of Klein & Heuchan?

8    A.    I was a commercial real estate broker

9    for a company that was then known as Merrill Lynch

10   Realty.

11   Q.    Where was that?

12   A.    Clearwater, Florida.

13   Q.    How long were you --

14   A.    Seven years.

15   Q.    And before -- before that, what did you

16   do?

17   A.    I was a hotel -- in hotel management.

18   Q.    For how long?

19   A.    Seven years.

20   Q.    For what hotel?

21   A.    Safety Harbor Spa.

22   Q.    And before that?

23   A.    I had a business of my own.

24   Q.    What was that?

25   A.    It was a model car racing center.

1          Q.    How long did you own that business?

2          A.    About two years.

3          Q.    What did you do before that?

4          A.    I sold meat to hotels, restaurants and

5     institutions.

6          Q.    For about how long?

7          A.    About six years.

8          Q.    What did you do before that?

9          A.    I went to college.

10         Q.    Where did you attend college?

11         A.    Fairleigh Dickinson University,

12    New Jersey.

13         Q.    Where did you -- what did you get your

14    degree in?

15         A.    Business management.

16         Q.    Do you have any graduate degrees?

17         A.    No.

18         Q.    Do you have any certifications or --

19         A.    Yes.

20         Q.    What are those?

21         A.    CCIM.   It's a commercial investment

22    member.

23         Q.    And did you have to take a test in order

24    to get that certification?

25         A.    Yes.

1    Q.    When did you receive that certification?

2    A.    1981, I believe.  In 1981 or 1982.

3    Q.    And what kind of test did you have to

4    take?

5    A.    I -- the -- well, the test was a

6    culmination of a number of week-long courses, and

7    then it was a six-hour test.

8    Q.    And what was the subject matter of the

9    courses?

10   A.    Commercial real estate.

11   Q.    Do you have any other certification?

12   A.    No.

13   Q.    Do you have a broker's license?

14   A.    Yes.

15   Q.    When did you receive that?

16   A.    1974.  It was '74 or '75.  I had my

17   salesman's license in '74.  It may have been 1975.

18   Q.    Did you have to take a test in order to

19   receive your broker's license?

20   A.    A test and some schooling.

21   Q.    And what was the -- how long was the

22   schooling?

23   A.    It was a long time ago.  There was

24   mandatory hours, so I can't recall what they were.

25   Q.    And what was the subject matter of the

1    schooling?

2         A.    Real estate.

3         Q.    Okay.  Who are the owners of

4    Klein & Heuchan?

5         A.    I am.

6         Q.    Are there any other owners?

7         A.    No.

8         Q.    And who are the other corporate officers

9    of Klein & Heuchan?

10        A.    Steve Klein.

11        Q.    What is his position?

12        A.    He's executive vice president and also a

13   broker of record there.

14        Q.    Does Klein & Heuchan have any

15   subsidiaries?

16        A.    No.  Well, you know, what.  Let me change

17   that.  We have a -- basically, a management LLC.

18   That's a subsidiary.

19        Q.    What's the name of that?

20        A.    K&H Management Services, I believe.

21        Q.    And who are the corporate officers of that

22   entity?

23        A.    Oh, it's an LLC, so I -- I'm the managing

24   member.

25        Q.    Are there any other managing members?

1    A.    I can't recall.

2    Q.    Does that LLC have any employees?

3    A.    No.

4    Q.    What is the function or purpose of

5    that LLC?

6    A.    As part of our practice, we manage

7    properties for -- for clients.

8    Q.    Um-hum.

9    A.    And that would be the entity that we use

10   to do the management.

11   Q.    Does Klein & Heuchan have any subsidiary

12   affiliations or companies other than K&H Management

13   Services?

14   A.    No.

15   Q.    Who are the employees of K&H -- or of

16   Klein & Heuchan?

17   A.    Myself and Steve Klein, Diane Sorrentino

18   who is the bookkeeper, Carol Sue Duncan, who is my

19   assistant, and Mary Wolf, who is another assistant

20   of ours.

21   Q.    Do you receive a salary from

22   Klein & Heuchan?

23   A.    No, I do not.

24   Q.    How are you compensated?

25   A.    Just like our independent contractors, on

1    the same commission schedule.

2         Q.   How is Mr. Steven Klein compensated?

3         A.   The same way.

4         Q.   How does the commission structure work? --

5    I'm sorry -- commission schedule work?

6         A.   There is a -- I believe you have access

7    to our company manual, and it's in there.  It's a

8    benchmark of percentages of commission received on

9    an annual basis, starting with 50/50, going up

10   to 90.

11        Q.   How did you first come to know Scott Bell?

12        A.   Scott Bell actually was the younger

13   brother of someone who lived -- was a friend of

14   Steve's that lived in our neighborhood when Steve

15   was growing up.  Steve is my son.

16             And we found that he was working for

17   Coldwell Banker as a realtor associate.  And he

18   arrived at our office with another sales associate

19   from Coldwell Banker talking about one of our

20   listings, I guess, and that's when I first met him.

21        Q.   Do you remember approximately what year

22   and month that was?

23        A.   I would assume that was about a year

24   before -- somewheres within the year before he

25   brought his license to us.

1       Q.   And what was the purpose of his visit that

2   day?

3       A.   Realtors co-broke all the time on

4   different listings.  And he and this other associate

5   were working on one of our listings, and they came

6   to our office to pick up some information.

7       Q.   How did Scott Bell come to work for

8   Klein & Heuchan?

9       A.   I believe he was unhappy with what he

10  was doing at Coldwell Banker, and he contacted us

11  and see if we would be interested in him joining us.

12  And we met with him, interviewed with him, and

13  decided that he might be a good candidate for us.

14      Q.   And, approximately, when did he start

15  working for you -- or for Klein & Heuchan?

16      A.   The dates are there someplace, but it's --

17  what? -- December '06 or something like that.

18      Q.   Is he still working for Klein & Heuchan?

19      A.   He is kind of a suspended leave.  His

20  license is with us.  He's a stay-at-home dad.  He

21  had two children and decided to do that and make a

22  decision whether he would want to come back to work

23  for us when that -- when the kids were old enough,

24  I guess, or he has a nanny.  So he asked if we would

25  hold his license for that period of time and we

agreed to.

Q.   And the suspended leave was his choice?

A.   Yes.

Q.   And you agreed to that?

A.   Yes.

Q.   And what does it mean when you say you're holding his license?

A.   All the independent contractors work under my broker's license and Steve's, I believe, also. So his -- excuse me -- I have to have a drink. Although Klein & Heuchan is the entity, there is a broker of record, and we are the brokers of record and those associates work under our brokerage.

Q.   And he -- if he wanted to come back and work for you, then he could do that easily.

A.   Um-hum.

Q.   Holding his license facilitates that, I'm assuming?

A.   Yes, if we decided we wanted to have him back.

Q.   Um-hum.  Is there any cost to K&H associated with holding his license?

A.   Very minimal.  Most of the costs are paid by him.  He must be a member of the Florida Gulfcoast Association of Realtors to be a member and

1  he pays for that himself, and that's -- that is part

2  and parcel of what he has do if he wants to keep his

3  license active with us.

4      Q.   Does Klein & Heuchan pay any cost

5  associated with holding his license?

6      A.   The City of -- City of Clearwater charges

7  us a fee for every licensed associate, and it's

8  about $30 a year or something like that.

9      Q.   And Klein & Heuchan pays that?

10     A.   Yes.  We -- it's mandated that we have to

11  pay that.

12     Q.   What were Scott Bell's responsibilities at

13  Klein & Heuchan while he worked there?

14     A.   Well, he's an independent contractor and

15  we hope that he would bring in money for himself and

16  the company.

17     Q.   What exactly did he do day-to-day?

18     A.   He contacted -- I assume that he contacted

19  people to list their properties and prospects to

20  sell properties to.

21     Q.   Who oversaw his work there?

22     A.   I did.

23     Q.   What types of interactions did you have

24  with him?

25     A.   Well, we have meetings twice a week.

1  They're sales meetings.  So he's always at those

2  sales meetings.  And we talked to him about what

3  he's doing, how he's progressing and working on

4  getting listings and making sales.

5      Q.    Did you ever assign listings to him?

6      A.    Yes.

7      Q.    About how often?

8      A.    I gave him one listing.

9      Q.    And, otherwise, how were listings assigned

10  to him?

11      A.    He would -- he would be able to get --

12  they were not assigned to him.  He would either have

13  another agent in the office who might want to work

14  with him on a listing and share a listing or he

15  would develop those listings by himself.  He would

16  go out and find people that wanted to sell or lease

17  property.

18      Q.    What else was discussed at your weekly.

19  meetings?

20      A.    We discussed -- on our Monday morning

21  meetings, we discussed all our deals that are in

22  progress, the calls that come into the company,

23  anything new that affects our industry.  We discuss

24  what's happening in the marketplace so that we have

25  a better idea together, all of the associates, as

1   to, is the market getting better?  Are rates going

2   up, down, values going up and down?  General stuff

3   like that.

4        Q.   Who else attended the meetings?

5        A.   All the associates attend most of the

6   meetings.

7        Q.   Were associates required to attend those

8   meetings?

9        A.   We make it a provision that they -- when

10  we hire them, that they have to be -- we require

11  that they be at the meetings.  It's not mandatory

12  that they're there.  But if they don't participate,

13  then we'll sever the relationship.

14       Q.   Did you provide -- what kind of office

15  space -- what kind of office space did you provide

16  for Scott Bell?

17       A.   Our company has private offices and it has

18  cubicles, and he had a cubicle in one of the areas

19  that we have three cubicles in, I believe.

20       Q.   Did you provide him with internet access?

21       A.   Yes.

22       Q.   Did you provide him with an e-mail

23  account?

24       A.   Yes, we did.

25       Q.   So, in terms of Scott Bell's -- the

1    properties that he was listing -- that he was

2    working on, how did Klein & Heuchan keep track of

3    what he was working on?

4        A.    The listings that he obtained had to be

5    accepted by me or Steve, and we signed the listing

6    agreements, and then we discussed with him how he's

7    going to market them.

8        Q.    Did you keep any records of the particular

9    listings that he was working on?

10        A.    All -- we keep all our listings --

11   all the company listing in a master file, and we

12   require that the associates put any of the germane

13   information into that file.

14        Q.    And do -- does that file associate

15   particular listings with particular -- the

16   particular associates that are working on them?

17        A.    Yes.

18        Q.    Can there be more than one associate that

19   is associated with a listing?

20        A.    Yes.

21        Q.    When you go through that file, are

22   you able to search -- are you able to search by

23   associate to obtain a list of all the listings that

24   they're assigned to?

25        A.    I'm not sure I understand the question.

1   So would you please repeat it?

2       Q.   Certainly.  If you -- if you wanted to

3   know at any particular point in time which listings

4   Mark -- Scott Bell was working on how, would you go

5   about figuring that out based on your file system?

6       A.   We have a list.  We have a list that

7   details -- each listing -- listing has a listing

8   number and an address and the associate that's

9   involved.  So I can go to that master list and pull

10  the file.

11      Q.   And do you keep historical records of that

12  list?  In other words, if you wanted to know in, you

13  know, May of 2007 which listings Scott Bell was

14  working on, would you be able to find those records

15  today?

16      A.   Yes, I would.  It's mandatory that we keep

17  all listing files for five years by the Florida Real

18  Estate Commission.

19      Q.   Have you ever used CoStar?

20      A.   No.

21      Q.   Do you know --

22      A.   Well, let me rephrase that answer.  Okay?

23  I was given a license to use CoStar by CCIM and I

24  accessed it one time.

25      Q.   Okay.  And what did you do when you

1    accessed it that one time?

2         A.    I found it so frustrating that I never

3    even bothered working through it.

4         Q.    What -- do you remember approximately what

5    year that was?

6         A.    What's this?  This is '09.  I don't know.

7    '06, '07, something like that.

8         Q.    A couple years ago?

9         A.    Yeah.

10        Q.    And what kind of license did you obtain

11   from CCIM?

12        A.    I don't -- I don't understand that

13   question.

14        Q.    Well, was it --

15        A.    Well, the -- CCIM is a designation given

16   by the institute -- an institute, which is a

17   division of the Florida -- of the National

18   Association of Realtors.

19             CCIM -- all the CCIM members are -- are

20   designees, and there are -- there are candidates for

21   designations.

22             CCIM cut a deal, as I understand it --

23   that's what they told us -- with CoStar, so that

24   every CCIM member and candidate could access CoStar.

25        Q.    Were there any limitations on the access?

1       A.   I have no idea.

2       Q.   Was it a temporary access or an indefinite

3  access?

4       A.   When it was -- when they sent us notice

5  of it, they indicated -- I thought that it was, you

6  know, on forever, but I have no idea.  I wasn't

7  interested in it.

8            MS. KERKSIEK:  Could we go off the record

9  for a second?

10           THE VIDEOGRAPHER:  The time is 9:54 a.m.

11  We're now off the record.

12           (Discussion off the record.)

13           THE VIDEOGRAPHER:  The time is 9:55 a.m.

14  We're now back on the record.

15           MS. KERKSIEK:  Was there a question

16  pending?

17           THE WITNESS:  Are you asking me?

18           MS. KERKSIEK:  No.  I'm asking the court

19  reporter.

20           THE COURT REPORTER:  She's asking me.

21  "I wasn't interested in it."

22           There is no question pending.

23           MS. KERKSIEK:  Okay.  Thank you.  Just

24  making sure.

25           THE WITNESS:  I'm the one with the gray

1  hair, you know.

2  BY MS. KERKSIEK:

3       Q.   When you used the CCIM license, did you

4  need a password in order to access CoStar?

5       A.   I can't remember.

6       Q.   Do you remember seeing or reading any

7  terms of use?

8       A.   No.

9       Q.   Is it something that you logged on with

10  the -- that you used a computer to access?

11       A.   Yeah.

12       Q.   Yeah.  Do you remember anything more about

13  logging on or what you saw once you logged on?

14       A.   I don't believe I ever got into the

15  system.  I think that the log-on was frustrating.

16  And I wasn't that interested in it, so I just

17  didn't.

18       Q.   Did -- so the part of it that was

19  frustrating about it was not being able to access

20  the database?

21       A.   I guess.  I mean, I was -- it was given to

22  us, you know, I thought, "Well, I'll look at it."

23  You must understand that I knew what CoStar was.

24  We'd been -- your salespeople had been calling on me

25  for years, so, you know, I really didn't think it

1  was something for us.

2      Q.  Did you search the database?

3      A.  No.

4      Q.  Did you see -- do you remember looking

5  at any photographs of any commercial real estate

6  properties?

7      A.  No.  I mean, I remember that I did not.

8      Q.  You remember that you did not?

9      A.  That's correct.

10     Q.  Did you use CoStar at any other time?

11     A.  I was given access to CoStar but never

12 opened it.

13     Q.  When were you given access?

14     A.  A number of years before.  The salesman

15 gave me about a three-month access and I never used

16 it.

17              (Cell phone rings.)

18              THE WITNESS:  Excuse me.  I'll just close

19 it -- shut this off.

20 BY MS. KERKSIEK:

21     Q.  You -- did they -- did CoStar provide you

22 with a user name and password when they -- when they

23 gave you the trial period?

24     A.  I guess they did.  I never opened it.

25     Q.  Do you remember receiving a license or

terms of use from them?

A.    No.

Q.    How did CoStar go about providing you with
the trial?

A.    The salesman, Tom Bible, stopped by and
said, "We're giving you the right to use CoStar."
I think it was for three months.

Q.    Had you requested that?

A.    No.

Q.    Did that CoStar salesman or any other
CoStar salesman ever provide you with any written
materials regarding CoStar?

A.    They showed them and demonstrated them to
us when they -- when they called on me.

Q.    Did they leave you with any brochures or
any other write-ups?

A.    I can't remember.

Q.    Did they ever send you any e-mails
regarding CoStar and the services?

A.    We're always bombarded with your
researchers.  They drive us crazy asking us for
information.

Q.    What type of information do you receive
from them?

A.    From their researchers?

1      Q.   Well -- oh, okay.  I think we're talking

2   about two different things.  There's the researchers

3   and then offers to provide service -- to provide the

4   CoStar service or offers to give a subscription.

5   I'm talking about the latter.

6           What types of information do the

7   CoStar representatives give you when they are --

8      A.   They'll come in with a laptop and show us

9   -- try to show us what we can do.  I believe they've

10  offered to give us a report, if we wanted a report

11  at any time, to show how good the system is, that

12  type of stuff.

13     Q.   Do you think you --

14     A.   We get e-mails from them to buy their

15  service.  We -- you know, I mean, they do a good job

16  of marketing.

17     Q.   Have you saved any of those marketing

18  materials?

19     A.   No.  I never saved any of them.

20     Q.   Do you have an e-mail archive where some

21  of the e-mails might be saved?

22     A.   No.

23     Q.   Are any K&H e-mails archived or saved?

24          MR. GIBSON:  Object to form.

25          THE WITNESS:  We don't --

1          MR. GIBSON:  On K&H?

2          THE WITNESS:  Yeah.  Answer the

3    question --

4      Q.    You can answer the question.

5      A.    Answer the question -- or ask the question

6    again.

7      Q.    Okay.  Does K&H have a server in its

8    offices?

9      A.    We have a server and we do not archive any

10   e-mails on the server.

11     Q.    Do you know whether -- do you know whether

12   your e-mail is a web-based e-mail?

13     A.    Do I -- well, I know we use Road Runner

14   and we have a -- I guess it is web-based.  I'm not

15   sure.

16     Q.    Who is your internet service provider?

17     A.    Road Runner and Web Services.  We have

18   two of them.

19     Q.    And do you know -- sorry.

20          Do you know whether either Road Runner or

21   Web Services archives any of your e-mails?

22     A.    I do not.

23     Q.    Did you attempt to contact them to find

24   out?

25     A.    No.

1     Q.   Does Klein & Heuchan have a document

2  retention policy?

3     A.   I'm not sure I understand what you mean by

4  that.

5     Q.   Do you have a policy in place where --.

6  you know, you had mentioned earlier that certain --

7  you're required to keep certain listings for five

8  years.

9     A.   (Witness nods head.)

10     Q.   Do you have any other such policies in

11  place?

12     A.   Sure, contracts -- contracts, failed

13  contracts.  Anything that has to do with that we

14  retain for at least five years.

15     Q.   And do you have any policies regarding

16  retaining e-mails?

17     A.   No.

18     Q.   What is your practice regarding saving

19  e-mails?

20     A.   Mine?

21     Q.   Yes.

22     A.   I save them on my -- my hard drive.

23     Q.   And do you organize them into folders?

24     A.   Sometimes.

25     Q.   How --

1          A.   I'm not really a great technocrat, so --

2     you know, I'm kind of old, so . . .

3          Q.   How long do you usually save e-mails for?

4          A.   Too long.

5          Q.   Do you know whether your system

6     automatically deletes e-mails after a certain period

7     of time?

8          A.   It can ask me if I want to archive them or

9     delete them.

10         Q.   And then do you ever archive them?

11         A.   Sometimes.

12         Q.   So you do have an e-mail archive

13    somewhere?

14         A.   No -- on my computer, yes.

15         Q.   Okay.  Did you search that archive for any

16    documents related to CoStar?

17         A.   No.

18         Q.   Did you or anyone at Klein & Heuchan ever

19    ask Mr. Bell to provide you with information from

20    CoStar?

21         A.   No.

22         Q.   Did you ever receive any CoStar-related

23    information from Mr. Bell?

24         A.   No, I did not.

25         Q.   Did you ever talk about this lawsuit with

1    Mr. Bell?

2         A.    Yes, I did.

3         Q.    How many occasions did you talk about this

4    lawsuit with him?

5         A.    You know, I didn't file it.  But, you

6    know, we -- when we first were threatened with a

7    lawsuit, I called him in and then we talked about

8    it.  We talked about it a number of times.

9         Q.    What did you talk about?

10        A.    We talked about -- we reiterated how he

11   had access.  We reiterated what -- what CoStar was

12   alleging in their lawsuit.  We told him that he

13   needed to get his own counsel if we got that far

14   because we would probably be adversarial.

15        Q.    What did you mean -- what do you mean

16   by you reiterated how he got access to CoStar?

17        A.    He told us that he was given a

18   subscription to CoStar when he was at Coldwell

19   Banker, and he still had access to that, even though

20   he asked his previous company, Coldwell Banker, to

21   take him off of all of their information.  He still

22   had the access.  He believed he had the access and

23   so I believed he had the access.

24        Q.    Did he tell you why he was unhappy at

25   Coldwell Banker?

1    A.    He wasn't learning.  You know, he was

2    fairly new to the business and they really didn't

3    bring him along and help him very much, and he

4    wasn't making any money.

5        Q.    Did you ever investigate whether there was

6    a way to create a log of the IP addresses visited by

7    Klein & Heuchan employees?

8        A.    You're over my head.

9        Q.    So -- do you know what an IP address is?

10       A.    I think I do.

11       Q.    Okay.  Do you know if there's a way to

12   figure out what IP addresses Klein & Heuchan

13   employees were visiting?

14       A.    No.

15       Q.    Did you contact your service providers in

16   order -- your internet service providers in order to

17   figure that out?

18       A.    No.

19            MS. KERKSIEK:  Let's take a ten-minute

20   break.

21            THE VIDEOGRAPHER:  The time is 10:07 a.m.

22   We're now off the record.

23            (There was a recess.)

24            THE VIDEOGRAPHER:  The time is 10:19 a.m.

25   We're now back on the record.

1   BY MS. KERKSIEK:

2       Q.   Okay.  A couple of follow-up questions and

3   then we'll get into the some documents.

4            You testified earlier about a list that

5   you're required to keep for, I think, five years

6   that documents which listings Scott Bell was

7   responsible for or worked on.  Is that right?

8       A.   Almost.

9       Q.   Almost.

10      A.   We're required to keep all listing files

11  and contract files for five years, not necessarily a

12  list.

13      Q.   But you testified that you do have such a

14  list?

15      A.   Yeah, because it's easier to find out

16  where the file is.

17      Q.   Did you ever provide that list to your

18  attorney?

19      A.   I don't remember.

20      Q.   Did you ever file -- provide the files to

21  the attorney -- to your attorney?

22      A.   The listing files?

23      Q.   Um-hum.

24      A.   I gave -- I gave him four files this

25  morning.

1    Q.    You did.  Which files were those?

2    A.    Files on 1250 Rogers Street.  There were

3    three files on 1250 Rogers Street and one file on

4    another transaction that Scott had completed.

5    Q.    Are those the files related to the

6    commissions that --

7    A.    Yes.  Yes.

8    Q.    -- Scott earned while he was at K&H?

9    A.    Yes.

10        MR. GIBSON:  They're being copied as we

11    speak.

12        MS. KERKSIEK:  Okay.

13        THE WITNESS:  Yeah.  I'm taking those

14    files back.

15        MS. KERKSIEK:  Okay.  Very good.

16    BY MS. KERKSIEK:

17    Q.    Now, you had also said that Scott had

18    called Coldwell to ask them to take him off of

19    everything that he was associated with over there.

20    A.    Yes.

21    Q.    Do you know whether Bell ever asked

22    Coldwell if he was still allowed to use CoStar --

23    A.    No.

24    Q.    -- while he worked for K&H?

25    A.    No.

1        Q.   You also said that -- that you'd never'

2  received anything -- any CoStar information from

3  Bell.  Do you know if anyone at K&H had ever

4  received any CoStar information or printouts

5  from Bell?

6        A.   At Bell's deposition he said that he

7  sent a market report to Steve, Judi Healey and

8  myself.  I frankly never met -- the first time I

9  ever saw a CoStar market report, to my recollection,

10  was at that -- at his deposition.

11        Q.   But do you know whether Bell ever gave

12  -- do you know personally whether Bell ever gave

13  anybody at K&H something from CoStar?

14        A.   I believe he did not.

15        Q.   Other than the e-mails that you saw on

16  that day.  You're not aware of anything else?

17        A.   Which e-mails?

18        Q.   I'm sorry.  Other than the reports --

19        A.   The market report.

20        Q.   -- the market reports that were referenced

21  during the Bell deposition --

22        A.   Right.  And I asked him --

23        Q.   -- you know of no other instances?

24        A.   And I asked him specifically if he did,

25  and he told me no.

1    Q.   And you're not aware of any other -- of

2  any other --

3    A.   Yes.  I am not aware.

4    Q.   You're not aware.  Okay.

5         You said you asked him specifically if he

6  ever -- who were you referring to?  Who did you ask

7  specifically if Bell had ever provided --

8    A.   The question was, did I -- I assume the

9  question was:  Did I ask him if he ever provided

10 information to anybody else?  And "he" is the --

11 that's the pronoun for Bell.

12   Q.   Scott Bell?

13   A.   Yeah.

14   Q.   Okay.  And, last, did -- are you -- did

15 you or anybody at K&H ever ask Scott Bell for any

16 CoStar materials?

17   A.   No, we did not.

18        MS. KERKSIEK:  Okay.  Let's mark as

19 Exhibit 3 or -- yeah, 3 -- this document.

20        (The document was marked as Klein Exhibit

21 Number 3 for identification.)

22        THE WITNESS:  Okay.

23 BY MS. KERKSIEK:

24   Q.   Have you had a chance to review Exhibit 3?

25   A.   I'm sorry?

1    Q.    Have you had a chance to review Exhibit 3?

2    A.    Yes.

3    Q.    Do you recognize this document?

4    A.    I do.

5    Q.    What is it?

6    A.    It is the Klein & Heuchan Policy Manual

7  and Commission Schedule.

8    Q.    And is there a signature on the front

9  page?

10    A.    Yes, there is.

11    Q.    And whose signature does that appear to

12  be?

13    A.    Scott Bell.

14    Q.    Was Scott Bell's affiliation with K&H

15  pursuant to this policy?

16    A.    This policy manual was -- was given to him

17  to be signed by him when we -- when we associated

18  with him --

19    Q.    Was he --

20    A.    -- when he became an associate.

21    Q.    Was he required to sign this --

22    A.    Yes.

23    Q.    -- policy as a condition of his

24  employment?

25    A.    Yes, he was.

1    Q.   Do all of the associates at K&H sign this

2  manual?

3    A.   Yes, they do.

4    Q.   What happens when an -- when an employee

5  violates a provision of this policy manual?

6    A.   I mean, if -- if it's a severe violation

7  of the manual, we'll sever our relationship with

8  them.

9    Q.   Are there any other less severe

10  consequences that could occur?

11    A.   I can't remember really having, you know,

12  any severe violations.

13    Q.   All right.

14        MS. KERKSIEK:   This is Number 4.

15        (The document was marked as Klein Exhibit

16  Number 4 for identification.)

17  BY MS. KERKSIEK:

18    Q.   Have you ever seen Exhibit Number 4

19  before?

20    A.   Yes.

21    Q.   When did you see this?

22    A.   At Scott Bell's deposition.

23    Q.   Did you ever see this before that day?

24    A.   I never -- I never recall ever seeing

25  this.

1        Q.    Do you recognize what this is?

2        A.    Yes.

3        Q.    What is it?

4        A.    It's an office report for the Tampa Bay

5 market, very similar to the ones that we get from

6 Cushman & Wakefield, the Maddux Report, and a host

7 of other service providers in the Tampa Bay area.

8        Q.    And what do you use these types of reports

9 for?

10       A.    Well, I've never used this report.  I've

11 never seen this report before the --

12       Q.    But reports -- office reports similar to

13 this one, what are they used for?

14       A.    It clarifies what we think we found out

15 about the market, what the vacancy factor is, what

16 the occupancy factor is, and whether they're

17 trending up and trending down.

18       Q.    Do you use it -- so you use it to verify

19 research you've already done?

20       A.    No.  You asked me if I use this report.

21 I've never -- I never use this report.

22       Q.    No.  I understand.  But reports like --

23 I'm just trying to understand what this -- what

24 these types of reports -- what their purpose is and

25 function is.

1        A.    It helps me understand the marketplace and

2   make sure that what I understand has -- has actually

3   been quantified, you know, by -- by other

4   researchers.

5        Q.    You use it, in other words -- you use

6   reports like this to verify research that you've

7   already conducted?

8        A.    That's correct.

9        Q.    What sources of information do you use for

10  your initial research?

11       A.    We're in the marketplace constantly, so we

12  know what's happening on a one-to-one basis.  These

13  reports are provided by researchers who talk to

14  people like us and many brokers to get an idea --

15  and properties owners -- to gather their research.

16  Many times their research is flawed.

17       Q.    Do you know if anyone at K&H has ever seen

18  this report, Exhibit 4?

19       A.    I have no idea.

20       Q.    Do you know if anyone at K&H ever asked

21  Scott Bell for -- to provide them with this report?

22       A.    No.

23            MS. KERKSIEK:  This is Number 5.

24            (The document was marked as Klein Exhibit

25  Number 5 for identification.)

1          THE WITNESS:  Okay.

2   BY MS. KERKSIEK:

3          Q.    Have you had a chance to review it?

4          A.    Yes.

5          Q.    Do you recognize this document?

6          A.    No.

7          Q.    Do you know generally what it is?

8          A.    Yes.

9          Q.    What is it?

10         A.    It's -- as it says, this is Year-End 2007

11   report.  The other one was a First Quarter Office

12   Report.

13         Q.    Can you tell me which Bell exhibit number

14   that is?

15               MR. GIBSON:  Let me swap -- there.

16               MS. KERKSIEK:  Oh, there we go.

17   BY MS. KERKSIEK:

18         Q.    Okay.  Now you're looking at Exhibit --

19   your Exhibit 5 --

20               MR. GIBSON:  5.  Right.

21         Q.    -- Klein Exhibit 5?

22         A.    I'm looking at -- okay.

23         Q.    Is that right?  You're looking at

24   Klein Exhibit 5?

25         A.    Yes.

1  Q. Do you see the court reporter's marking?

2  A. Yes.

3  Q. Okay. What is that?

4  A. First Quarter 2007.

5  Q. And have you ever seen this before?

6  A. No.

7  Q. Do you know whether anyone at K&H has ever

8 seen this before?

9  A. No.

10  Q. Did you or anyone at K&H ever ask Bell for

11 this report?

12  A. No.

13    (The document was marked as Klein Exhibit

14 Number 6 for identification.)

15 BY MS. KERKSIEK:

16  Q. Okay. Same questions. Have you ever seen

17 this before?

18  A. No.

19  Q. Do you know what this is?

20  A. It says it's The CoStar Industrial Report,

21 Year-End 2007.

22  Q. Do you know if --

23  A. I'll qualify that answer and say that I

24 saw it at the deposition.

25  Q. Okay. Is that the same answer for --

1    A.   Yes.

2    Q.   -- Exhibit Number 5?

3    A.   Right.  Yes.

4    Q.   But before the deposition, you've --

5    A.   I've never seen it.

6    Q.   -- you've never seen these?

7         MR. GIBSON:  And just so we're clear,

8    what deposition?  I mean --

9         THE WITNESS:  Scott Bell's deposition.

10        MS. KERKSIEK:  Scott Bell's deposition.

11        THE WITNESS:  On the 20th.

12   BY MS. KERKSIEK:

13   Q.   Do you know if anyone at K&H ever used

14   this report?

15   A.   No.

16   Q.   Do you know if anyone at -- you or anyone

17   at K&H asked Scott Bell to provide them with this

18   report?

19   A.   No.

20   Q.   Do you know whether Scott Bell used either

21   Exhibit 4, Exhibit 5 or Exhibit 6?

22   A.   No.

23        (The document was marked as Klein Exhibit

24   Number 7 for identification.)

25        THE WITNESS:  Okay.

BY MS. KERKSIEK:

    Q.   Have you ever seen this document before?

    A.   No.

    Q.   Did you see it at Scott Bell's deposition?

    A.   I don't recall seeing it.

    Q.   Do you know what this is?

    A.   It says that it's a comp report on a mini storage facility in Pasco County.

    Q.   Do you know if Scott Bell ever used this while he was at Klein & Heuchan?

    A.   No.

    Q.   Do you know if anyone at Klein & Heuchan ever used this information?

    A.   No.

    Q.   Do you know if anyone at Klein & Heuchan ever asked Scott Bell for this information?

    A.   No.

        (The document was marked as Klein Exhibit Number 8 for identification.)

BY MS. KERKSIEK:

    Q.   Have you had ever seen this -- Exhibit 8 before?

    A.   I may have seen it at Scott's deposition.

    Q.   Did you ever see it before that?

    A.   No.

1      Q.   What does this appear to be?

2      A.   It appears to be an e-mail to somebody.

3      Q.   And who is the e-mail from?

4      A.   Scott Bell.

5      Q.   And do you see where at the top it says

6   "scott@kh.com"?

7      A.   Um-hum.

8      Q.   Is that a Klein & Heuchan e-mail address?

9      A.   It may be an abbreviated address.

10     Q.   What makes you say that?

11     A.   Because we don't have a "kh.com" address.

12     Q.   What is K&H -- Klein & Heuchan's e-mail

13  address?

14     A.   I don't know what -- I can't remember

15  what Scott's would be, but it would have been

16  "scottbell@kleinand" -- no ampersand --

17  "heuchan.com."

18     Q.   Okay.  Do you know who "bmistak@gmail.com"

19  is?

20     A.   No.  I have no idea.

21     Q.   When you go down and there is -- it says,

22  about a quarter of the way down the page,  "Original

23  Message," it says from "printer@kh.com."

24     A.   Um-hum.

25     Q.   Is that K&H's printer -- Klein & Heuchan's

1    printer?

2         A.    Yes.    I believe it is.

3         Q.    Can you look at the attachment to the

4    e-mail?

5         A.    Sure.

6         Q.    Have you ever seen this before?

7         A.    At Scott's deposition.

8         Q.    And before that?

9         A.    No.

10        Q.    Did you or anyone at K&H ask Scott Bell to

11   provide this information?

12        A.    No.

13        Q.    Did you or anyone at K&H ever receive this

14   printout from Scott Bell?

15        A.    I don't believe we did.

16             (The document was marked as Klein Exhibit

17   Number 9 for identification.)

18             THE WITNESS:    Okay.

19   BY MS. KERKSIEK:

20        Q.    Do you recognize Exhibit 9?

21        A.    Yes.

22        Q.    What does this appear to be?

23        A.    It's an e-mail from Scott Bell.

24        Q.    And do you see his e-mail address as

25   scottbell@kleinandheuchan.com?

1      A.   Yes.

2           Q.   Is that the e-mail address that you were

3      referring to earlier?

4           A.   That's correct.  Yes.

5           Q.   And that is Klein & Heuchan's e-mail --

6           A.   That's correct.

7           Q.   -- provided account?

8           A.   That's correct.

9           Q.   Who is MSK?

10          A.   That's my -- the -- that's the e-mail

11     I use, which msk@tampabay.rr.com.

12               I don't use the -- I use the Klein &

13     Heuchan e-mail address, but I prefer to use the

14     Road Runner e-mail that I use.  Easier to spell.

15          Q.   And what is tampabay.rr.com?

16          A.   That's a Road Runner e-mail address.

17          Q.   And is the Klein & Heuchan e-mail account

18     provided by Road Runner or by a different ISP?

19          A.   A different ISP.

20          Q.   Which one?

21          A.   Web Services.

22          Q.   Why do you prefer to use the Road Runner

23     account?

24               MR. GIBSON:  Object to form.

25          A.   If I ask you to spell "Heuchan," how would

1    you spell it, without looking?  That's why.

2          Q.    Okay.

3          A.    It's too -- it's too easy to make a

4    mistake.

5          Q.    Is that why you -- Klein & Heuchan

6    obtained this e-mail account, Tampa Bay, for --

7    because it's easier to spell?

8          A.    I can't recall which came first.

9          Q.    Okay.  Is tampabay.rr, is that a separate

10   company?  What does that refer to?

11         A.    Road Runner -- Road Runner is a company,

12   and we get them through Bright Star, which is Bright

13   House Network.

14         Q.    And is Bright House Network the ISP?

15         A.    Got me.

16         Q.    It's the company?

17               Is -- what is Tampa Bay?  What does that

18   refer to?

19         A.    It's a name.  It's -- we're in the Tampa

20   Bay area.

21         Q.    Okay.

22         A.    And that is the address that Road Runner

23   uses for our area, so it's one word.  There's no

24   space.

25         Q.    And do you see the text of the first

1  e-mail says, "You probably have already seen this"?

2       A.   Yes.

3       Q.   Do you recall seeing this e-mail?

4       A.   I don't know.  I get a lot of e-mails.

5            MR. GIBSON:  Prior to the depo?

6       Q.   Prior to the deposition, do you recall

7  seeing this?

8       A.   I don't recall it.

9       Q.   Do you see that the forwarded

10  message comes from CoStar Group

11  [mailto:announcements@costar.com]?

12      A.   Yes.

13      Q.   Were you at any -- or anyone at

14  Klein & Heuchan aware that Scott Bell received

15  e-mails like this from CoStar?

16      A.   Everybody -- everybody at Klein & Heuchan

17  receives these offers from CoStar.

18      Q.   What kind of offer is this?

19      A.   I don't know.  I didn't look at it.

20      Q.   Will you take a look and then let me know

21  what it is?

22      A.   Sure.

23           "NEW:  Free Property Search."

24           "Looking for commercial properties to buy

25  or lease?  Visit CoStar."

1                 "Coverage. Listings to all 50 states.

2 All property types including office, industrial,

3 retail, land and multifamily. Convenience.

4 Unlimited searches. No cost. No registration

5 required.

6                 "Confidence. Researched, verified,

7 continuously updated listings."

8                 I guess I received this also and I had no

9 interest.

10     Q.   So this is something that one -- that you

11 would have received without having a CoStar account?

12     A.   I believe it's a marketing tool of CoStar.

13     Q.   Um-hum. And it's not something that you

14 would have required a password to look at?

15                 MR. GIBSON: Object to form.

16     A.   No.

17     Q.   So when Scott Bell says you probably have

18 already seen this, you believe that what he means is

19 that you had -- you had already received this

20 identical e-mail?

21                 MR. GIBSON: Object to form.

22     A.   I don't know what he had.

23     Q.   Okay.

24                 (The document was marked as Klein Exhibit

25 Number 10 for identification.)

BY MS. KERKSIEK:

    Q.    Can you tell me what Exhibit 10 is?

    A.    It looks like an Excel spreadsheet.
Well, that's the attachment. It's an e-mail from
Scott Bell.

    Q.    And who is the e-mail to?

    A.    It's to me.

    Q.    And the subject -- and do you recall
having received this e-mail on August 16, 2007?

    A.    No. I really don't.

    Q.    Do you recall seeing the Excel
spreadsheets similar to the one attached to the
e-mail?

    A.    No, I don't.

    Q.    Do you have any reason to believe that you
did not receive this e-mail?

    A.    No, I don't.

    Q.    Or any e-mails addressed to MSK?

    A.    No.

    Q.    Are you -- did you or anyone at K&H ask
Scott Bell to provide you with the Excel spreadsheet
that's attached to Exhibit 10?

    A.    Absolutely not.

    Q.    Do you know if anybody else at K&H ever
saw the attachment that's attached -- other than

1    you --

2         A.    No.

3         Q.    -- that's attached?

4         A.    No.

5              MR. GIBSON:  Object to form.

6              THE WITNESS:  We're killing a lot of

7    trees here, aren't we?

8              MS. KERKSIEK:  No.  That's what lawyers

9    do, unfortunately.  We've got to create the record.

10             (The document was marked as Klein Exhibit

11   Number 11 for identification.)

12             THE WITNESS:  Okay.

13   BY MS. KERKSIEK:

14        Q.    What is Exhibit Number 11?

15        A.    It is another copy of an office --

16   CoStar Office Report.

17        Q.    And what is the first page of Exhibit

18   Number 11?

19        A.    The first page of the exhibit?  The

20   CoStar Office Report, Year-End 2006.

21        Q.    No.  I'm referring to the e-mail.

22        A.    Oh, the e-mail?  Okay, Scott -- it's

23   from Scott Bell to Steve Klein.  Attachment is

24   "officeReport.pdf."

25             "Steve, Office report document."

1    Q.   And are you -- is that

2    "stevenklein@kleinandheuchan.com," that is

3    Steven Klein, the Executive Vice President of K&H?

4    A.   That's correct.

5    Q.   Did you or Steve Klein or anyone

6    at K&H ask Scott Bell to provide this report?

7    A.   I don't know.  I mean, I didn't.

8    Q.   Do you -- are you -- do you know whether

9    Steve Klein asked him to provide --

10   A.   I doubt -- I doubt that he did.

11   Q.   But you don't know for sure?

12   A.   No.

13   Q.   Do you know if anyone at K&H ever --

14   including Steve Klein -- ever read or used this

15   report?

16   A.   No.

17   Q.   So, again, Number -- Exhibit Number 11,

18   did you see this document at Scott Bell's

19   deposition?

20   A.   I believe I did.

21   Q.   And since that time did you ask anybody at

22   K&H or did ask you Steven Klein whether they asked

23   Scott Bell to provide this document to them?

24   A.   No.  I mean, I know that Steve did not

25   ask for it.  We had no reason to ask for it, but I

1    didn't ask him if he did that.

2         Q.    And how do you know, then, that

3    Steve Klein didn't ask for it?

4         A.    We have four or five office reports

5    from -- from Marcus & Millichap, from Cushman &

6    Wakefield, from the Maddux report, from Advantis

7    Real Estate.  They all provide them.  C.B. Richard

8    Ellis.  We have them all.  There's nothing

9    proprietary about this.

10        Q.    Those other reports, do you have to pay

11   for them?

12        A.    No.

13        Q.    Those other companies provide office

14   reports free of charge?

15        A.    Yes.  Yes.

16        Q.    Do you know whether CoStar provides office

17   reports free of charge?

18        A.    I have no idea.  I have no idea.

19        Q.    And just to be clear on Exhibit Number 11,

20   you never did ask Mr. Steven Klein whether he asked

21   Scott Bell for this report?

22              MR. GIBSON:  Object to form.  Asked and

23   answered.

24              THE WITNESS:  I'm sorry?  Oh, okay.

25              MR. GIBSON:  Go ahead.

1            THE WITNESS:  No, I did not.

2            MS. KERKSIEK:  Okay.  We're on -- where

3    is 12?  Okay.

4            (The document was marked as Klein Exhibit

5    Number 12 for identification.)

6            THE WITNESS:  Okay.

7    BY MS. KERKSIEK:

8        Q.    Can you tell me what Exhibit 12 is?

9        A.    I'm looking at 11.

10       Q.    The yellow one.

11       A.    Oh, I'm sorry.

12       Q.    I know.  They're a number off, so it makes

13   it confusing.

14       A.    Right.   It's an e-mail from Scott Bell

15   to somebody named Tracy McMurray.

16       Q.    Do you know who Tracy McMurray is?

17       A.    No, I do not.

18       Q.    Will you take a look at the attachment?

19       A.    Okay.

20       Q.    And will you take a look at the last four

21   pages of the attachment?

22       A.    Okay.

23       Q.    Can you tell me what those pages look

24   like?

25       A.    The pages are property listings.  One of

them that I see here is a -- these are CoStar

property listings.  And the one in the front is --

the first exhibit is a Colliers Arnold listing,

which is the same as page number -- I don't know --

one of the pages here on CoStar.  It's one of the

four pages.

Q.    Did you or anyone at K&H ask Scott Bell to

provide them with this information?

A.    No, I did not.

Q.    Did you or anyone at K&H ever receive this

information from Scott Bell?

A.    No, we did not.

MS. KERKSIEK:  We're going to go off the

record for two minutes and take a quick break.

MR. GIBSON:  Sure.

THE VIDEOGRAPHER:  The time is 10:53 a.m.

We're now off the record.

(Discussion off the record.)

THE VIDEOGRAPHER:  The time is 10:58 a.m.

We're now back on the record.

(The document was marked as Klein Exhibit

Number 13 for identification.)

BY MS. KERKSIEK:

Q.    Can you tell me what Exhibit Number 13 is?

A.    It's an e-mail from Scott Bell to

1    Carol Duncan in my office.

2         Q.   Carol Duncan is the --

3         A.   Administrative assistant.

4         Q.   Administrative assistant, okay.  Have you

5    ever seen this before?

6         A.   I think I may have seen this at the

7    deposition, at Scott's deposition.

8         Q.   Did you ask Ms. Duncan whether she asked

9    Mr. Bell to provide her with this link?

10        A.   No.

11        Q.   Do you know whether Ms. Duncan asked to --

12   Scott Bell to provide her with this link?

13        A.   She wouldn't have any reason to, but I

14   don't know.

15        Q.   Do you know if Ms. Duncan or anyone at K&H

16   used this link for any purpose?

17        A.   No.

18             MS. KERKSIEK:   Number 14.

19             (The document was marked as Klein Exhibit

20   Number 14 for identification.)

21             THE WITNESS:   Okay.

22   BY MS. KERKSIEK:

23        Q.   Can you tell me what Exhibit 14 is?

24        A.   It's an e-mail from Scott Bell to

25   Steve Klein.

1    Q. Do you know whether Steve Klein asked

2 Scott Bell to provide him with this information?

3    A. No, I do not.

4    Q. Did you ever ask Mr. Klein if -- well,

5 Steven Klein -- if he asked Scott Bell to provide

6 him with this information?

7    A. No, I did not.

8    Q. And do you know if --

9    A. 14.

10    Q. Did you or anyone at K&H ask Mr. Bell

11 to provide Steven Klein with this information?

12    A. No.

13      (The document was marked as Klein Exhibit

14 Number 15 for identification.)

15      THE WITNESS: Okay.

16 BY MS. KERKSIEK:

17    Q. Do you know what this -- what Exhibit

18 Number 15 is?

19    A. I have no idea.

20    Q. Have you ever seen it before?

21    A. At Scott Bell's deposition.

22    Q. Are you aware that this is something

23 that was obtained from CoStar by Scott Bell?

24    A. No.

25      (The document was marked as Klein Exhibit

1    Number 16 for identification.)

2              THE WITNESS:  Okay.

3    BY MS. KERKSIEK:

4         Q.   Do you know what Exhibit Number 16 is?

5         A.   It's an Excel spreadsheet.

6         Q.   Do you know whether this is something that

7    was obtained from CoStar's database?

8         A.   I have no idea.

9         Q.   Have you ever seen this before?

10        A.   At Scott Bell's deposition.

11        Q.   Did you ever see it before that?

12        A.   No.

13        Q.   Do you know if anyone at K&H had ever seen

14   this before that?

15        A.   No.

16        Q.   Did you ask anyone at K&H whether they had

17   ever seen this document?

18        A.   No.

19             MS. KERKSIEK:  17.

20             (The document was marked as Klein Exhibit

21   Number 17 for identification.)

22   BY MS. KERKSIEK:

23        Q.   Do you recognize Exhibit Number 17?

24        A.   No.

25        Q.   Have you ever seen it before?

1    A.    At Scott Bell's deposition.

2    Q.    Are you aware that this is something that

3    Scott Bell obtained from CoStar's databases?

4    A.    No, I am not.

5    Q.    Did you ask anyone at K&H whether they had

6    ever seen this?

7    A.    No.

8    Q.    Did you ask K&H -- anyone at K&H whether

9    they had asked Scott Bell to provide them with this

10   information?

11   A.    No, I did not.

12   Q.    No -- Mr. Klein, the court reporter --

13   it's hard for her to take down when we talk over

14   each other.  So if you could wait until I finish my

15   question and then answer, I would appreciate it.

16   A.    Are you finished?  I'll try.

17   Q.    Thank you.  I appreciate it.

18   A.    But this court reporter is pretty good.

19   She can do that.

20   Q.    But she's supposed to take everything down

21   exactly as she hears it, so --

22   A.    Okay.

23   Q.    If she hears that we're talking over each

24   other, then she tries to do that, too.

25   A.    I understand.  I'll try and comply.

1    Q.    Thank you.    Thanks.

2         THE COURT REPORTER:    18?

3         MS. KERKSIEK:    18, yes.

4         (The document was marked as Klein Exhibit

5    Number 18 for identification.)

6    BY MS. KERKSIEK:

7         Q.    Have you ever seen Exhibit Number 18

8    before?

9         A.    At Scott Bell's deposition.

10        Q.    And do you recognize this document?

11        A.    No.

12        Q.    Are you aware that this is a document that

13   Scott Bell received from CoStar's databases?

14        A.    No, I am not.

15        Q.    Do you know if anyone at K&H asked

16   Scott Bell to provide them with this information?

17        A.    No, I do not.

18        Q.    Do you know if anyone at K&H had ever seen

19   this -- the information contained in here -- or,

20   really, had ever seen Exhibit Number 18?

21        A.    No.

22        Q.    Did you ask anyone at K&H whether they

23   had seen or asked Bell to provide them with the

24   information in Exhibit 18?

25        A.    No.

1    MS. KERKSIEK: 19.

2    (The document was marked as Klein Exhibit

3  Number 19 for identification.)

4  BY MS. KERKSIEK:

5    Q.   Have you ever seen Exhibit Number 19

6  before?

7    A.   At Scott Bell's deposition.

8    Q.   Had you ever seen it before that?

9    A.   No, I did not.

10    Q.   Do you know what Exhibit Number 19 is?

11    A.   No.

12    Q.   I'm sorry?

13    A.   No.

14    Q.   Are you aware that Exhibit Number 19 was

15  obtained from CoStar's databases?

16    A.   No, I am not.

17    Q.   Did you -- or do you know whether anyone

18  at K&H asked Scott Bell to provide them with this

19  information?

20    A.   No, I do not.

21    Q.   Do you know whether anyone at K&H ever saw

22  or used this information?

23    A.   No, I do not.

24    Q.   Did you ever ask anyone at K&H whether

25  they had seen or used this information?

1     A.    Exhibit 19?

2     Q.    Yes.

3     A.    No.

4           The second one's "Ted Kennedy."

5  You might as well cross that off.

6           MS. KERKSIEK:  Oh.

7           MR. STEVEN KLEIN:  That's interesting.

8           MS. KERKSIEK:  That says "Ted Kennedy,"

9  the second entry.

10          MR. GIBSON:  Yours is just the line.

11          MS. KERKSIEK:  I think there probably are.

12          (The document was marked as Klein Exhibit

13  Number 20 for identification.)

14  BY MS. KERKSIEK:

15     Q.    Do you recognize this document?

16     A.    From Scott's -- Scott Bell's deposition,

17  I've seen it.  That's where I recognize it from.

18     Q.    Are you aware that Exhibit Number 20 is --

19  was obtained from CoStar's databases?

20     A.    No, I am not.

21     Q.    Do you know if anyone at Klein & Heuchan

22  asked Scott Bell to provide them with the

23  information in Exhibit 20?

24     A.    No, I do not.

25     Q.    Do you know whether anyone at K&H ever

1  saw or used the information contained in Exhibit 20?

2      A.   No, I do not.

3      Q.   And did you ever ask anyone whether

4  they used or asked Bell for the information in

5  Exhibit 20?

6      A.   No, I did not.

7           MS. KERKSIEK:   21.

8           MR. GIBSON:   Is this Exhibit 21?

9           MS. KERKSIEK:   21.

10          (The document was marked as Klein Exhibit

11 Number 21 for identification.)

12 BY MS. KERKSIEK:

13     Q.   Have you ever seen Exhibit Number 21

14 before?

15     A.   At the deposition -- at Scott Bell's

16 deposition.

17     Q.   Had you ever seen it before that?

18     A.   No, I have not.

19     Q.   Do you know what Exhibit 21 is?

20     A.   No.

21     Q.   Do you know whether anyone at K&H

22 ever asked Scott Bell to provide them with this

23 information?

24     A.   No, I do not.

25          THE WITNESS:   I'm sorry.  I talked over

1   you.

2   BY MS. KERKSIEK:

3       Q.   Are you aware that the information in

4   Exhibit Number 21 is information obtained from

5   CoStar?

6       A.   No, I'm not.

7       Q.   Do you know whether anyone at K&H ever

8   saw or used the information in Exhibit Number 21?

9       A.   No, I do not.

10      Q.   Did you ever ask anyone at K&H whether

11  they ever saw or used this -- the information in

12  Exhibit Number 21?

13      A.   No, I did not.

14           (The document was marked as Klein

15  Exhibit Number 22 for identification.)

16  BY MS. KERKSIEK:

17      Q.   Have you ever seen Exhibit Number 22

18  before?

19      A.   I don't think I saw it at Scott Bell's

20  deposition either.  I may have.

21      Q.   Okay.  Can you tell me what this is?

22      A.   It's an e-mail from Scott Bell to

23  FMALK175@aol.com.

24      Q.   Do you know whose e-mail address that is?

25      A.   No.

1    Q.   Can you turn to the attachment?

2    A.   Yes.

3    Q.   Can you tell me what the attachment is?

4    A.   It is a marketing flier on a town home

5    apartment complex.

6    Q.   Is this a Klein & Heuchan flier?

7    A.   Yes, it is.

8    Q.   How does Klein & Heuchan create these

9    fliers?

10   A.   We created them -- we create them

11   in-house.

12   Q.   What are the sources of information that

13   you use to create these fliers?

14            MR. GIBSON:  Object to form.

15   A.   We -- we -- let's go to the back of the

16   flier, the overview.  We get the zoning and the land

17   use from the municipality.  We get the floodplain

18   from the -- usually the municipality or wherever

19   it's available from.  The utilities -- we check the

20   utilities and then --

21   Q.   With the utility companies?

22   A.   With the utility companies to make sure

23   that we have the right one.  And then we get the

24   appraiser's -- the tax assessor's information.

25   Q.   What about things like improvements,

1  land area, year built?

2       A.  We get them from the tax assessor, but we

3  -- we request that our associates go out and check

4  them themselves because they're frequently wrong.

5       Q.  And when you say "we get this

6  information," do you mean the associates are

7  responsible for filling in this information.

8       A.  That is correct.

9            THE COURT REPORTER:  23.

10           (The document was marked as Klein Exhibit

11  Number 23 for identification.)

12  BY MS. KERKSIEK:

13       Q.  Do you recognize Exhibit Number 23?

14       A.  I sure do.

15       Q.  What is it?

16       A.  It's a threatening letter from your

17  client, CoStar.

18       Q.  Do you remember receiving this letter?

19       A.  I do.

20       Q.  What did you do when you received it?

21       A.  I got PO'd and I called CoStar, according

22  to the -- according to the instructions on the back.

23       Q.  What did you say to CoStar when you called

24  them?

25       A.  If I recall correctly, I did not

get Mr. Ricketts, but I got Steve Williams, who

informed me that he -- his question was: "Do you

have anybody that ever worked for Coldwell Banker

working for you or, you know, as an associate?"

I said, "Yes, I have three of them."

And he said, "Do" -- does Scott Bell --

is Scott Bell one of them?"

I said, "Yes."

And he said, "He's using our information

illegally, so we're" -- you know, this letter tells

us what they're going to do, that they want to

extort a license from me, and it really -- extortion

-- it really pissed me off.

Q. What did Steve Williams say in response to

you?

A. The conversation was, "Well, you know, we

can -- we can -- you owe us $69,000. But we'll make

a deal from you if you take a license from us."

And I said, you know, "I'm not interested."

And he said, "Well, if you -- we might

treat you as a two-member association and do this

for $10,000."

And then the very next day -- I ended

the conversation because I still was not interested.

And the very next day somebody else called -- and I

1    don't know if it was Ricketts or somebody else --

2    to say, "He wasn't authorized to make that deal for

3    you."

4         Q.   Hmm.

5         A.   And said, "I don't care.  You're not

6    going to use extortion and hold me hostage to buy a

7    license from CoStar."

8         Q.   Did you have any other conversations with

9    CoStar after that?

10        A.   I don't think I did.  I think I received

11   -- the next thing I received was the other letter

12   that said, "If you -- you haven't worked with us on

13   this.  So if you -- if you don't do that by Tuesday,

14   we're going to file a suit against you."

15        Q.   Did the second -- was -- you -- so you

16   received a -- you received a second letter from

17   CoStar?

18        A.   Yes.

19        Q.   And it was dated several days after

20   the letter --

21        A.   No.  It was dated about a month later.

22        Q.   A month later?

23        A.   Yeah.

24        Q.   Okay.  And what did you do after you

25   received that letter?

1       A.    Called my attorney and told him to file

2    suit.

3       Q.    Is your attorney Mr. Gibson?

4       A.    Yes.

5       Q.    Who else did you -- no.  Let's come back

6    to the first letter, Exhibit Number 23.

7             Did you have any conversations with

8    anybody at Klein & Heuchan about this letter?

9       A.    Scott Bell and Steve Klein.

10      Q.    Did you -- did you speak with them at

11   once, in one conversation, or were there several

12   conversations?

13      A.    I can't recall.

14      Q.    Do you remember what you talked about?

15      A.    Yeah.  I -- we talked about the letter and

16   I discussed it with Scott Bell.

17      Q.    What did you tell or ask Scott?  What did

18   you say to Scott Bell?

19      A.    "Tell me again how you happen to have this

20   CoStar information."

21      Q.    What did he say?

22      A.    He said, "They gave it to me.  It was a

23   subscription.  They called us all into a room and

24   said, "We are giving you a subscription to CoStar."

25      Q.    And what else did he say?

1       A.   That was it.  I mean, I --

2       Q.   What did --

3       A.   I can't recall.

4       Q.   What did you say to him?

5       A.   I said, "Fine.  Come here.  We're going to

6   call them."  So he was in the room when I called.

7       Q.   Okay.

8       A.   But he was not in the room when they

9   returned the call.

10       Q.   Okay.  What did you -- and you said you

11   discussed this letter with Steven Klein as well?

12       A.   Um-hum.  Yes.

13       Q.   What did you talk about with him?

14       A.   The letter, the extortion attempt.

15   And it is an extortion attempt.  You know that.

16            Would you admit that CoStar is a pretty

17   highly technical company?

18       Q.   I'm the one asking the questions here.

19       A.   Oh.  All right.

20            Just so that you know, when this subject

21   comes up, I still get excited, and not in a good

22   way.

23            (The document was marked as Klein Exhibit

24   Number 24 for identification.)

25   BY MS. KERKSIEK:

1    Q.   Do you recognize Exhibit Number 24?

2    A.   Yes, I do.

3    Q.   What is it?

4    A.   I'm sorry.

5    Q.   That's okay.

6    A.   Yes, I do.

7    Q.   What is it?

8    A.   It is a commission spreadsheet that we

9    give out to the associates when we give them a

10   commission.

11   Q.   And are these Scott Bell's commissions?

12   A.   All of them, yes.

13   Q.   He had no other commissions other than the

14   -- other than the ones reflected in these two pages?

15   A.   That's correct.

16   Q.   And do you know whether these are -- these

17   numbers are an accurate record of the commissions

18   that he received?

19   A.   Yes, they are.

20   Q.   And if you go to the column that says,

21   "Gross commissions" --

22   A.   Um-hum.

23   Q.   -- and then at the bottom it says,

24   "$1,749.56."

25   A.   Um-hum.

1         Q.   Is that the total commissions earned on

2 this -- on these sales?

3         A.   That's correct.

4         Q.   And then the two columns that says

5 "Commission Earned" and "Commission Paid," what

6 are those?

7         A.   Okay.  The commission earned is the

8 associate's split of the commission that we

9 received, which is the gross commission.

10 Commission paid is all of the money he received.

11 Because if you read our policy manual, we do give a

12 bonus at the end of the year based on the percentage

13 that they put into the fund, and he got this $43.74.

14         Q.   And what is the column that says

15 "K&H Net"?

16         A.   That shows what we have net after paying

17 out the salesman's portion of the commission.

18         Q.   In other words, the --

19         A.   So it -- so that would be, column one,

20 Gross Commission, 1749; Commission Earned, 874.78;

21 K&H Net, 874.78.

22         (The document was marked as Klein

23 Exhibit Number 25 for identification.)

24         THE WITNESS:  Yes, Sanya.

25 BY MS. KERKSIEK:

1    Q.   Do you recognize Exhibit Number 25?

2    A.   I guess I do, yes.

3    Q.   Have you ever seen this before?

4    A.   Yes.

5    Q.   Can you tell me what it is?

6    A.   It's a First Set of Interrogatories.

7    Q.   Is it Klein & Heuchan's Response?

8    A.   It's Klein & Heuchan's Response to

9  Defendant's First Set of Interrogatories.

10    Q.   Can you turn to the last page?

11    A.   Okay.

12    Q.   Do you see that's a certification?

13    A.   Yes.

14    Q.   And it's signed Klein & Heuchan, Inc.,

15  by President?

16    A.   Yes.

17    Q.   And there's a signature there?

18    A.   Yes.

19    Q.   Is that your signature?

20    A.   Yes, it is.

21    Q.   Do you remember reading these responses --

22    A.   Yes, I do.

23    Q.   -- when you signed them?

24    A.   Yes.

25    Q.   Were they true and accurate, to the best

1    of your knowledge, at the time?

2         A.    Yes.   Okay.   This -- yeah.   This includes

3    the commissions not only in this year.   It's total

4    commissions earned.

5         Q.    For 2007 and 2008?

6         A.    Yes.   Yes.

7         Q.    Yes.

8         A.    Yes.   That's correct.

9         Q.    Okay.   Can you read, just to yourself,

10   Interrogatory Number 5?

11        A.    Okay.

12        Q.    Now, earlier you had testified that you

13   oversaw Scott Bell's work.   Is that right?

14        A.    Yes.

15        Q.    So in response to this interrogatory --

16        A.    I'm answering corporately.

17        Q.    -- your name could be included?

18        A.    It could be, but I'm answering

19   corporately.

20        Q.    What do you mean by that?

21        A.    Klein & Heuchan.   Remember, we talked

22   about -- we're talking about my answers as

23   Klein & Heuchan or my answers individually?

24        Q.    Um-hum.   So you -- Klein & Heuchan

25   supervised and oversaw?

1    A.    That's correct.

2    Q.    Did you ever review Scott Bell's work

3 personally?

4    A.    I'm going to have to answer "no" because

5 I'm not sure what you mean by "review his work."

6    Q.    Well, what did you -- in your capacity as

7 the President and CEO of Klein & Heuchan, what were

8 your interactions with Scott Klein (sic) regarding

9 the work that he did for you?

10   A.    I wanted to know what he was doing and

11 what progress he was making on getting listings,

12 what -- who he was calling on to -- or what he was

13 doing to find buyers. We talked about different

14 mailings he was doing to get listings or to find

15 buyers.

16   Q.    What would you do if he wasn't making

17 satisfactory progress in finding buyers?

18   A.    Well, you know, that's -- that's kind of a

19 question that has a time frame involved in it. When

20 we hire a new associate, we figure it takes them at

21 least about a year to get up to speed, even if they

22 had some prior experience, as Scott had.

23        But after a few years if they don't make

24 it, depending on market conditions, we'd probably

25 sever our relationships.

1          Q.    And did you provide him with constructive

2 feedback regarding the jobs he was working on?

3          A.    Yes.

4          Q.    What kind of feedback would you give him?

5          A.    I would tell him to get his nose out of

6 the computer and get out on the street and start

7 talking to people.

8          Q.    Did he take your advice?

9          A.    Not really.

10          Q.    Back to Interrogatory Number 5, other than

11 yourself, was there anybody else at Klein & Heuchan

12 who supervised, oversaw, reviewed or provided any

13 kind of feedback to Scott Bell regarding his work?

14          A.    Steve Klein.

15          Q.    What kind of oversight did Steve Klein

16 provide?

17          MR. GIBSON:  Object to the form.

18          A.    I guess the same.

19          MR. GIBSON:  Object to form.

20          Q.    You mean the same -- the same type of

21 oversight that you provide?

22          A.    Sales management oversight.

23          Q.    Can you turn to the next page to

24 Interrogatory Number 6?

25          A.    Okay.

1    Q.   And the question states, "Identify all

2  persons affiliated with Klein & Heuchan who have

3  used CoStar's products or services."

4    A.   Chris Howell, CCIM.

5    Q.   Is that -- that's Chris Howell --

6    A.   That's a designation.

7    Q.   That's a designation?

8    A.   Right.

9    Q.   Okay.  And would Scott Bell be included in

10  that response as well?

11   A.   Yes.

12   Q.   Anyone else?

13   A.   No.

14   Q.   Who is Scott Howell -- or Chris Howell?

15  Sorry.

16   A.   Chris Howell is an associate, an

17  independent contractor; previously worked at

18  Coldwell Banker; told me that he had used CoStar

19  at Coldwell Banker.

20   Q.   Did he use CoStar while he was at

21  Klein & Heuchan?

22   A.   No, he did not.

23   Q.   Why not?

24   A.   Because he didn't have any need for it and

25  he wasn't licensed.

1    Q.   How do you know he wasn't licensed?

2    A.   He didn't have an access and he didn't

3    want one.  He didn't use it when CCIM gave it to him

4    either.  He didn't see the value in it.

5    Q.   Did you ever ask him whether he would have

6    been allowed to use the access provided to him at

7    Coldwell?

8    A.   No.

9    Q.   How did you know that Chris Howell did not

10   have access to CoStar?

11   A.   He told me.

12   Q.   Did he tell you he didn't have access or

13   did he tell you that he wasn't allowed -- he wasn't

14   licensed to use it?

15   A.   He told me that he used it when he was at

16   Coldwell Banker.  He didn't see the value in it.  He

17   gave them the opinion that they shouldn't buy the

18   system.  And he didn't use it at Klein & Heuchan

19   because he used another service.

20   Q.   Which service did he use?

21   A.   Microbase.  He liked Microbase.

22   Q.   Could he have used CoStar if he had wanted

23   to --

24   A.   I guess so.

25   Q.   -- at Klein & Heuchan?

1  A. I have had no idea.

2  Q. Did you ever ask him?

3  A. I mean, could he have -- could he have

4  bought a license for CoStar? I guess he could have.

5  Q. Could he have used the access -- the user

6  name and password that he obtained through Coldwell

7  Banker at CoStar?

8  A. How would I know?

9  Q. Let's move on to Interrogatory Number 8.

10  Identify all persons affiliated with Klein & Heuchan

11  who, during their affiliation with Klein & Heuchan,

12  have observed or received information or products

13  derived from CoStar's services, such as CoStar

14  market reports, printouts of search results,

15  property details, or other such information.

16  A. Scott Bell.

17  Q. Did the marketing e-mails that you and

18  other associates at Klein & Heuchan received contain

19  any information like property details or more

20  substantive information about properties?

21  A. No. I think they -- they indicated that

22  one could that find that -- or could get that from

23  CoStar.

24  Q. When did Chris Howell start working for

25  Klein & Heuchan?

1      A.    Oh, I believe it was 2004 or 2005.  I'm

2   not sure exactly when.

3      Q.    Does he still work for Klein & Heuchan?

4      A.    Yes.

5      Q.    What's his position there?

6      A.    He is a licensed associate, sales

7   associate, independent contractor.

8      Q.    And the service that he uses that he

9   prefers, does he need to use a user name and

10  password to access that?

11     A.    I have no idea.

12     Q.    Did you ever ask him whether was required

13  to use a user name and password?

14     A.    No, I did not.

15     Q.    Do you or anyone at Klein & Heuchan

16  subscribe to any paid service where a user name and

17  password is necessary?

18     A.    Yes.

19     Q.    What are those services?

20     A.    IMAP.

21     Q.    What else?

22     A.    Some of the associates purchase the

23  premium membership to LoopNet.

24     Q.    Does Klein & Heuchan pay the IMAP

25  subscription fee?

1          A.   I'm going to answer "no" but explain.

2    IMAP is a company that provides two services.

3          One of them is their previous, called

4    IRIS service, which is a mapping and database

5    service that comes from the Property Appraiser's

6    Office, Property Assessor's Office -- Appraiser's

7    Office, actually.  That's provided by Klein &

8    Heuchan for them.

9          The IMAP service, which is much more

10   detailed, is they buy through their membership with

11   the Florida Gulfcoast Commercial Association of

12   Realtors.  They can opt to buy that or not buy that.

13         Q.   And who is "they"?

14         A.   The associates.

15         Q.   And the associates pay that -- for that

16   service out of their own pocket?

17         A.   They pay out of their own pocket.

18         Q.   Do you pay for that service?

19         A.   Yes, I do.

20         Q.   And do you use a user name and password to

21   gain access to it?

22         A.   Yes, I do.  Yeah.

23         Q.   What about the premium LoopNet service;

24   who pays for that?

25         A.   An associate if they feel they want it.

1        Q.    Do you pay for that?

2        A.    No.

3        Q.    Does Klein & Heuchan pay for any portion

4    of the LoopNet subscription?

5        A.    No.

6        Q.    So regarding Number 8, the question

7    is, "Identify all persons affiliated with

8    Klein & Heuchan who have observed or received

9    information or products from CoStar's."

10            Based on the e-mails that we reviewed

11   earlier today, would you include your -- that were

12   addressed to you and Steven Klein, would you include

13   your names in the response -- in that response?

14       A.    I would include Steven's.   I don't recall

15   ever getting it.

16       Q.    Why would you include Steven's and not

17   yours?

18       A.    Because you -- Scott said that he gave

19   it to him, and I think there was an e-mail to him

20   saying that.   There may have been one to me also,

21   but I don't ever remember seeing it.

22       Q.    Did you ask Steve Klein whether he ever

23   remembered receiving . . .

24       A.    No.

25            MR. GIBSON:   Object to form.   Asked and

1    answered.

2    BY MS. KERKSIEK:

3        Q.    Moving on to Number 9, "Identify all

4    persons affiliated with Klein & Heuchan who were

5    in a position to physically observe Scott Bell's

6    actions during his affiliation with Klein & Heuchan"

7    -- I'm sorry -- "Klein & Heuchan."

8              I'm going to just ask a narrower

9    question --

10       A.    Thank you.

11       Q.    -- which is:  Who were the associates

12   who sat next to or near Scott Bell in your office?

13       A.    Judi Healey sat next to him.  She was

14   the only one sitting in that room that he was in.

15       Q.    Did you ever ask Judi Healey whether she

16   talked to Scott Bell about his CoStar subscription?

17       A.    Yes.

18       Q.    What did she say?

19       A.    No.

20       Q.    Going to Interrogatory Number 11,

21   "Identify all persons who you believe have evidence

22   supporting the allegations made in your declaratory

23   judgment complaint."  And there are a number of

24   names listed there.

25              Chris Howell's name is listed there.

What information would he have that supports the allegations in your declaratory judgment complaint?

A.   What are my allegations?

Q.   Do you know what your allegations are?

A.   Well, I'm -- you know, this thing has been going on for a long time, so I'm not sure exactly what you're asking for here.

Q.   Well -- let's go back to -- I think it was Exhibit Number 2.

As we had discussed before, Exhibit Number 2 is the deposition notice to Klein & Heuchan.

A.   Um-hum.

Q.   Did you review this notice before -- well, have you ever reviewed this notice?

A.   Yeah.  I think I have.

Q.   Is that a yes or a no?

A.   The answer would be yes.

Q.   You have reviewed it?

A.   Yes.

Q.   When did you review this?

A.   I can't tell you.  I don't remember.

Q.   So when you -- earlier when you were talking about how you prepared for this deposition, you went through a file.  This notice was not

1    contained in that file?

2         A.    It may have been, but I didn't read it.

3         Q.    Can you turn to Topic Number 27?  It's on

4    the last page.

5         A.    Okay.

6         Q.    So are you aware that these are the topics

7    about which Klein & Heuchan was noticed to testify

8    today?

9         A.    Okay.  Yes.

10        Q.    And what is the basis of Klein & Heuchan's

11   allegation in paragraph 11 of its declaratory

12   judgment complaint that Scott Bell is a licensed

13   agent and independent contractor of K&H?

14        A.    Repeat that question, please.

15             MS. KERKSIEK:  Will the court reporter

16   read the question back?

17             (Discussion off the record.)

18             MS. KERKSIEK:  I'll read the topic back.

19   BY MS. KERKSIEK:

20        Q.    What is Klein -- what is the basis of --

21   what is Klein & Heuchan's basis for its allegation

22   in paragraph 11 of its declaratory judgment

23   complaint that Scott Bell is a licensed agent

24   and independent contractor of K&H?

25        A.    What is the basis of that?

1       Q.   Yes.

2       A.   All right.  He had his license with us and

3  we're -- he was part of our chain.

4       Q.   And what is the basis of Klein & Heuchan's

5  position that he's an independent contractor of K&H?

6       A.   Because he signed an independent

7  contractor agreement and -- which was part of our

8  company policy, policy manual.

9       Q.   What is the basis -- turning to Topic

10  Number 28, so you can read along as I read.

11       What is the basis for Klein & Heuchan's

12  allegation in paragraph 12 of its declaratory

13  judgment complaint that 'At all times material,

14  Scott Bell was an authorized user of the CoStar

15  database"?

16       A.   He told us he was and he had access

17  to your database -- or your client's database.

18       Q.   And what about his having access to the

19  database made Klein & Heuchan believe that he was an

20  authorized user?

21       A.   If he wasn't, why wouldn't you cut him

22  off?  You're a highly technical company.  13 months,

23  you knew that he was using it, in your allegation.

24       Q.   Did you ever ask Scott Bell whether he

25  contacted Coldwell Banker regarding his access?

1      MR. GIBSON: Object to the form. Asked

2  and answered.

3      A.  No.

4      Q.  Topic Number 29.  What is the basis for

5  Klein & Heuchan's allegation in paragraph 14 of its

6  declaratory judgment complaint that K&H did not

7  obtain access to the CoStar database by obtaining

8  authorized user names and passwords and did not

9  access the CoStar database for its own commercial

10  purpose without a valid license or any other

11  authorization from CoStar?

12      A.  I'm going to have to ask you to repeat

13  that question because you're saying Topic Number 14?

14      MR. GIBSON:  29.

15      Q.  It's topic -- oh, I -- it's Topic Number

16  29 referring to paragraph 14 --

17      A.  Okay.

18      Q.  -- of the complaint and -- which quotes

19  directly from the complaint -- your complaint or

20  Klein & Heuchan's complaint.

21      A.  Okay.

22      MR. GIBSON:  Do you mind if I show him the

23  complaint?

24      MS. KERKSIEK:  I mean, it should be --

25      MR. SAUERS:  He should have, in

1   preparation for the deposition -- I mean, this is a

2   topic that's been noticed.

3            MR. GIBSON:  So you don't -- you don't

4   want me to show him the complaint?  I think it gives

5   context of the allegations, both before and after

6   it.  It's up to you.

7            THE WITNESS:  Yeah.  I'm having a problem

8   understanding your question, but we can get to it.

9            MR. SAUERS:  That's fine.

10           MS. KERKSIEK:  That's fine.  Yeah.  That's

11  okay.

12           THE WITNESS:  Okay.  Ask the question

13  again, please.

14  BY MS. KERKSIEK:

15       Q.   You were just reviewing the complaint

16  filed this action.

17       A.   Right.  Yeah.

18       Q.   Did you review that in preparation for

19  your deposition today?

20       A.   You know what, I don't think I did.

21           MR. GIBSON:  Just so we're clear, one of

22  the complaints that's part of this action.

23           MS. KERKSIEK:  Well, K&H's declaratory

24  judgment complaint.  That's the one I'm referring to

25           THE WITNESS:  Okay.  I did not.

1    MR. GIBSON: But there is two complaints

2  in this consolidated action, though.

3  BY MS. KERKSIEK:

4    Q.  Did you review the other complaint that's

5  filed --

6    A.  I did not.

7    Q.  -- in preparation for your deposition

8  today?

9    A.  I did not.

10    Q.  So back to the pending question

11  from a few moments ago.  What is the basis for

12  Klein & Heuchan's allegations in paragraph 14 as

13  quoted in Topic Number 29 of the deposition notice

14  to K&H?

15    A.  The answer is, we didn't.  We didn't have

16  access to it.  Mr. Bell had access to it, but we

17  didn't.  And we were told that he had access, legal

18  access to it.  And it was prima facie evidence that

19  he did because you didn't shut him off -- or your

20  client didn't shut him off.

21    Q.  Topic Number 30, what is the basis for

22  Klein & Heuchan's allegation in paragraph -- oh,

23  sorry.  I'll let you find it.

24    A.  Thank you.

25    Q.  Did you find it?

1          A.    Yeah.

2          Q.    Okay.  Topic Number 30.  What is the basis

3     for Klein & Heuchan's allegation in paragraph 18 of

4     its declaratory judgment complaint that Plaintiff

5     K&H is in doubt as to his rights and obligations?

6          A.    CoStar's allegation is that we were part

7     of a phantom agreement.  We were not.  And I was

8     unsure about that, and I wanted the Court to decide

9     since you were threatening to sue me -- your client

10    was threatening to sue me.

11         Q.    Topic Number 31.  What is the basis for

12    Klein & Heuchan's allegation in paragraph 19 of its

13    declaratory judgment complaint that Plaintiff K&H is

14    in further doubt as to the existence or nonexistence

15    of any legal relationship between CoStar and K&H?

16              MR. GIBSON:  I'm just going to object to

17    the question, as it -- to as much as it calls for a

18    legal conclusion as an element of the claim for a

19    declaratory judgment.  But he certainly can answer

20    as to the factual basis.

21    BY MS. KERKSIEK:

22         Q.    You can answer.

23         A.    All right.  I'm going to answer and tell

24    you that I wanted -- you were -- I was threatened

25    with a lawsuit by CoStar; threatened.  And it was my

1   way of getting -- I knew we couldn't make you say

2   that I was not a licensed user. So I asked the

3   Court to decide.

4           I mean, in your allegations you talk about

5   agreements I had with CoStar. I had no agreements

6   with CoStar. Never did.

7           MS. KERKSIEK: Why don't we take a lunch

8   break? Is now a good time? I think it's around

9   noon.

10          MR. GIBSON: Well, how much longer do

11  you have? Because if there isn't much longer, I'd

12  prefer that we take a break and finish up. And I

13  think Mr. Klein would --

14          MR. SAUERS: Do you have questions?

15          MR. GIBSON: Of Mr. Klein? No. I have

16  one question.

17          MS. KERKSIEK: Okay. Well, why don't we

18  take a five- to ten-minute break and then decide?

19          THE WITNESS: Sure.

20          THE VIDEOGRAPHER: The time is 11:55 a.m.

21  We're now off the record.

22          (There was a recess.)

23          THE VIDEOGRAPHER: The time is 12:14 p.m.

24  We're now back on the record.

25  BY MS. KERKSIEK:

1  Q. Before the break we were talking about the

2  deposition notice to Klein & Heuchan. I want to

3  back up and go back over how you prepared for this

4  deposition.

5  When did -- when did you prepare for this

6  deposition?

7  A. Last night.

8  MR. GIBSON: Object to form.

9  Q. Did you prepare -- did you do any other

10  preparation other than the preparation you did last

11  night?

12  A. I read through Scott Bell's deposition.

13  No. Other than last night, no.

14  Q. And what did you read?

15  A. I read his deposition.

16  Q. What else?

17  A. I read the Rickett's letter.

18  Q. Um-hum.

19  A. I should have read it this morning instead

20  of last night because I had a hard time sleeping.

21  I was so angry.

22  Q. So you read the Ricketts letter --

23  A. Right.

24  Q. -- which is one of the exhibits here,

25  Exhibit Number 23. Right?

1    A.    Do you want me to check?

2    Q.    If you -- yeah, if you would like to.

3    A.    Yes.

4    Q.    Okay.  What else did you read?

5          MR. GIBSON:  That wasn't drafted by an

6    attorney or communicated by an attorney.  Correct?

7          THE WITNESS:  I don't --

8          MR. GIBSON:  I don't want him to answer

9    that if it includes communications that came from

10   me.

11   A.    No.  I didn't -- I didn't review any of

12   those.

13   Q.    How long did you spend reading those --

14   the materials that you referred to?

15   A.    Half hour, hour.

16   Q.    Did you read Exhibit Number 2, the

17   deposition notice to Klein & Heuchan?

18   A.    I don't know.  Let me take a look at it

19   and see if I did.

20         MR. GIBSON:  It's the one we've --

21   A.    No, I did not.

22   Q.    Have you ever read this?

23   A.    Yes.

24   Q.    When?

25   A.    You know, whenever it was drafted.  I

1    mean, I can't recall how long that was -- ago that

2    was.

3        Q.    Did your attorney provide this to you?

4        A.    He provided -- let me see what we're

5    looking at here.  Are these the interrogatories

6    or --

7        Q.    No.  This is the deposition notice.  If

8    you look, actually, at the second page, it says it's

9    dated July 22nd, 2009.

10       A.    Yes.

11       Q.    Does that jog your memory as to when you

12   might have read this before?

13       A.    I guess July 23rd or July 22nd.  I can't

14   -- you know, I can't recall.

15       Q.    Do you remember reading these?

16            MR. GIBSON:  Object to form.  Asked and

17   answered several times.

18       Q.    Go ahead.

19       A.    I said yes.

20       Q.    And other than the hour or half hour

21   that you spent last night, did you do any other

22   preparation for the deposition today?

23       A.    No.

24       Q.    Did you discuss this deposition with your

25   attorney at all?

1      A.    Yes.

2            MR. GIBSON:  Object to form.  Asked and

3   answered.

4      Q.    When did you discuss it with him?

5      A.    I can't recall.

6      Q.    Did you discuss it with him yesterday?

7      A.    I did.  I did.  We had a brief

8   conversation yesterday.

9      Q.    On the telephone or in person?

10     A.    On the phone.

11     Q.    How long was the conversation?

12     A.    About three minutes.

13     Q.    Did you discuss the deposition with him

14  this morning --

15     A.    No.

16     Q.    -- before the deposition began?

17     A.    No.

18     Q.    Did you discuss the deposition with him

19  at any time other than yesterday during your

20  three-minute phone call?

21     A.    I can't remember.

22     Q.    Last night on the phone -- well, never

23  mind.  Strike that.

24           Did Klein & Heuchan ever have a contract

25  with CoStar?

1      A.    No.

2      Q.    Did Klein & Heuchan ever have a

3   subscription to any CoStar service?

4      A.    No.

5      Q.    Did Klein & Heuchan ever pay for any

6   CoStar service?

7      A.    No.

8      Q.    When Scott Bell started working for

9   Klein & Heuchan, did you have a conversation -- did

10   you ever have a conversation with him regarding his

11   position and his responsibilities and the

12   expectations that you had for him?

13      A.    Yes.  I guess so.

14      Q.    Do you recall that conversation?

15      A.    Not really.

16      Q.    Do you recall what was -- what you told

17   him during that conversation?

18      A.    No.

19           MR. GIBSON:   Object to form.

20      Q.    I'll rephrase the question.

21           Do you recall what you told Scott Bell

22   at any point in time about what you expected from

23   him as a sales associate?

24      A.    I really can't recall specifically what I

25   told him.

1    Q.   Do you recall generally?

2    A.   Generally, we expected him to work

3    diligently, to interface with our people, to be out

4    in the marketplace, to find listings and find people

5    to buy properties.  I mean, it wasn't like he was

6    naive.

7    Q.   What kind of records does Klein & Heuchan

8    keep regarding the revenues -- regarding the

9    revenues it earns?

10    A.   Well, we have a partner called Uncle Sam,

11    so we keep -- we have an outside CPA firm that --

12    that does our -- all our monthly bookkeeping and

13    prepares all our returns, our corporate returns.

14    Q.   Do you -- you mentioned a bookkeeper

15    earlier.

16    A.   We have a bookkeeper in-house.

17    Q.   And does she maintain any financial or

18    accounting records internally in your office?

19    A.   Which she passes on to our CPA.  But, yes,

20    she's in charge of what we have.  She is the one who

21    pays out the commissions and prepares the commission

22    spreadsheet that you saw.

23    Q.   Okay.  What are her other job

24    responsibilities?

25    A.   She pays sales tax for properties.  In

Florida, all leases are subject to sales tax. So
she does all the sales tax. She does reports on,
you know, what the salesman's revenue is and what
our desk costs are, and she does any report I will
ask her to do.

Q. What is the name of your CPA firm?

A. Crown & Company.

Q. And are they located here in Clearwater?

A. Yes, they are.

Q. Would you also provide them with records
regarding Klein & Heuchan's expenses?

A. Yes.

Q. Backing up again to a number of the
exhibits that we looked at earlier, Exhibit Numbers
4, 5, 6, 15, 16, 17, 18 --

A. You're going too fast. 4, 5, 6 --

Q. 4, 5, 6. And then I believe it's all the
way from 15 through 19.

A. Did you say 15?

Q. Correct.

A. 15. And I'm going by the yellow numbers.
Correct?

Q. Yes.

A. So you want 15, 16 -- I don't think I
have a 16. Yeah, I do. 16, 17, 18 -- did you say

1  through 19?  Did you say through 19?

2       Q.   Yes.   Um-hum.

3       A.   Okay.  Do you want them in any particular

4  order?

5       Q.   And 21 as well.   No.   They don't need to

6  be.

7       A.   Okay.   Good.

8       Q.   Earlier we went through these sort of one

9  by one.  And the follow-up question is:  Have -- did

10 you ever -- did you ever -- I'm sorry.  Strike that.

11      You saw some or all of these for the first

12 time at Scott Bell's deposition.  Correct?

13      A.   That's correct.

14      Q.   Since that time -- before this deposition,

15 did you ask anyone at K&H whether they had seen or

16 used any of these reports?

17           MR. GIBSON:  Object to form.

18      A.   I believe that when the lawsuit was

19 started, I walked around to the associates and

20 asked them if they ever got anything from -- from

21 Scott Bell on -- from CoStar or if they've ever

22 seen any CoStar reports and --

23      Q.   Do you remember who you asked

24 specifically?

25      A.   Yeah.  I asked Linda Gardiner.  I

1   asked Chris Howell.  I asked Bud Lytle.  I asked

2   Joe Santolucito and Sherri Strazz, Marty Slavney and

3   Larry Gilbert.

4       Q.   And what did they say?

5       A.   No.

6       Q.   That they had never asked --

7       A.   They'd never asked, never knew, never ever

8   had any . . .

9       Q.   Never saw these reports?

10      A.   No.

11      Q.   And that was when the lawsuit was filed.

12  Now, what about these reports in particular,

13  Exhibits, as we had discussed --

14      A.   Okay.

15      Q.   -- Exhibits 4, 5, 6, 15 through 19, and 21

16  -- did you ask anyone at K&H whether they had ever

17  seen these or used these or asked Scott Bell to

18  provide them with them?

19      A.   No.

20           By the way, some of those reports, those

21  spreadsheets --

22      Q.   Uh-huh.

23      A.   -- are available from any one of the

24  services we have, including Black's Guide.

25      Q.   Which ones?

1    A.    All of those Excel spreadsheets you have.

2    Q.    Can you refer me to a specific exhibit?

3    A.    Sure.   19.

4    Q.    And where would this -- where else would

5    this be available?

6    A.    Black's Guide, IMAP, Microbase.

7    Q.    And how do you know that?

8    A.    Well, because we use IMAP.  We get

9    Black's Guide and --

10   Q.    Well, I guess, just so I can understand,

11   you know, what is this?  What is Exhibit Number 19

12   and how do you know that it would be available

13   from IMAP?  Is it based on the information that's

14   contained here or on the format or on something

15   else?

16   A.    19 is a compilation of office buildings in

17   the Tampa Bay market.  It's a free publication that

18   comes from Black's Guide because it's the very, very

19   same information.

20   Q.    The same information but not necessarily

21   the same format?

22   A.    No.  I mean, it comes in a nice book with

23   pictures.  It's much better than that.

24   Q.    Okay.  Is it -- is it the same exact

25   information?

1          A.   Oh, come on.  I mean, I can't tell you if

2     it's exactly the same.  The information about the

3     buildings and their occupancies are the same.

4     They're published quarterly.

5          Q.   Well -- so on the first page it says

6     "Building Address," "Building Name," "Building

7     Park."

8               And then because this is an Excel

9     spreadsheet, you have to kind of turn several pages

10    in to get to the next column or columns?

11              And at the top, about -- maybe seven pages

12    in -- it says "Building Status, Building Class,

13    Submarket Cluster."  Do you see that page?

14         A.   Yes.

15         Q.   "Building Status, Building Class,

16    Submarket Cluster, Submarket Name" --

17         A.   Um-hum.

18         Q.   -- are those things that can be found in

19    these other databases?

20         A.   Yes.

21               How do you know that this is a CoStar --

22              MR. GIBSON:  Just wait for a question.

23              MS. KERKSIEK:  Okay.

24              THE COURT REPORTER:  26.

25              THE WITNESS:  Can I put these back in my

1  stack now, Sanya, or --

2          MS. KERKSIEK:  Yes.

3          MR. GIBSON:  This is Exhibit 26?

4          THE COURT REPORTER:  Yes, it is.

5          (The document was marked as Klein Exhibit

6  Number 26 for identification.)

7  BY MS. KERKSIEK:

8      Q.    Have you ever seen Exhibit Number 26

9  before?

10     A.    Yes.

11     Q.    When was that?

12     A.    Let me see if we can find the date on here

13  and I might be able to be more specific.

14          I don't recall.

15     Q.    Can you tell me what Exhibit Number 26 is?

16     A.    It's Plaintiff's Response to Defendant,

17  CoStar Realty Information, Inc.'s First Request For

18  Production of Documents.

19     Q.    What did you or Klein & Heuchan do to find

20  documents in response to CoStar's document requests?

21     A.    Repeat the question, please.

22     Q.    What type of search for documents did you

23  conduct in order to -- in order to prepare this

24  response or allow your attorney to prepare it?

25     A.    Any documents I would have needed.  I

1   don't know.

2       Q.   Do you recall the steps that you've

3   taken --

4       A.   I mean, I'm not reading this now.

5   I don't --

6       Q.   No.  I understand.  I'm not talking in

7   response to any specific request.

8       A.   Right.

9       Q.   I'm just talking in general.  When the

10  requests came in, what did -- what did -- what steps

11  did you or Klein & Heuchan take to look for

12  documents related to this lawsuit?

13          MR. GIBSON:  Object to form.  Not related

14  to any specific request?  That was your question?

15          MS. KERKSIEK:  In response to all of

16  them.

17          MR. GIBSON:  Okay.  And don't answer the

18  question if it involves any communication with your

19  attorney.

20      A.   I don't think I can answer the question.

21  I'm just not sure I understand it.

22      Q.   Did you ask someone at Klein & Heuchan to

23  search through your hard copy files that are kept in

24  your office, for example?

25      A.   If I had to research a hard copy, I got it

1    myself.

2         Q.    And did you look for hard copy documents

3    yourself?

4         A.    I can't remember.

5         Q.    Did you or anyone at Klein & Heuchan

6    search through the -- actually, let me rephrase

7    that.

8              Did you search through your personal --

9    not personal e-mails but your Klein & Heuchan

10   e-mails for documents that were responsive to any

11   of these requests?

12        A.    I don't think so.

13        Q.    Did you ask anyone at Klein & Heuchan to

14   search through their e-mail accounts?

15        A.    I can't recall doing that.

16        Q.    Is that a yes or a no?

17        A.    That's a no.

18        Q.    Did you or anyone at K&H contact your --

19   either of your internet service providers in order

20   to obtain e-mails or search for e-mails that were

21   responsive to these requests?

22        A.    No.

23        Q.    And then regarding your e-mails, earlier

24   we talked about this Road Runner and then the Web

25   Service, I think it was called, and that -- the fact

that Klein & Heuchan has two e-mail addresses.

One is kleinandheuchan.com.  The other one is tampabay.rr.com.

How -- just so I understand, how do you decide which e-mail account to use?  How do you decide which e-mail account to use?

A.  How do I, you said?

Q.  Yes.

A.  I made a decision to use MSK because there are less -- there are less mistakes in the spelling of kleinandheuchan.

Q.  Did --

A.  Yeah.

Q.  Sorry.  Were you -- are you done?

A.  That's good.  That's fine.

Q.  If you receive an e-mail that's addressed to your kleinandheuchan.com address, how do you -- how do you receive it?

A.  It comes into my computer.  They both come into my computer.

Q.  Do they come into the -- like, do you have Outlook, for example?

A.  We have Outlook.

Q.  Okay.

A.  It comes in through Outlook and we send --

1    we send -- now I send through MSK.

2        Q.   You send through MSK?

3        A.   Yeah.

4        Q.   Okay.  And so --

5        A.   At one time I was sending through

6    kleinandheuchan.

7        Q.   Is there a function in your Outlook, then,

8    that allows you to choose --

9        A.   Yeah.

10       Q.   -- which e-mail you send it from?

11       A.   Yeah.

12       Q.   Does everybody at Klein & Heuchan have

13   e-mail addresses at both of those addresses?

14       A.   No.  We give a Klein & Heuchan e-mail

15   address to all our associates.  Many of the

16   associates use their own e-mails.  They prefer them.

17       Q.   Their personal e-mail?

18       A.   Yeah.  They prefer them as I prefer using

19   MSK.

20       Q.   Did you ask any of your associates to

21   search through their personal e-mail accounts, their

22   non-kleinandheuchan e-mail accounts, for documents

23   responsive to CoStar's requests?

24       A.   No.

25            MR. GIBSON:  Object to form.

1     Q.   Do you assign tampabay e-mail addresses to

2   any of your associates?

3     A.   I don't believe so.  But I think my

4   employees may have a tampabay e-mail address.

5     Q.   The employees but not the sales

6   associates?

7     A.   That's correct.

8     Q.   Do you know if Scott Bell has a tampabay

9   e-mail address?

10     A.   I have no idea.

11     Q.   All right.  So going to -- back to

12   Exhibit Number 26, Request Number 1 or Response

13   Number 1, "All employment records created or

14   maintained by Klein & Heuchan relating to

15   Scott Bell."

16          What did you do to search for Scott Bell's

17   employment records?

18     A.   I went to his personnel file.

19     Q.   Did you personally or did you ask someone

20   at Klein & Heuchan to do it?

21     A.   I went in to my bookkeeper who keeps them,

22   and she pulled it out of the rack while I was there.

23     Q.   And then -- and then did you take them and

24   then provide them to your attorney?

25     A.   No.  I can't remember.

1    Q.   Okay.  And regarding Request Number 2,

2   tax forms relating to Scott Bell, what did you do

3   to respond to that request?

4        MR. GIBSON:   Just so that we're on

5   the same page, I'm going to assume that all the

6   questions regarding Exhibit 26 are being directed to

7   Mr. Klein individually -- not to Klein & Heuchan --

8   as it's not a subject of the request that was made.

9        MS. KERKSIEK:   What?

10       MR. GIBSON:   It's not a topic on the

11  Notice of Deposition.  The actual steps taken by

12  Klein & Heuchan in responding to CoStar's Request

13  For Production is not a topic upon which -- that

14  is listed on the deposition notice directed to

15  Klein & Heuchan.

16       So these questions you're asking -- are

17  you asking Mr. Klein individually what he did to

18  comply with the request?

19       MS. KERKSIEK:   So I think there was a

20  pending question regarding Number 2, "All tax forms

21  created, issued or maintained by Klein & Heuchan

22  relating to Scott Bell."

23       MR. GIBSON:   Yes.

24  BY MS. KERKSIEK:

25      Q.   What did you do to respond to that

1  request?

2      A.    We got them out of our file.

3      Q.    Who is "we"?

4      A.    My bookkeeper and I.

5      Q.    Did she get them from the same place

6  that she got the documents responsive to Number 1?

7      A.    No.  They're not in -- they're not in

8  his personnel file.  They're in our corporate file.

9  I mean, we have a tax file and they would be in the

10  tax file.

11      Q.    Are there any -- other than the corporate

12  file and the tax file, are there any other files

13  where you keep documents -- hard copy documents

14  related to Scott Bell?

15      A.    No.                                    .

16            MR. GIBSON:  Object to the form.

17      Q.    Do you know of any other files that

18  Klein & Heuchan keeps relating to Scott Bell?

19      A.    No.

20            MR. GIBSON:  Object to form.

21      A.    The answer should be there are none.

22            MS. KERKSIEK:  Okay.  I'm missing a page.

23  BY MS. KERKSIEK:

24      Q.    Getting to Number 3 --

25      A.    Okay.

1    Q.    -- "Documents sufficient to identify

2  each and every client or potential client that

3  Scott Bell contacted during his affiliation with

4  Klein & Heuchan."

5    A.    I can't --

6         MR. GIBSON:  We -- we objected to that

7  interrogatory, and it was the subject of a 3.01(g)

8  conference with counsel.  No documents were produced

9  pursuant to that request.

10        MR. SAUERS:  We can ask if he looked.

11        MS. KERKSIEK:  Yeah.  I think that was

12  the question that's pending.

13        MR. GIBSON:  That wasn't asked.

14        MS. KERKSIEK:  Did you --

15        MR. SAUERS:  Well, nothing has been asked

16  yet.  We just turned to it and you noted there was

17  an objection.

18  BY MS. KERKSIEK:

19    Q.    Did you look for documents responsive to

20  this request?

21    A.    I wouldn't have any.

22    Q.    Did you look for any documents?

23    A.    No.

24        MS. KERKSIEK:  Can we go off the record

25  for two minutes?

1    THE VIDEOGRAPHER:  The time is 12:42.

2    We're now off the record.

3    (There was a recess.)

4    THE VIDEOGRAPHER:  The time is 12:48 p.m.

5    We're now back on the record.

6    BY MS. KERKSIEK:

7    Q.    Regarding -- back to page 2 of Exhibit --

8    A.    26.

9    Q.    -- 26.  Request Number 3, "Documents

10   sufficient to identify each and every client or

11   potential client that Scott Bell contacted during

12   his affiliation with Klein & Heuchan."

13   Earlier you testified that there --

14   that you keep a list of all the properties on which

15   Scott Bell was the listing agent.  Is that right?

16   A.    Yes.

17   Q.    So documents responsive to this request

18   would include that list and also the files that you

19   referred to earlier?

20   A.    That's correct.

21   Q.    Did your ever provide those files or that

22   list to your attorney?

23   A.    You know, I don't think so.  You're asking

24   me -- this question is everything and every client

25   he. . . I wouldn't have any way of knowing that.

1  If it was in the file, then I would have given it to

2  him.

3      Q.    But the -- but, you know, properties

4  for which he's the listing agent are -- contain

5  information regarding the clients or potential

6  clients that Scott Bell contacted while he was

7  at Klein & Heuchan.  Correct?

8      A.    That's correct.

9      Q.    And, likewise, for Request Number 4,

10 "Documents sufficient to identify each and every

11 client or potential client that Klein & Heuchan had

12 contact with during the period in which Scott Bell

13 was affiliated with Klein & Heuchan."

14          That information regarding Klein &

15 Heuchan's contacts with clients would be contained

16 in the property files and in the lists of properties

17 on which the associates were listing agents.  Right?

18          MR. GIBSON:  Object to form.

19     A.    It might be.

20     Q.    But that information, just as with -- I

21 mean, you responded that that information was in --

22 with respect to Scott Bell and clients that he

23 contacted, it could be in those files.

24          Likewise, it would be for the other

25 associates at Klein & Heuchan.  Right?

1        A.    They might be if they retain (sic)

2  to that file.  But if he or any other associate

3  received a call --

4        Q.    Um-hum.

5        A.    -- a floor call from one of our signs,

6  that might not be in there.

7        Q.    Would that be recorded anywhere?

8        A.    Not -- the associate would be able --

9  might record it on his -- you know, in his book of

10  information, but I'm not a document person.  I mean,

11  I don't have to, you know, spread documents for

12  everybody I talk to.  This is not the CIA.

13        Q.    So associates sometimes keep their own

14  logs of contacts?

15        A.    They always keep their own logs.

16        Q.    They always do.  Do you know if Scott Bell

17  kept such a log?

18        A.    I don't know.

19        Q.    Do you know which associates at K&H keep

20  such logs?

21        A.    No.

22        Q.    But if they always do, you can generally

23  assume that they have such logs -- that most of them

24  have such logs and someone who doesn't is an

25  anomaly?

1          A.    No.    That's not correct.

2          Q.    What -- then what is correct?

3          A.    That some are very fastidious at what they

4     do and some are not.

5          Q.    Did you ever ask any of the associates if

6     they kept -- if they kept such logs?

7          A.    No.

8               MR. GIBSON:  Object to the form.

9          Q.    Regarding Request Number 6, "Copies of

10    all documents, data, or other tangible or intangible

11    computer records that were printed, copied from, or

12    otherwise derived from CoStar."

13               Did you search for any such documents?

14         A.    We don't have any.

15         Q.    Did you search for any?

16         A.    I searched my computer for them, but I

17    don't have any.

18         Q.    Did you ask anyone else at Klein & Heuchan

19    to search for such documents?

20         A.    No.

21         Q.    And same question for Number 7,

22    "All documents comprising, reflecting or relating

23    to communications between Klein & Heuchan and

24    Scott Bell relating to this lawsuit or the

25    lawsuit filed by CoStar against Klein & Heuchan in

1    Maryland, including all internal Klein & Heuchan

2    communications concerning either lawsuit."

3              MR. GIBSON:  Object to form.

4         Q.   Did you search for documents responsive to

5    Request Number 7?

6         A.   No.  I didn't have any.

7         Q.   And when you said, in response to Question

8    6, that you had searched your own computer for

9    documents that were printed, copied, or derived from

10   CoStar, what steps did you take in that search?

11        A.   Get a mouse and you click and you get

12   "find."

13        Q.   What did you -- what did you  --

14        A.   And you find CoStar.

15        Q.   Find CoStar?

16        A.   Right.

17        Q.   And you did a "find CoStar" using the

18   interface?

19        A.   Right.

20        Q.   And did you get any hits?

21        A.   None.

22        Q.   And what did -- what directories did your

23   "find search" search?

24        A.   What directories?

25              MR. GIBSON:  Object to form.

1    A.    My Outlook directory.

2    Q.    Your find --

3    A.    My e-mails.  My e-mails.

4    Q.    Your e-mails.  Did you -- well, okay.

5    You searched your e-mails for CoStar. You did a

6    "control find" in Outlook to search your e-mails for

7    CoStar-related documents --

8    A.    That's right.

9    Q.    -- and found nothing?

10    A.    Right.

11    Q.    Did you do a similar search of the -- of

12    your hard drive for other user created documents

13    such as Word?

14    A.    That is my hard drive.

15    Q.    Did you search for MicroSoft -- actually

16    -- well, what type of word processing software do

17    you use?

18    A.    Word.

19    Q.    Did you search your Word documents for

20    CoStar-related materials?

21    A.    I may have.  Yeah.

22    Q.    You may have or you did?

23    A.    I did.

24    Q.    Was that the same search that you did from

25    within Outlook?

1      A.   Yes.   We use MicroSoft Office.

2      Q.   Okay.

3      A.   So Word, and they're all together.

4      Q.   They're all together.   All right.

5

6           Did you ask any other Klein & Heuchan

7  employees or associates to conduct a similar search?

8      A.   No.

9      Q.   Are you aware that any of them conducted

10  such a search?

11      A.   No.

12      Q.   And regarding your e-mails, how -- how old

13  -- how far back do your saved e-mails go in time?

14      A.   I have no idea.

15      Q.   Do they go back five years?

16      A.   I don't know.

17      Q.   Do they go back more than one year?

18           MR. GIBSON:   Object to the form.

19      A.   Let me see if I can answer the question.

20  I don't know.

21      Q.   I understand.   I'm just trying to get a

22  sense of if they go back a year.   Do they go back

23  20 years?   To get an estimate.

24      A.   I don't know.

25           MR. GIBSON:   And he's now answered the

1  question five times.

2       A.    How many times do I have to answer it?

3       Q.    I asked a different question every time.

4  Thank you for your answer.

5           Who would know at Klein & Heuchan?

6       A.    No one.

7       Q.    No one would know how far back the e-mails

8  go in time?

9       A.    (Witness shakes head.)

10       Q.    No one would be able to find that out?

11           MR. GIBSON:  On his personal computer?

12  Is that what you're asking?

13           MS. KERKSIEK:  On -- well, I'll ask --

14  BY MS. KERKSIEK:

15       Q.    On your personal computer, would anyone

16  know?

17       A.    No.

18       Q.    On the Klein & Heuchan server, would

19  anyone know?

20           MR. GIBSON:  Object to form.  Lack

21  of predicate.  Assumes facts that have not been

22  testified to.

23       Q.    You can answer the question.

24       A.    I don't know.

25       Q.    And did anyone ever contact the service --

1    your internet service provider to find out how far

2    back in time the e-mails go?

3           MR. GIBSON: Where?

4           MR. SAUERS: Is that an objection?

5           MR. GIBSON: It is an objection. It's a

6    vague question.

7           MR. SAUERS: Okay. You can answer it.

8           THE WITNESS: No.

9    BY MS. KERKSIEK:

10       Q. Turning to Page Number 4, Request Number

11    16, "All electronic records of the IP addresses or

12    web site addresses visited by persons affiliated

13    with Klein & Heuchan using computers or internet

14    connectivity provided by Klein & Heuchan during

15    Scott Bell's affiliation with Klein & Heuchan."

16    What did you do to find -- or did you search

17    for such documents responsive to Number 16?

18           MR. GIBSON: Object to form.

19       A. I wouldn't know where to search for them.

20       Q. Is that a no?

21       A. That's a no.

22       Q. Did you ask -- did you or anyone at

23    Klein & Heuchan ask Klein & Heuchan's internet

24    service provider to -- whether they could --

25    whether they would be able to obtain such IP address

1   records.

2       A.    No.

3       Q.    Regarding Topic Number 17, "Copies

4   of any document retention policies in place."

5           Do you -- I know we had talked about this

6   briefly before, but does Klein & Heuchan have a

7   written document retention policy?

8       A.    No.

9       Q.    Regarding Number 18, "All documents

10  relating to the destruction of documents by

11  Klein & Heuchan."

12          Do you -- are you aware of any such

13  documents?

14      A.    No.

15      Q.    Did anyone at Klein & Heuchan contact the

16  internet service provider to determine whether there

17  is an automatic archiving or deletion process that

18  occurs --

19      A.    No.

20      Q.    -- with Klein & Heuchan's e-mails?

21      A.    No.

22      Q.    And the last question about Number 26.

23  Did -- has Steve -- Steven Klein ever searched his

24  e-mail or hard drive for documents responsive to

25  these requests?

1          MR. GIBSON:  Object to form.  Calls for

2    speculation.

3          A.    I have no idea.  No.  I don't know.

4          Q.    Did you ever ask him to search for

5    anything?

6          A.    No.

7          Q.    Did you ever ask him if he did search for

8    anything?

9          A.    No.

10              (The document was marked as Klein Exhibit

11   Number 27 for identification.)

12   BY MS. KERKSIEK:

13          Q.    Have you ever seen Exhibit Number 27

14   before?

15          A.    I think I have, yes.

16          Q.    Do you remember when?

17          A.    No.

18          Q.    Turning to page 7 of the Document Requests

19   or -- of Exhibit 27?

20              Regarding Request Number 26, "Documents

21   sufficient to show the revenues earned by Klein &

22   Heuchan during the time of Bell's affiliation with

23   Klein & Heuchan," did you search for documents

24   responsive to that request?

25          A.    Yes.

1  Q.  And what did you do to conduct that

2  search?

3  A.  I went with my bookkeeper and I got the --

4  excuse me -- the revenue that he earned and what his

5  -- what the Klein & Heuchan share was and his, the

6  same document we talked about before, the same

7  thing.

8  Q.  The commissions document?

9  A.  Right.  That's the only revenue he had.

10  Q.  And you're referring to revenue relating

11  to Scott Bell only.  Correct?

12  A.  That's correct.

13  Q.  Did you search for documents relating to

14  the revenues of Klein & Heuchan?

15  A.  I don't think so.  Why would I?

16  Q.  Did you -- regarding Request Number 27,

17  did you search for documents relating to

18  Klein & Heuchan's expenses?

19  A.  Not specifically.

20  Q.  But those records, I think, as you

21  testified earlier, would be in the possession of

22  your outside CPA firm?

23  A.  That's correct.

24  (The document was marked as Klein Exhibit

25  Number 28 for identification.)

BY MS. KERKSIEK:

    Q.    Do you recognize this document?

    A.    Yes.

    Q.    What is it?

    A.    It's a 2007 and 2008 compendium of the associates that -- the independent contractors that work in our company.

    Q.    Who prepared this document?

    A.    I have no idea.  I mean, it probably came from -- my bookkeeper pulled it off of -- one of my assistants.

    Q.    Do you know why this document was created?

    A.    No.  I can't recall.

    Q.    Was it created for this litigation?

    A.    I believe so, yes.

    Q.    And is this an accurate list of the associates that were employed by Klein & Heuchan in 2007 and 2008?

        MR. GIBSON:  Object to form.

    A.    Yes.

    Q.    So earlier you testified that you never received any CoStar information from Scott Bell.  Correct?

    A.    Correct.

    Q.    Later we looked at a number of e-mails

1   that were addressed to you at your MSK e-mail

2   account, which were Exhibits 8 -- no, I'm sorry --

3   this one I didn't mark -- 9 -- 8, 9 and 10, I

4   believe.

5           THE WITNESS:  I mixed these up.

6           MR. GIBSON:  Well, 8 is not correct.

7           THE WITNESS:  Huh?

8           MS. KERKSIEK:  8 is not correct?  Which --

9   oh.  Yeah -- no.  You're right.  This is a different

10  -- okay.

11  BY MS. KERKSIEK:

12      Q.   8 -- oh, I'm sorry.  9 -- Exhibits 9

13  and 10.

14          MR. GIBSON:  And what's the question?

15          THE WITNESS:  Well, let me find it.

16          MS. KERKSIEK:  Just that we had looked at

17  these earlier.

18          MR. GIBSON:  Okay.

19           THE WITNESS:  Okay.  I got 9.  I got 12.

20  Bear with me.  I got these mixed up, so. . .

21  We're looking for 9 and 10?

22          MS. KERKSIEK:  Just 9 and 10.  Um-hum.

23          THE WITNESS:  All right.  Well, I've

24  got 9, but I can't find 10.

25          MR. GIBSON:  Here it is.  Here it is.

1    THE WITNESS:  Oh.  Why would I see it?

2  It's right in front of me.

3    MR. SAUERS:  Right in plain sight.

4    MR. GIBSON:  9 and 10.

5    THE WITNESS:  Yeah.  Go ahead.

6  BY MS. KERKSIEK:

7    Q.   Okay.  So earlier you testified that

8  you never received any CoStar information from

9  Scott Bell.

10    A.   That's correct.

11    Q.   But you did -- you also testified that

12  you had no reason to believe that you didn't receive

13  these e-mails.  Right?

14    A.   That's correct.

15    Q.   So, to clarify, your testimony is that you

16  don't recall receiving any CoStar material from

17  Scott Bell.

18    A.   Exhibit Number 9 was a copy of an offer to

19  all associates.  I don't consider that proprietary

20  information.

21    I do not -- oh, wait a minute.

22  Exhibit Number 10.  I don't recall receiving it.

23    Q.   Okay.  When you did your e-mail search of

24  your Outlook, did you search for e-mails to or from

25  Scott Bell?

1       A.    Yeah, I think I did.

2       Q.    And what did you find?

3       A.    Nothing.  I mean, I don't -- you know,

4  I don't recall finding any.

5       Q.    Any what?  Do you recall any -- do you

6  recall finding --

7       A.    Any e-mails from him.

8       Q.    Any e-mails from him?

9       A.    I don't recall finding any.

10       Q.    And you -- neither you nor anyone at

11  K&H ever contacted your internet service providers

12  regarding your correspondence with Scott Bell --

13  regarding your e-mail correspondence with

14  Scott Bell?

15       A.    That's correct.

16       Q.    So there could have been e-mails from

17  Scott Bell with CoStar information to you and others

18  at K&H; you just don't know whether there are or

19  not?

20            MR. GIBSON:  Object to form.

21       A.    That's correct.

22       Q.    Are you aware that CoStar is a

23  subscription-based service?

24       A.    Yes.

25       Q.    Are you aware that CoStar is a service

1    that requires a user name and password?

2         A.    Yes.

3               MS. KERKSIEK:  No more questions.

4               MR. GIBSON:  We'll read.

5               THE VIDEOGRAPHER:  The time is 1:10 p.m.

6    We're now off the record.

7               (The deposition was adjourned at

8    1:10 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OATH

STATE OF FLORIDA        )
COUNTY OF HILLSBOROUGH)

    I, the undersigned authority, certify that
MARK S. KLEIN personally appeared before me
and was duly sworn.

    WITNESS my hand and official seal this
5th day of September, 2009.

                          _____
                          JEAN M. WILKES, RPR-CP
                          Notary Public - State of Florida
                          My Commission No. DD 752848
                          Expires:  Januray 28, 2012

REPORTER'S DEPOSITION CERTIFICATE WITH ACKNOWLEDGMENT
STATE OF FLORIDA        )
COUNTY OF HILLSBOROUGH)

    I, JEAN M. WILKES, RPR-CP, Certified Shorthand
Reporter, certify that I was authorized to and did
stenographically report the foregoing deposition; and
that the transcript is a true record of the testimony
given by the witness.

    I FURTHER CERTIFY that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of the parties'
attorneys or counsel connected with the action, nor
am I financially interested in the action.

    DATED this 5th day of September, 2009.

                          _____
                          JEAN M. WILKES, RPR-CP
                          Notary Public - State of Florida
                          My Commission No. DD 752848
                          Expires:  January 28, 2012

## SIGNATURE PAGE/ERRATA SHEET

**WITNESS:** MARK S. KLEIN
**CASE STYLE:** Klein & Heuchan, Inc. vs. CoStar Realty Information

### INSTRUCTIONS TO WITNESS
After you have read the transcript of your deposition, please note any errors in transcription on this page. Do not mark on the transcript itself. Please sign and date this page as indicated below. If additional lines are required for corrections, attach additional pages.

| PAGE | LINE | ERROR OR AMENDMENT/REASON FOR CHANGE | REPORTER'S INITIALS |
|------|------|--------------------------------------|---------------------|
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |

I have read the transcript of my deposition and subscribe to its accuracy, to include the corrections or amendments noted above or attached hereto.

_____          _____
Signature of Witness                      Date