IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KLEIN & HEUCHAN, INC.,

     Plaintiff,

v.                          Civil Action No. 8:08-cv-01227-JSM-MSS

COSTAR REALTY INFORMATION, INC.,
and COSTAR GROUP, INC.,

     Defendants / Counter-Plaintiffs

v.

SCOTT BELL and KLEIN & HEUCHAN,
INC.

     Counter-Defendants

_____/

## NOTICE OF FILING DEPOSITION TRANSCRIPT (WITHOUT EXHIBITS) OF CHRISTOPHER SCOTT BELL IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

Plaintiff, KLEIN & HEUCHAN, INC., by and through their undersigned counsel herby files

the deposition transcript of CHRISTOPHER SCOTT BELL (without exhibits) which was taken on

August 20, 2009 in support of Plaintiff's Response to Defendants Motion for Summary Judgment.

**[Remainder of Page Intentionally Left Blank]**

RESPECTFULLY SUBMITTED on this <u>16th</u> day of October, 2009.

   /s/ Jeffrey W. Gibson
J. PAUL RAYMOND, ESQ.
Florida Bar No. 0169268
jpr@macfar.com
JEFFREY W. GIBSON, ESQ.
Florida Bar No. 0568074
jg@macfar.com
Macfarlane Ferguson & McMullen
P.O. Box 1669
Clearwater, FL 33757
(727) 441-8966 – Phone
(727) 442-8470 – Facsimile
Attorneys for Plaintiff
Klein & Heuchan, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October <u>16</u>, 2009, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send notice of electronic filing to the

following participants:

| | |
|---|---|
| William J. Sauers, Esq. | Nicholas Louis Ottaviano, Esq. |
| Shari Ross Lahlou, Esq. | Florin Roebig, PA |
| Sanja Sarich Kerksiek, Esq. | 777 Alderman Road |
| Crowell & Moring, LLP | Palm Harbor, FL 34683 |
| 1001 Pennsylvania Avenue, NW | |
| Washington, DC 20004 | Randall J. Love, Esq. |
| | Randall J. Love & Associates, P.A. |
| William Cooper Geurrant, Jr. | 5647 Gulf Drive |
| Hill Ward Henderson | New Port Richey, FL 34652-4019 |
| 101 E. Kennedy Blvd, Suite 3700 | *Counsel for Counter-Defendant, Scott Bell* |
| Tampa, FL 33601 | |
| *Counsel for Defendants-Counter-Plaintiffs* | |
| *CoStar Realty Information, Inc. and CoStar* | |
| *Group, Inc.* | |

   /s/ Jeffrey W. Gibson
JEFFREY W. GIBSON, ESQ.
Florida Bar No.: 0568074

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Civil Action No. 8:08-cv-01227-JSM-MSS

- - - - - - - - - - - - - - -x
                      :

KLEIN & HEUCHAN, INC.,      :

    Plaintiff,          :

                      :

vs.                    :

                      :

COSTAR REALTY INFORMATION,  :
INC., and COSTAR GROUP,    :
INC.,                  :

                      :

    Defendants/        :
    Counterclaim-Plaintiffs, :

                      :

vs.                    :

                      :

SCOTT BELL and         :
KLEIN & HEUCHAN, INC.,      :

                      :

    Counterclaim-Defendants. :

                      :
- - - - - - - - - - - - - - -x

CERTIFIED COPY

VIDEOTAPED
DEPOSITION OF:   CHRISTOPHER SCOTT BELL

DATE:          August 20, 2009

TIME:          9:07 a.m. to 2:14 p.m.

PLACE:         Hill, Ward & Henderson, P.A.
                Bank of America Plaza, Suite 3600
                101 East Kennedy Boulevard
                Tampa, Florida 33602

REPORTED BY:     Jean M. Wilkes, RPR-CP
                Notary Public
                State of Florida at Large

APPEARANCES:

JEFFREY W. GIBSON, ESQUIRE
Macfarlane Ferguson & McMullen, P.A.
Intervest Bank Building
625 Court Street, Suite 200
Clearwater, Florida 33756
(727) 441-8966 phone
(727) 442-8470 fax
JG@macfar.com E-MAIL
        Attorney for Plaintiff

WILLIAM J. SAUERS, ESQUIRE
        - and -
SANYA KERKSIEK, ESQUIRE
Crowell & Moring, LLP
1001 Pennsylvania Avenue
Washington, D.C. 20004
(202) 624-2746 PHONE
(202) 628-8844 FAX
wsauers@crowell.com E-MAIL
SKerksiek@crowell.com E-MAIL
        Attorneys for Defendants/
        Counterclaim Plaintiffs
        COSTAR REALTY INFORMATION, INC.
        and COSTAR GROUP, INC.

RANDALL J. LOVE, ESQUIRE
Randall J. Love and Associates
5647 Gulf Drive
New Port Richey, Florida 34652
(727) 847-0800 PHONE
(727) 842-3610 FAX
mmjlove@aol.com E-MAIL
        Attorney for Counterclaim
        Defendant SCOTT BELL

ALSO PRESENT:

TY BOWLING - Videographer
Watson Legal Video

MARK S. KLEIN, CCIM

STEVEN KLEIN

## I N D E X

PAGE

Examination by Mr. Sauers . . . . . . . . . . . . . 7

Examination by Mr. Gibson . . . . . . . . . . . 121

Examination by Mr. Sauers . . . . . . . . . . 153

Examination by Mr. Gibson . . . . . . . . . . . 155

Examination by Mr. Love . . . . . . . . . . . . . · 156

## EXHIBITS

NO.                    DESCRIPTION                         PAGE

1      Defendants/Counterclaim-Plaintiffs
       CoStar Realty Information, Inc. and
       CoStar Group Inc.'s Amended Notice
       of Deposition to Counterclaim-Defendant
       Scott Bell Pursuant to Rule 30 of the
       Federal Rules of Civil Procedure . . . . . .   8


2      Klein & Heuchan, Inc. Realtors Office Policy
       and Commission Schedule For Employees and
       Independent Contractors   . . . . . . . . . .  40


3      The CoStar Office Report Year-End 2007
       Tampa/St. Petersburg Office Market . . . . .   41


4      The CoStar Office Report First Quarter 2007
       Tampa/St. Petersburg Office Market . . . . .   41


5      The CoStar Industrial Report Year-End 2007
       Tampa/St. Petersburg Industrial Market . . .   41


6      Printout from CoStar COMPS database for
       mini storage site in Pasco County   . . . . . 44


7      E-mail dated 6/14/07 from Scott Bell to Gus    53

# EXHIBITS (Continued)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 8 | E-mail dated 6/5/08 from Scott Bell to 'msk' . . . . . . . . . . . . . . . . | 56-57 |
| 9 | E-mail dated 8/16./07 from Scott Bell to 'msk'; subject: CoStar Report . . . . . | 59 |
| 10 | E-mail dated 8/4/07 from Scott Bell to Steven Klein with attachment, The CoStar Office Report, Year-End 2006, Tampa/ St. Petersburg Office Market . . . . . . . . | 62 |
| 11 | E-mail dated 1/31/07 from Scott Bell to Tracy McMurray, Subject: 5216 Lois Avenue, Tampa Warehouse . . . . . . . . . . . . . . | 64 |
| 12 | E-mail dated 5/23/07 from Scott Bell to Carol Duncan . . . . . . . . . . . . . . . . | 70 |
| 13 | E-mail chain dated 4/4/07 and 4/5/07 from Scott Bell to Steven Klein; Office report document . . . . . . . . . . . . . . . . . . | 76 |
| 14 | Spreadsheet for self-storage units from CoStar's database . . . . . . . . . . . . . | 87 |
| 15 | Excel spreadsheet from CoStar's database containing list of office buildings in the metropolitan area with mailing addresses . . . . . . . . . . . . . | 90 |
| 16 | List with different owners and addresses of property . . . . . . . . . . . . . . . . | 91 |
| 17 | Spreadsheet for industrial warehouses in the Holiday, Florida, area . . . . . | 92-93 |

## EXHIBITS (Continued)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 18 | Documents from Mr. Bell's computer not obtained from the CoStar database . . . | 95-96 |
| 19 | Documents from Mr. Bell's computer not obtained from the CoStar database . . . | 95-96 |
| 20 | Documents from Mr. Bell's computer not obtained from the CoStar database . . . | 95-96 |
| 21 | Spreadsheet with office buildings in Clearwater and Tampa metropolitan area . | 96-97 |
| 22 | Spreadsheet obtained from the CoStar database pertaining to developers, property managers and some brokers . . . . . . . | 96-98 |
| 23 | Spreadsheet . . . . . . . . . . . . . . . . | 96 |
| 24 | E-mail chain dated 5/27/08 from C. Scott Bell to Fadi Malki; e-mail dated 2/23/08 from Fadi Malki to Scott Bell . . . . . . . . | 99-100 |
| 25 | Composite letters dated 4/16/08 from Curtis Ricketts to Mark Klein; CoStar License Agreement Subscription Form | 101 |
| 26 | Scott Bell Commissions 2007, dated 1/22/2009 . . . . . . . . . . . . . | 114 |
| 27 | List of K&H Associates in 2007 and 2008 . | 120 |

1　　　　　　　　The videotaped deposition, upon oral

2　examination, of CHRISTOPHER SCOTT BELL, taken on

3　the 20th day of August, 2009, at the offices of

4　Hill, Ward & Henderson, P.A., 101 East Kennedy

5　Boulevard, Suite 3600, Tampa, Florida, beginning

6　at 9:06 a.m., before Jean M. Wilkes, RPR-CP, Notary

7　Public in and for the State of Florida at Large.

8　　　　　　　　　- - - - - - -

9　　　　　　　　THE VIDEOGRAPHER:  This is videotaped

10　deposition of Scott Bell taken in the matter

11　of <u>Klein & Heuchan, Inc. versus CoStar Realty</u>

12　<u>Information, Inc., et al.</u>, held at the offices of

13　Hill, Ward & Henderson, 101 East Kennedy Boulevard

14　in Tampa, Florida, on August 20th, 2009, at

15　9:06 a.m.

16　　　　　　　　Will you counsel please introduce

17　yourselves beginning with the plaintiff counsel?

18　　　　　　　　MR. SAUERS:  There are a couple of them.

19　　　　　　　　THE VIDEOGRAPHER:  Okay.

20　　　　　　　　MR. SAUERS:  I'll go first.

21　William Sauers from Crowell & Moring,

22　Washington, DC, for the CoStar Counterclaim

23　Plaintiffs.

24　　　　　　　　MR. LOVE:  Randall Love on behalf of

25　Mr. Bell.

1          MR. GIBSON:  Jeff -- Jeffrey Gibson with

2     -- from Macfarlane Ferguson & McMullen here on

3     behalf of Klein & Heuchan.

4          THE VIDEOGRAPHER:  There will be a

5     microphone for you there, sir, somewhere.

6          MR. GIBSON:  Did I steal yours?

7          MR. LOVE:  I don't see one.

8          MR. GIBSON:  Here's one for you right

9     there.

10          MR. LOVE:  Oh.  Right.

11          MR. GIBSON:  Here we go.

12          THE VIDEOGRAPHER:  Will the court

13     reporter swear the witness, please.

14          THE COURT REPORTER:  Would you raise your

15     right hand?

16                CHRISTOPHER SCOTT BELL,

17     being first duly sworn to testify the truth, the

18     whole truth, and nothing but the truth, was examined

19     and testified as follows:

20          THE WITNESS:  Yes.

21                     EXAMINATION

22     BY MR. SAUERS:

23          Q.    Good morning.

24          A.    Good morning.

25          Q.    Can you please state your full name and

1  address for the record?

2      A.   It's Christopher Scott Bell,

3  2725 Big Pine Drive.  That's Holiday, Florida,

4  34691.

5           MR. SAUERS:  Thank you.  I'd like to just

6  go ahead and mark the first exhibit, which is the

7  Amended Notice of Deposition for today.

8           (The document was marked as Bell Exhibit

9  Number 1 for identification.)

10 BY MR. SAUERS:

11     Q.   Have you seen this document before?

12     A.   Yes.

13     Q.   Okay.  And are you here to testify

14 pursuant to this deposition notice?

15     A.   Yes.

16     Q.   Great.  Thank you.

17          Mr. Bell, where are you currently

18 employed?

19     A.   I am a full-time stay-at-home father.

20     Q.   Since when?

21     A.   Since August of 2008.  Yeah.

22     Q.   And where were you employed prior to that?

23     A.   Klein & Heuchan.

24     Q.   And during what time period were you

25 employed with Klein & Heuchan?

1    A.    Approximately somewhere between, like, the

2    latter part of December, early part of January, of

3    '06/'07 through -- until now.  I'm still -- I still

4    have my license under their -- with their firm,

5    still.  But I'm, for the most part, just -- you have

6    to park your license there to maintain an active

7    status should I ever do come back.

8        Q.    Could you go back?

9        A.    It doesn't look -- probably not as

10   probable because I am a -- I like my job that I have

11   now and it's --

12       Q.    Right.

13       A.    -- it's fantastic, so -- the market is not

14   very well and --

15       Q.    Sure.  I guess I meant market issues aside

16   and employment preference aside, if you decided

17   tomorrow you wanted to go back, could you?

18       A.    I'm not -- I'm not sure.  I'm not sure.

19       Q.    But your license is still parked, you

20   said, with them?

21       A.    Yeah.  It's still parked with Klein, yeah.

22       Q.    So what does that mean, that it's parked

23   there?

24       A.    It remains active within the Florida Real

25   Estate Department.

1    Q.    Okay.

2    A.    So if you go inactive, then you have to

3    come back and find a new place or whatever and --

4    you have to kind of start all over again.

5    Q.    Okay.

6    A.    So most people try and stay active even

7    though they might not be actively practicing.

8    Q.    Is there a cost -- are you aware of a cost

9    to Klein and -- are you aware of a cost associated

10   with parking your license?

11   A.    No.

12   Q.    Where were you employed -- did you say

13   December, January -- December '06, January '07 --

14   where were you employed prior to that?

15   A.    It was for Coldwell Banker Commercial NRT.

16   Q.    And when did you start with them?

17   A.    It seems like it was probably September of

18   '05 through, let's say, November of 2006.

19   Q.    So there was a break between when you were

20   employed by Coldwell Banker and when you moved over?

21   A.    For a short period of time -- I guess

22   it was sort of a break.  I was at -- I went up to

23   F.I. Grey & Son, which is in New Port Richey.  And

24   I hadn't completely made a transition yet, and he --

25   he asked me if I might be interested.

1          I went up there and checked out the

2     office a few times and I kind of made my decision

3     to go with Klein & Heuchan.

4          Q.   And prior to Coldwell Banker where were

5     you employed?

6          A.   I worked for a company called Ecolab,

7     E-c-o-l-a-b.

8          Q.   Okay.  When did you start with them?

9          A.   February 1998 through -- it seems like it

10    was probably about June of -- what is that?   '95.

11    June, July-ish of '95.

12         Q.   June '05?

13         A.   '05, yeah.  Did I say '95?  Yeah.

14         Q.   And what sort of job did you have with

15    Ecolab?

16         A.   I was a territory manager for them.

17         Q.   What does that mean?  What were your job

18    responsibilities?

19         A.   I sold new business to restaurants,

20    hotels, the hospitality time industry.  Ecolab is

21    an institutional supplier of chemicals, sanitizers.

22         Q.   So it was not in the real estate industry?

23         A.   No.

24         Q.   Okay.  So Coldwell Banker was your first

25    job in the real estate industry?

1      A.   Yes.

2      Q.   Okay.  When did you get your real estate

3  license?

4      A.   It was about June/July of 2005.  Or 1995.

5  I'm sorry.  No, no.  2005.

6      Q.   Okay.

7      A.   I get the -- it's shortly after I left

8  Ecolab.  I get it confused.

9      Q.   Okay.  Do you have a college degree?

10     A.   Yes.

11     Q.   Where from?

12     A.   Florida State University.

13     Q.   What year?

14     A.   1995.

15     Q.   Bachelors of Science, B.A.?

16     A.   Bachelor of Science, B.S.

17     Q.   In what area?

18     A.   Marketing.

19     Q.   Marketing.

20     A.   Um-hum.

21     Q.   Any other degrees?

22     A.   That's it.

23     Q.   Okay.  How about associations,

24  affiliations?

25     A.   Florida Gulfcoast Association of Realtors.

1    Its acronym is FGCAR.

2         Q.   Thank you.   Much faster.   And when did you

3    join them?   In '05?

4         A.   Yes.   Yeah.

5         Q.   Okay.   Any others?

6         A.   What?

7         Q.   Any other associations?

8         A.   That I was associated with or I am

9    associated with?   I'm not sure I understand your

10   question.

11        Q.   How about currently -- that you currently

12   are?

13        A.   That's it.

14        Q.   That's it.   How about that you were from

15   September of 2005 through August 2008?

16        A.   It would be the Pinellas Realtor

17   Organization.

18        Q.   All right.   Anything else?

19        A.   No.

20        Q.   Okay.   Have you ever been deposed before?

21        A.   No.

22        Q.   Are you aware of generally how the process

23   works?   Have you gone over all of that --

24        A.   Familiar.

25        Q.   Okay.   You can take a break whenever you

1    want to.  I would just ask if you -- there's a

2    question pending, you would give us an answer to

3    that question and then we can take a break.

4         A.    Okay.

5         Q.    If you're -- if I'm unclear in a question

6    -- you've already done it once --

7         A.    Okay.

8         Q.    -- let me know and I'll try and clarify

9    the question so that -- so that I get it right.

10         A.    Okay.

11         Q.    Thank you.

12              What was your position with

13    Klein & Heuchan?

14         A.    I --

15         Q.    What was your title?

16         A.    Salesperson, commercial salesperson, sales

17    associate.

18         Q.    Okay.  Is that the -- sales associate,

19    is that the only title or job description that

20    you had during the time period you were with

21    Klein & Heuchan?

22         A.    Correct.

23         Q.    Okay.  What were your job responsibilities

24    in that position?

25         A.    To get listings and sell our listings and

1    assist the company with being helpful.

2         Q.    Can you expand on that a little bit?

3         A.    What do you mean?

4         Q.    Well, I guess my question is:  What do you

5    mean by "being helpful"?

6         A.    Answer telephones, take floor calls, maybe

7    show another associate's listing if they're not

8    there.

9         Q.    Right.  How many agents were in the office

10   when you were there, approximately?

11        A.    I would say 14, 15, possibly.  Some came,

12   some went.

13        Q.    Were they all in the same area -- did they

14   all handle commercial realty?

15        A.    Yes.

16        Q.    Okay.  Who are the owners of

17   Klein & Heuchan?

18        A.    Mark Klein and Steve Klein.

19        Q.    Were you aware -- you said you left

20   Klein & Heuchan in -- effectively in August 2008.

21   Is that correct?

22        A.    Yes.

23        Q.    Okay.  Are you aware -- were you aware of

24   the existence of this lawsuit at that time?

25        A.    Yes.

1         Q.   Did you discuss the lawsuit with anyone at

2 Klein & Heuchan?

3         A.   We got the -- we got a notice from --

4 the guy's name is Curtis Ricketts indicating that he

5 believed there was somebody using CoStar's database

6 at Klein & Heuchan --

7         Q.   Um-hum.

8         A.   -- and didn't comply with the -- paying

9 for the past use and future license use; that they

10 would -- they would take -- they would -- they would

11 be suing them, Klein & Heuchan.

12         I didn't -- never was -- myself was

13 ever -- was my name ever brought into that.

14         Q.   Did you discuss it with anyone at

15 Klein & Heuchan?

16         A.   We discussed the implications that the

17 lawsuit could have if I was involved in it and that

18 I should seek counsel and talk to somebody.

19         Q.   Who is "we"?

20         A.   It would be Mark and Steve.

21         Q.   When was that discussion?

22         A.   Must have been right around the early part

23 of June when the letter came around.

24         Q.   And they advised that you should get

25 counsel?

1    A.   I should consider getting counsel if

2  we don't get this -- if we can't bring it to a

3  resolution, which was what was in the letter.  They

4  wanted to try and resolve it and get it over with so

5  it wouldn't escalate into this.

6    Q.   How did they bring it to your -- how

7  did they bring the lawsuit to your attention?

8  Did they call you, come to your desk?  Was there

9  a companywide meeting?

10    A.   No.  Mark called me on the telephone when

11  I was out in the field one day and said, "We got a

12  letter from CoStar.  Can you come and we need to

13  sit down and discuss it and see what's going on?

14  Because they're calling me.  We need to call them

15  back get on a conference call and discuss that with

16  them."

17    Q.   Were you ever on a conference call with

18  CoStar?

19    A.   Yes, I was, with Ricketts and Mark and

20  Steve.  We all were on the phone with them.  Um-hum.

21    Q.   And what were -- what was discussed during

22  that call?

23    A.   Mr. Ricketts indicated that Klein and --

24  somebody at Klein & Heuchan was using it.  It was

25  me.  That -- and he asked "Why?"

1    And I said, "Well, Coldwell Banker, at

2    a meeting that they had, kicked it off and said we

3    purchased everybody here a subscription to CoStar's

4    database."

5    And after I -- they -- you know, when

6    I think in terms of a subscription, it's like a

7    -- perhaps a magazine subscription, a newspaper

8    subscription. And they put it in my laptop and it

9    went with me, and I -- at some time I would expect

10   the subscription would run out. And that's pretty

11   much what we told Ricketts.

12   And he got very pushy, kind of -- almost

13   in kind of a threatening way, that he didn't really

14   -- he wasn't buying what we were telling him. And

15   that's exactly what it was, so -- and . . .

16   Q.   When you accessed the CoStar database, you

17   were aware that there were terms of use that you had

18   to accept. Is that correct?

19   A.   I believe so, yes.

20   Q.   Did you have any other discussions with

21   CoStar?

22   A.   Other than the folks that would call from

23   the marketing department about listings and things

24   like that, that was it.

25   Q.   And what were those calls?

1    A.    What were --

2    Q.    The folks that would call from the

3 marketing departments for listings.

4    A.    Megan Meyer, something like that, the

5 people from --

6    Q.    I'm not under -- I guess -- I'm sorry.

7 I'm not understanding.  Was that related to the

8 litigation?

9    A.    No.

10    Q.    Okay.

11    A.    No.  They would call -- other than that,

12 they would call and -- they'd call up every real

13 estate company and -- probably in the metropolitan

14 area to ask them about their listings and things

15 like that, so --

16    Q.    Ah.  Information gathering?

17    A.    Yes.

18    Q.    Okay.  I understand.

19          Did you have any other discussions with

20 anyone at Klein & Heuchan other than the one call in

21 the field that you had and then the group call with

22 CoStar?

23    A.    Just -- just my attorneys.

24    Q.    Okay.

25    A.    Jim Astrachan and Marilyn.

1    Q.  Um-hum.

2    A.  Another attorney, Steven P. Ross.

3    He's in Hackensack, New Jersey.  And Randall Love.

4    Steven Dupre at --

5            THE WITNESS:  What's the company he works

6    for?  Do you know?

7            MR. LOVE:  I do, but it's your

8    deposition.

9            THE WITNESS:  Okay.  I can't remember.

10   A.  Steven Dupre is -- he's over by the

11   International Mall and --

12   Q.  Is he an individual -- a sole

13   practitioner?

14   A.  No.  He's with -- I can't remember.

15   Q.  Is it a law firm?

16   A.  Yes, a law firm.

17   Q.  Oh, okay.

18           MR. LOVE:  For the record, it's

19   Carlton Fields.

20           THE WITNESS:  Carlton Fields.  Yes.

21           MR. SAUERS:  Okay.  Thanks.

22   A.  And there's some other ones I talked to,

23   but it was just kind of information gathering, other

24   firms in the metropolitan area, just to see what

25   their rates were and things like that.  Never --

1  never really went any further than that.

2       Q.   Did you use CoStar's services as part

3  of your work while employed at Klein & Heuchan?

4       A.   Yes.

5       Q.   In what ways?  What ways?

6       A.   I would say primarily, the -- most of what

7  I used CoStar was to perform some informative

8  research to learn about the market.

9       Q.   Comparative properties?  Would you

10  look at comparative -- if you were trying to sell

11  a property, would you try to find comps?

12       A.   Yes, I -- I would look at them, yeah.

13  Um-hum.

14       Q.   Would you run reports to do that?

15       A.   Yes.  There was -- I believe there was a

16  report you could run on that.

17       Q.   Would that include images of the property?

18       A.   We do -- we have some documents for you.

19  They're very small images.

20       Q.   Right.  I'm just asking generally.

21       A.   Yeah.  I mean, they're fairly small

22  images.  Yeah.  Um-hum.

23       Q.   When did you -- do you recall when you

24  first began using CoStar while you were employed

25  with Klein & Heuchan?

1       A.      December or January of last -- '06-'07.

2   Somewhere --

3       Q.      Right when you started?

4       A.      -- somewhere in there.

5       Q.      So pretty much when you -- when you

6   started?

7       A.      Yeah.

8       Q.      When did you stop using CoStar?

9       A.      When we got the letter from Mr. Ricketts.

10      Q.      Do you have any affiliation with Coldwell

11  Banker now?

12      A.      No.  Unh-unh.

13      Q.      Okay.  Did you at the time that you went

14  to Klein & Heuchan?

15      A.      No.

16      Q.      Did you obtain market -- CoStar market

17  reports while you were logged into CoStar's

18  database?

19      A.      Yes.  Yes.

20      Q.      Did you download information from CoStar's

21  database?

22      A.      Yes.  The market reports, yes.

23      Q.      Anything else?

24      A.      I printed a few properties, yes.

25      Q.      Did you ever send those to other people?

1     A.   I sent them -- I sent a few to some people

2    that I know over here in Tampa, yes, clients of

3    mine.

4     Q.   Prospective clients --

5     A.   Yeah.

6     Q.   -- or clients for prospective properties?

7     A.   Clients that I've worked with for years,

8    yes.

9     Q.   And what would you send them?

10     A.   I sent -- actually, I sent one -- one

11   person some comps on a property that he was perhaps

12   interested in.  It wasn't that property.  It was

13   what the surrounding area, what -- some things that

14   had sold, and I verified those with the Hillsborough

15   County Property Appraiser as well to make sure that

16   the numbers were accurate.

17    Q.   You verified the information obtained from

18   the CoStar database against the Hill County

19   appraisal records?

20     A.   Hillsborough County, yes.

21     Q.   Hillsborough.  I'm sorry.  Hillsborough

22   County --

23     A.   Yes.

24     Q.   -- appraisal records.

25        Is that standard practice?

1     A.    For the most -- yeah.  For the most

2  part when you get -- you go to Hillsborough County

3  web site, and you can get the information based on

4  what's sold and -- I'm guessing that's where CoStar

5  probably gets that information from as well.

6     Q.    So did you make it a practice to use

7  CoStar as part of your research when evaluating

8  properties for sale and prospective -- which ones

9  might be appropriate for certain customers?

10    A.    No.  I would say most of the time when I

11 used CoStar, I was just kind of browsing, looking

12 around, not particularly at any one point of

13 interest.  It was more or less learning how to use

14 the database and just seeing what was actually out

15 there, things that I wasn't even involved in or

16 anything.  You look at hotels and things like

17 that.  We don't sell hotels.  It was more of an

18 informative-type thing.

19    Q.    But, of course, you would use that

20 knowledge in your business.  Correct?

21    A.    Well, it's more of a -- kind of like you

22 wish you could play in the NFL one day.  It's kind

23 of like -- you know, I don't sell hotels.  We don't

24 do any business with hotels.  So it's just kind of

25 like, gee, you know, you just want to see what --

what's going on out there, what -- you know, what's

selling.

Q.    But you did do research in the markets in

the areas in which you were active?

A.    I did -- I did research out of the market

that -- some in and some out, outside of the market

that I did work in.

Q.    So, yes, you used CoStar to perform

research in the market where you were active?

A.    Yes.

Q.    Thank you.  Did you ever receive

authorization from CoStar to use CoStar's services

while you were at Klein & Heuchan?

A.    I received authorization from Coldwell

Banker.  They -- when they -- they purchased the

license for me and put it on my laptop and said,

"Here you go.  Here's your subscription -- it's

yours -- and use it."

So it's kind of -- never did any -- never

had any contact with CoStar when they signed me up,

so I -- no.

Q.    Prior to the lawsuit, this lawsuit,

did you ever discuss CoStar with anyone at

Klein & Heuchan?

A.    Mark and Steve were the guys we spoke

1    with, yes.

2        Q.    And when did you speak with them about

3    CoStar, excluding a lawsuit?

4        A.    That's when we --

5        Q.    Other than --

6        A.    Oh.  I'm sorry.  I don't understand your

7    question.

8        Q.    Other than -- prior to the lawsuit being

9    filed, did you ever --

10       A.    Prior to that?

11       Q.    Yes.

12       A.    On a few occasions we looked -- had

13   some reports.  I would -- like, the Market Report

14   for Office.  I believe I gave Mark and Steve a copy.

15   And I also gave Judi Healey next to me, an associate

16   that's there.  She does a lot of Office.  I gave her

17   a report.

18            And I gave -- I think I had sent Mark

19   and Steve, maybe, some -- some space availabilities

20   that were in a building -- a couple buildings in

21   Tampa.  I don't recall exactly which ones they are.

22       Q.    Did you ever discuss -- and all these

23   questions are excluding the lawsuit time period.

24       A.    Okay.

25       Q.    Did you ever discuss CoStar with

1    anyone at --

2         A.    No.

3         Q.    Never mentioned that you were using CoStar

4    to anyone?

5         A.    I mean, Mark and Steve were the only --

6    the only folks.  I think Judi Healey, I -- I think

7    I'd shown her maybe once or twice, you know, like,

8    what a -- what the -- you know, I showed her the

9    database.  Because she had used it before at --

10   where she used to work, too.

11        Q.    Did she use -- did you let her use the

12   database at all while she was with Klein & Heuchan?

13        A.    No.

14        Q.    You said that you may have talked about

15   it.  Well, maybe I didn't understand your answer.

16        A.    Yeah.

17        Q.    What discussions did you have with

18   Mark Klein or Steve Klein about CoStar prior to the

19   institution of a lawsuit?

20        A.    I -- we just -- if there was property.

21   Or sometimes they would say, "Hey, could you look

22   something up?  You know, what does your thing say

23   about this?"

24              They're doing -- they've done their own

25   research.  And they would say, you know, "What does

1    your thing say?" -- dah, dah, dah.

2        Q.   "Your thing" being CoStar?

3        A.   Yes.

4        Q.   So they would ask you to perform searches

5    on CoStar's --

6        A.   On a few occasions, yes.

7        Q.   So they knew you had access to CoStar?

8        A.   Yes.

9        Q.   Do you know when they became aware that

10   you had access to CoStar?

11       A.   I want to say it was probably a couple of

12   months after I joined, a few months after.

13       Q.   How did they become aware?

14       A.   I had shown them an office report, and

15   that's -- that's how.

16       Q.   And then they -- did they ask you if you

17   had access?

18       A.   Yeah, they -- they -- he did ask me.  He

19   said, you know, "Where -- how are you using that?"

20   And I said, "Well, they -- we got a subscription

21   from -- I had a subscription bought from -- while I

22   was at Coldwell Banker."

23       Q.   Do you know if Mark -- was that discussion

24   with Mark Klein or with Scott Klein or with both?

25       A.   It was with Mark and Steve.

1    Q.    Or Steve.  Sorry.

2    A.    Yeah.

3    Q.    Did they -- either of them tell you if

4    they were aware of what CoStar was at that time?

5    A.    I think they had used maybe some trial

6    times and that they weren't exactly thrilled with

7    the database.

8    Q.    Did they tell you that -- when did they

9    tell you they weren't thrilled with the database?

10   A.    I don't remember.

11   Q.    Was it during these initial discussions

12   when you were first showing them your CoStar --

13   A.    Yeah.  They -- it didn't seem to -- it

14   wasn't a big deal to them.  It didn't seem like --

15   it didn't really fit the shoe.  I mean, most of what

16   we do is not what CoStar does.  So we -- most of

17   what we used it for was to research and just gain an

18   understanding of the market as an educational tool.

19   Q.    You said that Mark and Steve had had some

20   -- did you say "a test use"?

21   A.    I think -- as I recall it, they had -- I

22   guess CoStar salespeople would come in all the time

23   trying to get them to buy the database, and they

24   just were never interested in it.

25            They -- I think they might have tried it

1      a few times and just weren't -- they didn't -- they

2      didn't see a value in it, I think is exactly what

3      Mark's words were.

4          Q.   But they did ask you to run reports on

5      occasion and to conduct research?

6          A.   They would ask me to -- yes.  They would

7      ask me to look at a property or something like that

8      and see if there -- the information that was there.

9          Q.   Did you use the CoStar services --

10     did you access the CoStar services during your

11     employment with Klein & Heuchan on the premises

12     of Klein & Heuchan with their internet access?

13         A.   Yes.  I used their internet access there.

14     Right.

15         Q.   Did you pay for the internet access?

16         A.   No.

17         Q.   Who paid for the internet access?

18         A.   I'm assuming it would be Klein & Heuchan,

19     but I -- I'm not . . .

20         Q.   Did you have a Klein & Heuchan e-mail

21     account?

22         A.   Yes.

23         Q.   Who provided you with that e-mail account?

24         A.   Klein & Heuchan.

25         Q.   Tell me if you don't follow this.  What

1    sort of e-mail account was it from a technical

2    standpoint?  Internet?  Server-based?  Do you know?

3         A.   I don't know.

4         Q.   Okay.  When you wanted to find your

5    e-mails, where were they?  What sort of program did

6    you log into?

7         A.   It would be Outlook.

8         Q.   It was Outlook.  Okay.

9         A.   Yeah.

10        Q.   Is that your copy of Outlook?

11        A.   Is what copy?

12        Q.   The Outlook that -- the Outlook that you

13   logged into.  Would you log into the network at

14   Klein & Heuchan and get your e-mails, or how did

15   you get your e-mails?

16        A.   We would have to go in the office and plug

17   in or we could do it remotely.

18        Q.   Okay.  So there was a -- to your

19   understanding, there would be a server or something

20   like that that had all of your e-mails?

21        A.   Yeah.

22             MR. GIBSON:  Object to form.

23        Q.   Were there any other sorts of computer

24   programs or databases that were provided to you by

25   Klein & Heuchan?

1      A.   There was -- there's one.  It was the

2   IMAP, which was another real estate -- it's kind of

3   a -- more of a residential/a little bit commercial.

4   That's -- I just remember it being IMAP.

5      Q.   Was the Microsoft Outlook part of an

6   office suite?  Did you have Word and PowerPoint?

7      A.   Did I?

8      Q.   Um-hum.

9      A.   Yeah.  I believe so.

10      Q.   And when you -- did you have the ability

11   to save documents and images and things like that to

12   somewhere other than your hard drive?

13      A.   There was a -- at Klein & Heuchan there

14   was a place -- it was called, I think, the EDrive or

15   the IDrive or something -- where people could store,

16   like, proposals and things like that, or whatever,

17   on the server.  Yeah.

18      Q.   Did you ever use that drive?

19      A.   Very rarely.

20      Q.   You could log into that drive remotely or

21   on --

22      A.   No.  You had --

23      Q.   Only on site?

24      A.   -- you had to be on the property.

25      Q.   When you wanted to -- could you make photo

copies on -- did Klein & Heuchan have a photocopier?

A.   Yes.

Q.   They provided it for your use?

A.   For everyone's use.

Q.   For everyone's use.

A.   Yeah.

Q.   Did it have any notices on it or anything like that?

A.   Not that I recall seeing.

Q.   Did you ever use it to make copies of CoStar information?

A.   I think I printed -- because the reports are so long, I put it -- I think I had made some copies and used it on the copier, yeah.

Q.   So you would -- you could e-mail it directly to that copier?  Was it a copier printer?

A.   No.  You'd have to print them out and then put it through the copier.

Q.   Okay.  Was there a Klein & Heuchan copier as well?

A.   Copier, yeah.

Q.   And a printer?

A.   They had print -- they had their printers. We had -- everybody had their own -- everybody had their own printers, and they had their own printers

1   as well.

2           So every associate had their printer.

3   And then, like, the staff, the administrative people

4   had their printers separately.

5       Q.   Okay.  And all those printers were

6   provided by Klein & Heuchan?

7       A.   No.  I provided my printer.

8       Q.   Okay.

9       A.   Each associate bought their own printers.

10      Q.   Understood.  So you would -- you would get

11  something from the CoStar database, print it out on

12  your printer, walk over to the Klein & Heuchan

13  copier and make a copy?

14      A.   Right.

15      Q.   Okay.  Do you know if your e-mails were

16  archived on Klein & Heuchan's servers?

17      A.   Almost all the information I provided for

18  the deposition for you was from archived e-mails,

19  yes.

20      Q.   When did you obtain them?

21      A.   When did I obtain them?

22      Q.   When did you obtain the information you

23  provided to us?

24      A.   I just -- maybe about a month or two ago

25  when I thought we were having the deposition, I had

1   gone through all my archives and printed off

2   everything to provide to you.

3        Q.   So you were still able to access

4   Klein & Heuchan's servers to get this information?

5        A.   No.  I have -- when you send and receive

6   things, it archives on my computer.

7        Q.   Right.  I'm sorry.  Yes.  That's exactly

8   right.  I meant -- I wasn't clear enough.

9             Do you know if Klein & Heuchan saves a

10  backup copy of e-mails and things like that?

11       A.   I wouldn't have any idea.  I don't know.

12       Q.   That's fine.  I just --

13            So the copies of the documents that you

14  provided were on your personal computer?

15       A.   Right.

16       Q.   Okay.  Would you have additional hard

17  copy files at the offices of Klein & Heuchan?

18       A.   I'm not sure I understand the question.

19       Q.   For properties -- excuse me -- for

20  properties that were listed through Klein & Heuchan,

21  would there be a file, a hard copy file?

22       A.   For Klein and -- all of Klein & Heuchan

23  would have, yeah.

24       Q.   And would you keep information -- what

25  sort of information would you keep in those files?

1    A.    Contracts and listing agreements and

2    correspondence between the client.

3    Q.    Okay.  Anything else?  Notes, research,

4    that sort of thing?

5    A.    No.

6    Q.    Were you required to put correspondence in

7    -- with clients -- into that file?

8    A.    Only if it was about a contract.  Any

9    legal-type document, that was basically all that was

10   in those files.  Like a legal contract, a listing

11   agreement, any earnest money, check information,

12   closing, most -- that would be what I recall as

13   being what would be in there.

14   Q.    Okay.  How would you know which properties

15   were associated with you?

16   A.    How would I know?

17              (Cell phone ringing.)

18              MR. SAUERS:  Excuse me.  I thought I

19   turned that off.  The screen was off.

20   BY MR. SAUERS:

21   Q.    Yeah.  How would you know -- you know, all

22   of -- I'm sure you had a database of your listings

23   that were with you.  But how was the -- how were the

24   records organized so that you could know, in hard

25   copied, which ones were associated with you?

1    A.    They assigned -- I don't know that -- I

2    don't think the way they filed them wasn't in my

3    name or anything like that.

4         They -- they would give them -- each

5    property would be assigned an "SI," which is sale

6    improved, or "LO," which is lease, and they would

7    -- maybe 123 or 611 or something like that.

8         And that's how it -- and then they --

9    there was -- I think there was a list -- I'm sure

10    there was -- that would give the associate's name of

11    what listing, who had the listing so you know whose

12    it was and you could reference -- if you were shown

13    somebody else's listing, you could ask them who it

14    was.

15    Q.    Right.  Did anyone -- other than Judi

16    Healey, did anyone at CoStar ever see you using the

17    CoStar database at Klein & Heuchan's offices?

18    A.    I had shown Mark -- on one Saturday

19    afternoon when we were doing a report, I had shown

20    him the -- whatever -- I was showing him the CoStar,

21    how you could type in an address and all that.  That

22    was basically it.  Nobody else in the office, no.

23    Q.    I'm sorry.  You said that was Mark Klein?

24    A.    Yes.

25    Q.    On a Saturday.  Do you know -- do you

1      recall roughly when that was?

2          A.    I have no idea.

3          Q.    The beginning --

4          A.    That's been two years ago.

5          Q.    No.  I understand.  And I'm not looking

6      for an exact date.

7                Within the first couple months you were

8      there?

9          A.    I'd say --

10         Q.    Right before you left?  You know.

11         A.    -- mid part of the year after I was there,

12     probably.

13         Q.    Okay.  How were commissions handled by

14     Klein & Heuchan?  What was the process when you

15     would make a sale?  What would happen?  You got

16     a signed contract.  Money goes into escrow.  What

17     happens?

18         A.    Signed contract; money goes into escrow.

19         Q.    Um-hum.  Whose escrow account is it?

20         A.    Well, it depends.  If the buyer -- the

21     buyer or the seller can --

22         Q.    Sure.  You are a seller.  So it goes

23     into --

24         A.    It could be -- it could be Klein & Heuchan

25     sometimes, and most of the time it might be their

1  attorneys or maybe some other -- maybe they kept it

2  at one -- I don't know.

3      Q.  And then the proceeds -- the commission

4  off of the sale, would that go directly to you?

5      A.  Sometimes --

6      Q.  Would it go to --

7      A.  Sometimes it would; sometimes it wouldn't.

8  It would go -- I can't collect a commission.

9      Q.  Okay.

10     A.  A broker can only pay a commission to

11 a salesperson.  A salesperson is not entitled to

12 collect a commission unless it's paid through his

13 broker to him.

14     Q.  Okay.  So the money would go to

15 Klein & Heuchan and then they would pay you?

16     A.  Yes.

17     Q.  Okay.  And what was the percentage that

18 you received on -- what was your commission

19 percentage?

20     A.  It's -- there's a -- there's a scale.

21     Q.  Um-hum.

22     A.  And you start at 50-50 and you work your

23 way from there.

24     Q.  And is it based on the value of the

25 property?

1      A.   No.  It's based on how much you sell in a

2   calendar year.

3      Q.   Ah, I see.  So total sales volume --

4      A.   Right.

5      Q.   -- would adjust the percentage that you

6   would get?  And the higher your volume, the greater

7   the percentage you would get?

8      A.   Correct.

9      Q.   Okay.  So, of course, the -- there's an

10  incentive to sell as many properties as you can?

11     A.   Um-hum.

12          THE COURT REPORTER:  That's a yes?

13          THE WITNESS:  Yes.

14          MR. SAUERS:  I'll mark the next exhibit.

15          (The document was marked as Bell Exhibit

16  Number 2 for identification.)

17          MR. SAUERS:  We're up to 2?

18          THE COURT REPORTER:  Um-hum.

19  BY MR. SAUERS:

20     Q.   Take a minute and look through this

21  document and tell me when you're ready.

22     A.   Is there anything you want me to look at?

23     Q.   No, no.  Just familiarize yourself with

24  it, see if you recognize it.  I'll ask you some

1   attorneys or maybe some other -- maybe they kept it

2   at one -- I don't know.

3       Q.   And then the proceeds -- the commission

4   off of the sale, would that go directly to you?

5       A.   Sometimes --

6       Q.   Would it go to --

7       A.   Sometimes it would; sometimes it wouldn't.

8   It would go -- I can't collect a commission.

9       Q.   Okay.

10      A.   A broker can only pay a commission to

11  a salesperson.  A salesperson is not entitled to

12  collect a commission unless it's paid through his

13  broker to him.

14      Q.   Okay.  So the money would go to

15  Klein & Heuchan and then they would pay you?

16      A.   Yes.

17      Q.   Okay.  And what was the percentage that

18  you received on -- what was your commission

19  percentage?

20      A.   It's -- there's a -- there's a scale.

21      Q.   Um-hum.

22      A.   And you start at 50-50 and you work your

23  way from there.

24      Q.   And is it based on the value of the

25  property?

1    A.   No.  It's based on how much you sell in a

2   calendar year.

3    Q.   Ah, I see.  So total sales volume --

4    A.   Right.

5    Q.   -- would adjust the percentage that you

6   would get?  And the higher your volume, the greater

7   the percentage you would get?

8    A.   Correct.

9    Q.   Okay.  So, of course, the -- there's an

10   incentive to sell as many properties as you can?

11    A.   Um-hum.

12        THE COURT REPORTER:  That's a yes?

13        THE WITNESS:  Yes.

14        MR. SAUERS:  I'll mark the next exhibit.

15        (The document was marked as Bell Exhibit

16   Number 2 for identification.)

17        MR. SAUERS:  We're up to 2?

18        THE COURT REPORTER:  Um-hum.

19   BY MR. SAUERS:

20    Q.   Take a minute and look through this

21   document and tell me when you're ready.

22    A.   Is there anything you want me to look at?

23    Q.   No, no.  Just familiarize yourself with

24   it, see if you recognize it.  I'll ask you some

25   questions about it after you flip through it.

1      A.    Okay.

2         Q.    Have you seen this document before?

3      A.    Yes.

4         Q.    Can you tell me what it is?

5         A.    It looks like it's the Office Policy and

6  Commission Schedule for Employees and Independent

7  Contractors.

8         Q.    And did you -- was your employment

9  pursuant to the terms of this policy?

10     A.    Yes.

11            MR. SAUERS:  Okay.  I'll mark the next

12  three exhibits.  Let's see.  Let me make sure I get

13  this right.  This will be Exhibit 3.

14            (The document was marked as Bell Exhibit

15  Number 3 for identification.)

16            MR. SAUERS:  And this will be Exhibit 4.

17            (The document was marked as Bell Exhibit

18  Number 4 for identification.)

19            MR. SAUERS:  And this will be Exhibit 5.

20            (The document was marked as Bell Exhibit

21  Number 5 for identification.)

22  BY MR. SAUERS:

23        Q.    Okay.  Got them all?

24            All right.  Take a minute and

25  look through those documents.  And when you're --

1  familiarize yourself with them and let me know when

2  you're ready.

3      A.  Okay.

4      Q.  Do you recognize these documents?

5      A.  Yes.

6      Q.  Can you tell me what each of them are?

7      A.  Year-End CoStar Industrial Reports,

8  the Year-End Office Report for 2007 and the

9  First Quarter Office Report, 2007.

10      Q.  Are these documents that you obtained

11  from your computer and produced in this litigation?

12      A.  Yes.

13      Q.  Did you obtain these reports from the

14  CoStar database pursuant to your password access?

15      A.  Yes.

16      Q.  And did you give copies of any of these

17  three reports to anyone at Klein & Heuchan?

18      A.  Yes.

19      Q.  Whom?

20      A.  Mark Klein, Steve Klein and Judi Healey.

21      Q.  All three of them?  All three reports to

22  all three people?

23      A.  No.  I don't -- I gave Judi one of the

24  office reports.  I don't recall which one it was

25  because there's two here.  And then --

1    Q.   So that would -- you're talking about

2    Exhibit 3 or Exhibit 4?

3    A.   Yeah.   Right.

4    Q.   Okay.   And which ones did you give to

5    Mark or -- Mark Klein?

6    A.   Probably -- most likely, that I can

7    remember, it would probably be the office report for

8    first quarter and -- I don't know.   Maybe -- maybe

9    both of them.   I don't know.   I don't remember.

10   Q.   So that's, again -- that's 3 and 4 again?

11   A.   Yes.

12   Q.   And how about -- which ones did you give

13   to Steve Klein?

14   A.   Probably the industrial and then the

15   office report.

16   Q.   So all three exhibits, 3, 4 and 5?

17   A.   I --

18   Q.   Possibly?

19   A.   I don't know.

20   Q.   Okay.   Why would you have given

21   Steve Klein the industrial report but everyone

22   else only the office market reports?

23   A.   Steve does a lot with the industrial.

24   Q.   Ah.   Okay.   So the Industrial Market

25   Report would have been more relevant for him?

1    A.   I assume so.

2    Q.   Did you ever discuss any of these reports

3    with anyone at Klein & Heuchan?

4    A.   I don't understand.

5    Q.   Did you go over -- ever sit down and go

6    over one of them with anybody?

7    A.   No.  I mean, they're pretty

8    self-explanatory.  I don't . . .

9    Q.   Okay.  And how did you come to give these

10   reports to the various people in the office?  Did

11   anyone ask for them?

12   A.   I had given them one and then -- I would

13   say primarily I would offer them to them, yes.

14   Q.   Okay.  So you gave them the first one.

15   And then after that you would say, "I've got the new

16   one" or --

17   A.   I don't remember if they asked me for

18   office report or not.  I, more or less -- it was --

19   it was a learning experience for everybody, so . . .

20   Q.   Okay.

21          MR. SAUERS:  I'll mark the next exhibit

22   as Exhibit 6.

23          (The document was marked as Bell Exhibit

24   Number 6 for identification.)

25   BY MR. SAUERS:

1    Q.    Have you had a chance to take a look at

2    that?

3         A.    Yes.

4         Q.    Is this a document that you obtained from

5    your computer --

6         A.    Yes.

7         Q.    -- and produced in this litigation?

8         A.    Yes.

9         Q.    Can you tell me what it is?

10        A.    It is a mini storage site in Pasco County.

11        Q.    Okay.  And is it a -- is this a printout

12   from CoStar Comps database?

13        A.    Yes.

14        Q.    And would you have needed to use your

15   password to obtain this information?

16        A.    Yes.

17        Q.    And I see on the bottom right it says what

18   appears to be a date of January 17th, 2007.  Is that

19   correct?

20        A.    Um-hum.

21        Q.    Is that the date you would have printed

22   this out from the database?

23        A.    Yep.

24        Q.    And that's just shortly after you started

25   with Klein & Heuchan.  Correct?

1   A.   Correct.

2   Q.   Did you ever provide this to anyone at

3   Klein & Heuchan?

4   A.   No.

5   Q.   Anyone else?

6   A.   Unh-unh.

7   Q.   Okay.  Why did you save this particular

8   document?

9   A.   This was a -- I had done a -- when I first

10  got to Klein & Heuchan, I did a large mail-out for

11  the Pasco County industrial market.

12  Q.   Um-hum.

13  A.   And this gentleman called and was in a --

14  in a mode to possibly list his property.

15  Q.   So this gentleman -- the owner of this --

16  the listed property here?

17  A.   Right.

18  Q.   Okay.  And so after you discussed the

19  property with him, you went and obtained this

20  report?

21  A.   After?

22  Q.   Or before.

23  A.   I -- most of what I obtained was from the

24  -- either the Pinellas Realtor Organization or the

25  West Pasco -- they have a co-op.  And then I used

1    this as a tool to -- it was just another tool to

2    validate the sales price in the past that was going

3    -- what it had sold for.  Right.

4        Q.   And so was that -- you went and did this

5    after you were contacted or you contacted the owner

6    of this property?

7        A.   Correct.

8        Q.   Okay.

9        A.   No.  He contacted -- we did a mail-out and

10   then he contacted us.

11       Q.   And then you performed this research?

12       A.   Yes.

13       Q.   Thanks.  And where -- where was this saved

14   on your computer?

15       A.   This --

16       Q.   What file folder?

17       A.   I don't know.

18       Q.   It wasn't attached to an e-mail?

19       A.   I don't -- no.  I don't believe so because

20   the guy didn't have e-mail.  I would never have sent

21   him this.

22       Q.   Okay.  The copies of -- I think you said

23   there's an E or an IDrive that was available at

24   Klein & Heuchan.

25       A.   Um-hum.

1    Q.    And then you would, I guess, separately

2    also save lots of things to your hard drive.    Is

3    that correct?

4    A.    What's the question again?

5    Q.    Would you save things -- strike the

6    question.

7              Would you ever save documents to both

8    the hard drive on your computer and on the "I" or

9    EDrive server?

10   A.    No.    Unh-unh.

11   Q.    How did you decide when to save things in

12   one place or the other?

13   A.    How did I decide to save it?

14   Q.    In which place.    A particular document,

15   how did you decide whether you would save it on the

16   hard drive of your computer or on the network at

17   Klein & Heuchan?

18   A.    Almost -- I saved it on my hard drive

19   almost all the time.    It would go into My Documents,

20   I think.    Yeah.

21   Q.    Okay.    Why would you ever save something

22   onto the network drive at Klein & Heuchan?

23   A.    It was like a legal contract or a -- like,

24   a letter or something or a mail-out or something

25   like that.    That would be the only reason why.    Or

1    if you took -- if you went out and took pictures of

2    the property or something to -- to make a flier --

3          Q.    Sure.

4          A.    -- or something like that.  That way --

5          Q.    What's a mail-out?

6          A.    A mail-out?

7          Q.    Um-hum.

8          A.    Is a letter.  You make a general letter.

9    You send it out to a use code or a property that

10   fits -- in this case I believe that is 4400 use

11   code, and it's for all industrial properties in a

12   county.  Or it can be divided down into Zip Code or

13   something like that.

14         Q.    Okay.  So it would be an advertisement

15   for a property that was available that you were

16   promoting?

17         A.    No.  It would be for a property you're

18   trying to get a listing for.

19         Q.    Ah.  Okay.  I see.

20         A.    I guess you could do it -- you could do it

21   that way, too, if you were promoting a property.

22         Q.    Right.  Did you ever do that, promote a

23   property?

24         A.    Yeah.  We would do post cards.  Right.

25         Q.    Anything else?

1    A.   I don't know -- I don't remember if we --

2    letters weren't very effective, so most of it was

3    post cards.

4    Q.   Okay.  And you see on the bottom left of

5    the page there, there's a copyright notice.

6    A.   Um-hum.

7    Q.   And does that say that it's "Copyright

8    2002 through 2007, CoStar Realty Information.  All

9    rights reserved"?

10    A.   Um-hum.

11    Q.   And then can you read to me what's --

12    what's the line underneath that?

13    A.   Oh.  "By using this site, you agree to the

14    Terms of Our Use."

15    Q.   And you see there that "Terms of Use" is

16    sort of in a -- maybe a slightly bolder font with an

17    underline?

18    A.   I can't see that here.

19    Q.   Okay.  Do you see that it's underlined?

20    A.   I see it's underlined.

21    Q.   Okay.  Do you understand that to mean that

22    that was an active link that you could click on?

23            MR. GIBSON:  Object to form.

24    Q.   You can answer.

25    A.   What is it?

1          Q.    Do you understand --

2                THE WITNESS:  Somebody just said

3     something.  I'm sorry?

4                MR. SAUERS:  He objected to form.

5                MR. LOVE:  Go ahead and answer.

6                MR. SAUERS:  There will be --

7     occasionally counsel -- or maybe not -- will object

8     at times.  Unless your lawyer specifically tells you

9     not to answer the question --

10               THE WITNESS:  Oh.  Did he object?  I

11    didn't even hear him.

12               MR. SAUERS:  Yeah.  Yeah.  No, no.  He --

13    your lawyer did not object.

14               THE WITNESS:  Oh, okay.

15               MR. SAUERS:  But unless he specifically

16    -- even if he objects, unless he specifically tells

17    you not to answer on the advice of counsel, you can

18    still answer --

19               THE WITNESS:  Oh, okay.

20               MR. SAUERS:  -- even if there's an

21    objection.

22               MR. GIBSON:  Just so you know, I'm

23    putting something on the record that we may deal

24    with later.

25               THE WITNESS:  Okay.

1    MR. GIBSON:  I'm preserving something, is

2  all I'm doing.

3    THE WITNESS:  No, that's fine.  I didn't

4  even --

5    MR. SAUERS:  It's part of the games we

6  all play.

7    THE WITNESS:  Okay.

8    THE VIDEOGRAPHER:  One minute.

9    MR. SAUERS:  One minute?  Okay.  Well, I

10  think we'll have to -- we'll have to -- let me just

11  ask this one last question here.

12  BY MR. SAUERS:

13    Q.  "Terms of Use" is underlined.  Correct?

14    A.  It's underlined on this, yes.

15    Q.  Yeah.  And would that be a -- could you

16  click on "Terms of Use" to go and read the Terms of

17  Use?

18    MR. GIBSON:  Object to form.

19    A.  I don't know.

20    Q.  Okay.  Did you ever read the Terms of Use?

21    A.  Never.

22    Q.  Even when you first signed onto the CoStar

23  database?

24    A.  When you sign on, it just says "Click here

25  to 'I agree.'"

1      The document, as I recall, never came up.

2      Q.   But you had to scroll through it to get to

3   "Click on 'I agree'"?

4      A.   I don't remember.

5           THE VIDEOGRAPHER:   Counsel, we'll have to

6   change tapes.

7           MR. SAUERS:   That's fine.  Let's take a

8   break.

9           THE VIDEOGRAPHER:   We're off the record

10   at 10:06 a.m.

11          (There was a recess.)

12          THE VIDEOGRAPHER:   We're on the record at

13   10:22 a.m.

14          MR. SAUERS:   I'd like to mark the next

15   exhibit.

16          (The document was marked as Bell Exhibit

17   Number 7 for identification.)

18   BY MR. SAUERS:

19      Q.   Have you had a chance to take a look at

20   that document?

21      A.   Yes.  Um-hum.

22      Q.   Can you tell me what this is?

23      A.   This -- I -- when I found this in the

24   e-mails, I don't remember who "bmistak" is.  Most of

25   the time when we -- we get a lot of floor calls,

1  of people looking for something or they'll inquire

2  about a listing.  And I had -- I sent this -- I

3  sent him the wrong attachment.

4  Actually, I believe this is a report --

5  I can't even read this.  Is it -- it looks like it's

6  the Office Report for Metropolitan Area.  I think

7  this guy was looking for -- he was looking for some

8  information about what's going on in the office

9  market.  He was considering, I believe -- I think he

10  was considering moving or something like that.  He

11  was inquiring about what was going on out there.

12  Q.  And on the second -- let me back up

13  for one second.  You obtained this e-mail and the

14  attachment from your computer?

15  A.  Yes.

16  Q.  Okay.  And on the second page at the

17  bottom --

18  A.  Okay.

19  Q.  -- do you see where it says, on the left,

20  "CoStar Property"?  It's in small print under

21  "Vacancy Rate."

22  A.  Um-hum.

23  Q.  Is that the database from which you would

24  obtain this -- have obtained this particular report?

25  A.  No.  I believe this was taken out of the

1    -- one of these CoStar Office Reports that you

2    provided previously.  It was a page out of one of

3    these.

4        Q.   I see.  It's a selected page.

5             And then turning to the front page of the

6    document --

7        A.   As a matter of fact, if you go to Office

8    Market, page 17 on the Year-End 2000 CoStar Office

9    Report, it looks like page 17 --

10       Q.   That's Exhibit 3?

11       A.   Yeah, Exhibit 3.

12       Q.   Okay.

13       A.   It appears that this was taken from the

14   CoStar Office Report on page 17.

15       Q.   Okay.  And turning to the front page --

16       A.   Yes.

17       Q.   -- the original message underneath that,

18   there's --

19       A.   What front page are we talking about?

20       Q.   The front page of Exhibit 7.  I'm sorry.

21       A.   Okay.

22       Q.   There's a -- the bottom half of the

23   e-mails has something that says "Original Message."

24       A.   "Original Message."

25       Q.   Do you see that?

1    A.    Okay.  What are we looking at?

2    Q.    Underneath -- underneath that it says,

3    "From:  printer@kh.com."

4    A.    Right.

5    Q.    What is that?

6    A.    What we do is when we print something out,

7    I can actually take this and scan it through the

8    copier and it wraps it into a PDF and it e-mails it

9    to me.

10    Q.    Ah.

11    A.    It sends it to me and then --

12    Q.    So that's the e-mail address for the --

13    for the copier?

14    A.    It looks -- yeah.  It looks that way.

15    Q.    Okay.  So you would -- you would scan it

16    through the system and then it would e-mail it to

17    your Outlook?

18    A.    Right.

19    Q.    Okay.  And then you could forward it,

20    which is what you did on top?

21    A.    Right.

22            MR. SAUERS:  Okay.  I'll mark the next

23    exhibit.  I think it's 8.

24            (The document was marked as Bell Exhibit

25    Number 8 for identification.)

BY MR. SAUERS:

    Q.   Take a look at that and let me know when you're ready.

    A.   Okay. I'm ready.

    Q.   Okay. Great.

    A.   Um-hum.

    Q.   Is this an e-mail that you obtained from your computer?

    A.   Yes.

    Q.   Okay. And the "To" line in the e-mail is "msk." Who is that?

    A.   That's Mark Klein.

    Q.   Okay. And the e-mail -- the text of the last string of the e-mail is that "You have probably -- you probably have already seen this" --

    A.   Um-hum.

    Q.   -- to Mark.

    What is it that you're forwarding to him?

    A.   This was -- I had received an e-mail from CoStar that they were -- they offered -- looked like they were offering that you could search their database for no charge or something like -- no cost. "Find a commercial property now, no cost, no registration."

    Q.   And that's useful because normally you had

1    to have a registration?

2         A.    I don't -- I thought they had offered this

3    a while ago.  This was just kind of -- this was

4    informative.

5         Q.    And why did you send this on to

6    Mark Klein?

7         A.    This looks like -- let's see -- I think he

8    -- I think everybody in the office had gotten

9    something like this and I was just showing -- I was

10   showing Mark that you guys are offering a "No Cost,

11   No Registration" -- or not you -- but CoStar was

12   offering a -- you could find commercial property.

13        Q.    And why would you have sent this on to

14   Mark?

15        A.    For his view -- just for him to check

16   it out and see if he might be interested in it.

17        Q.    Did you think he would be?

18        A.    Probably not.

19        Q.    And why not?

20        A.    He -- he's never -- he just never has seen

21   a value -- he always had told me, "I" -- he had

22   never seen a value in it.

23        Q.    In what?

24        A.    In CoStar.

25        Q.    And --

1        A.   Their database.

2        Q.   And that's based on his prior interaction

3  with the CoStar database?

4        A.   I think when he -- when the salespeople

5  had come out and would do a demonstration, and they

6  showed him all the bells and whistles, it -- it

7  didn't do anything -- he said -- it didn't do any --

8  it didn't really serve our market.  It didn't do

9  anything.

10            MR. SAUERS:  Okay.  Let's mark the next

11  exhibit.

12            (The document was marked as Bell Exhibit

13  Number 9 for identification.)

14  BY MR. SAUERS:

15        Q.   And, again, take a minute, take a look

16  through that and let me know when you're ready.

17  All set?

18        A.   Yeah.

19        Q.   Did you obtain this e-mail and attachment

20  from your computer?

21        A.   Yes.

22        Q.   And the "from" address is from you.  Is

23  that your e-mail address, "scottbell@kleinand" --

24        A.   Yeah.  Uh-huh.

25        Q.   Okay.  And, again, "msk" is Mark Klein?

1     A.    Yes.

2          Q.    And the subject matter is CoStar report.

3     Is that correct?

4     A.    Yes.

5          Q.    Okay.  And it has a Follow Up Flag of

6     "Follow up."  Is that correct?

7     A.    Yes.

8          Q.    Okay.  And then the text of the e-mail

9     says, "Here it is.  C. Scott Bell."

10    A.    Um-hum.

11         Q.    What is "it"?

12    A.    It looks like it's a number of office

13    buildings that are in the -- down in this corridor

14    where we're at here, downtown Tampa.

15         Q.    Okay.  Is this a report that you would

16    have obtained from the CoStar database?

17    A.    Yes.

18         Q.    And the text of your e-mail is, "Here it

19    is."  Is that in response to something?  Is your

20    statement in response to a prior statement?

21    A.    Well, this is about the time -- I was -- I

22    was gathering a lot of data on my own.  And at this

23    time of the year is around August of '07.  I was

24    doing a lot of research in the office market in

25    Tampa.  And Mark had -- Mark, and I think Steve,

1    were working on some project where they were trying

2    -- they were assisting a group. They were acting as

3    a -- not a broker but as an information-type -- they

4    were providing help to somebody else that was

5    looking to maybe buy an office building in the

6    metropolitan area.

7        Q.    So consulting?

8        A.    Consulting.   That's the word.

9        Q.    And so your e-mail stating "Here it is" --

10       A.    Um-hum.

11       Q.    -- is this in response to a request from

12   Mark Klein to work as part of that consulting work?

13       A.    Mark was -- had asked me what he -- what

14   -- based on all the research I was doing, what kind

15   of rents were we really seeing out there because

16   that drives the property value.   So these -- I just

17   sent him this and he could take a look at it.   I

18   didn't know if it helped him or not.

19       Q.    Okay.   And then you have it marked as

20   "Follow Up Flag:   Follow up."

21       A.    Uh-huh.

22       Q.    Why would you have done that?

23       A.    When I was going through all my archived

24   e-mails, I flagged all the ones that I needed to

25   prepare for the deposition.

1    Q.   Ah.  So that has been added.  That was not

2    -- that "Follow Up Flag" and "Flag Status" was not

3    related to the time that the e-mail was created?

4         A.   No, it wasn't.  So I marked each one,

5    so I -- because there's so many e-mails.  I had

6    to go through them one by one.  And when I found

7    something, I would flag it.  Then I could go -- I

8    could go to each one of those and then print them

9    out for you.

10        Q.   Understood.

11             MR. SAUERS:  Okay.  Let's go to the next

12   exhibit.  Okay.  10.

13             (The document was marked as Bell Exhibit

14   Number 10 for identification.)

15   BY MR. SAUERS:

16        Q.   All set?

17        A.   Yes.

18        Q.   Is this -- was this e-mail and attachment

19   obtained from your computer?

20        A.   Yes.

21        Q.   And this is an e-mail from you,

22   Scott Bell -- from your e-mail account,

23   scottbell@kleinandheuchan.com?

24        A.   Yes.

25        Q.   To stevenklein@kleinandheuchan.com?

1      A.   Yes.

2          Q.   And is that Steven Klein, one of the

3   principals?

4          A.   Yes.

5          Q.   And the text of the e-mail is "Office

6   report document."

7          A.   Um-hum.

8          Q.   And is that referring to the attachment

9   here?

10         A.   Yes.

11         Q.   Okay.  Did you obtain this attachment from

12  the CoStar database pursuant to your password?

13         A.   Yes.

14         Q.   Okay.  And this office report is different

15  than the other ones.  Am I correct?

16         A.   I don't know.  We'll have to see.

17         Q.   Let's see.  I believe the others were all

18  from 2007.

19         A.   Yes.  The other ones were from '07.  This

20  is from '06.

21         Q.   Okay.  So this is a fourth CoStar report.

22  Okay.

23              And do you recall the circumstances

24  surrounding why you gave this report to Mr. Klein?

25         A.   I offered this to Steve as a tool to

1  research and provide information to them.

2      Q.   And what did -- what did Mr. Klein say

3  when you offered it to him?

4      A.   "Thanks."

5      Q.   Did he say, "Yes, I'd like you to send it

6  to me" or --

7      A.   I don't recall.

8      Q.   Just "thanks"?  So how did you know to

9  send it to him?

10     A.   Like I'd stated earlier, I offered it

11 to him.  Because I -- I would get these and review

12 them myself.  And I said, "I have an office report.

13 Would you like to take a look?"  He said "Thanks."

14     Q.   And that's because you thought the reports

15 might be informative to him?

16     A.   Yes.  They have a lot of data in them.

17     Q.   Okay.

18          MR. SAUERS:  Let's mark the next exhibit.

19          (The document was marked as Bell Exhibit

20 Number 11 for identification.)

21 BY MR. SAUERS:

22     Q.   All set?

23     A.   Yes.

24     Q.   Great.  And is this an e-mail and an

25 attachment that you obtained from your computer?

1     A.    Yes.

2     Q.    Okay.  And is this an e-mail from your

3  Klein & Heuchan account?

4     A.    Yes.

5     Q.    Okay.  And who -- is it sent to somebody

6  named Tracy McMurray.  Is that correct?

7     A.    Correct.

8     Q.    Who's Tracy McMurray?

9     A.    He is somebody that I've known for about

10  10 years, a client of mine.

11     Q.    Okay.  And the subject matter of the text

12  of the e-mail states, "I have attached a few reports

13  for the warehouse we saw today.  The timing may

14  provide an opportunity for you."

15     A.    Um-hum.

16     Q.    Had you shown him the property that's

17  described in the following attachment earlier that

18  day?

19     A.    He -- he was driving around looking for a

20  -- perhaps a new location for them to move into.  He

21  found this and asked me if I could show it to him.

22     Q.    Okay.  You said "for them to move into."

23  Was he a business owner?

24     A.    Yes.

25     Q.    Okay.  What kind of business did he have?

1      A.    A water-softening business.

2      Q.    Ah.   So he was looking for a new office

3   for his water-softening business?

4      A.    Warehouse.

5      Q.    A new warehouse?

6      A.    Yeah.

7      Q.    Okay.   And so you provided him the

8   attachment as a follow-up to your earlier visit

9   to a property that day?

10     A.    Yes.

11     Q.    Okay.   And turning to the attachment,

12  is the first page the property that you visited?

13     A.    Yes.

14     Q.    Okay.   And then the second page is showing

15  the location of that property on a map?

16     A.    Yes.

17     Q.    And then what is the third page of the

18  attachment?

19     A.    It looks like it's a pull from the public

20  records from CoStar, and it contains all of the

21  sales value and what the building is.

22     Q.    You said "the public record."  You did not

23  need to -- did you need to log into the CoStar

24  database with your password to obtain this

25  information?

1      A.   Yes.   I was just looking up here on the

2  page.  It says, "Public record."  On the --

3      Q.   Understood.

4      A.   -- middle line here it says, "Public

5  record."

6      Q.   Okay.  And then at the bottom of the page

7  there's another copyright notice for CoStar.  Is

8  that correct?

9      A.   Yes.

10     Q.   And then, again, it also says, "By using

11  this site, you agree to our Terms of Use."

12     A.   Yes.  I see that.

13     Q.   Okay.  And then the date on the bottom

14  right appears to be the same date as the e-mail.

15  Is that January 31, '07?

16     A.   Yes.

17     Q.   Great.  And that's the first or maybe

18  second month that you were with Klein & Heuchan.

19  Correct?

20     A.   Correct.

21     Q.   Let's turn to the next page of the

22  attachment.

23     A.   Um-hum.  Okay.

24     Q.   What is -- what is that page?

25     A.   Let's see.  It looks like -- it lists

1  buildings that are in Tampa, the year they're built,

2  the date it was sold, and the square footage it was

3  sold for, and it's the type of building, industrial.

4  Q.  Okay.  And is this something that you

5  obtained from the CoStar database with your

6  password?

7  A.  Yes.

8  Q.  Okay.  Turning to the -- and, again,

9  that's -- I'm sorry.  That also has a copyright

10  notice, as we have discussed, and it's from the same

11  date.

12  A.  Okay.

13  Q.  Is that correct?

14  A.  Yep.

15  Q.  Let's turn to the next page.

16  Is this a duplicate page?  No.  This --

17  can you describe what this page is?

18  A.  This looks like it is a -- the -- it

19  kind of looks like it's a -- provides the same

20  information as the -- maybe some of the previous

21  pages.  It gives you the square footage and the

22  price it's selling for and that it's industrial and

23  the year it was built and some of the square footage

24  information.

25  Q.  Okay.  And this was obtained from the

1    CoStar database with your password?

2      A.   Yes.

3      Q.   And then turning to the last page --

4      A.   Um-hum.

5      Q.   -- can you describe what that page is,

6    please?

7      A.   Okay. It looks -- I see the "public

8    record" highlighted. It lists all of the -- what

9    the property appraiser would have, his total value

10    assessed, and the land value and the improved, the

11    parcel ID number, township, range and section, and

12    the roof. Yes. Okay.

13      Q.   And this page was also obtained from the

14    CoStar database with your password?

15      A.   Yes.

16      Q.   And I guess we can know that if we look at

17    the top of that page by the picture, for example, it

18    says, "Log out." Does that indicate to you that you

19    were logged in at the time you did this?

20      A.   Where do you see that?

21      Q.   If you look at the last page, for example.

22    It's on each of the pages, CoStar pages.

23      A.   Oh, okay. I see "log out."

24      Q.   Yes. Does that indicate to you that you

25    were logged in at the time you did this?

1    A.    It looks that way.

2         MR. SAUERS:  Okay.  Let's move on to the

3    next exhibit.

4              (The document was marked as Bell Exhibit

5    Number 12 for identification.)

6    BY MR. SAUERS:

7    Q.    Have you had a chance to take a look?

8    A.    Yes.

9    Q.    Is this an e-mail from your

10   Klein & Heuchan e-mail account?

11   A.    Yes.

12   Q.    And it's to csduncan@tampabay.rr.com.

13   Is that correct?

14   A.    Yes.

15   Q.    Do you know who that is?

16   A.    That is Carol Duncan, works for

17   Klein & Heuchan.  She's an administrative assistant.

18   Q.    Not an agent?

19   A.    No.

20   Q.    And is her office at Klein & Heuchan's

21   offices?

22   A.    Yes.

23   Q.    And the subject is "OneClick.aspx floor

24   plan."  And then there's a link below.

25   A.    Um-hum.

1   Q.   What is that link?

2   A.   That is a link that CoStar -- I don't

3   know if it originated from the database or if it was

4   from CoStar.  It was a floor plan for a property.

5        Q.   Okay.  Are the floor plans from properties

6   generally available on -- as part of -- when you

7   had to log in?  Could you get pass -- could you get

8   floor plans for properties from the CoStar database

9   unless you logged in?

10       A.   I don't know.

11       Q.   Did you ever get property floor plans

12  from the CoStar database without logging in?

13       A.   I never tried.

14       Q.   Okay.  Did you get floor plans from the

15  CoStar database by logging in?

16       A.   One time, yeah.

17       Q.   Is that this one?

18       A.   Yeah.  Well, this one actually -- I sent

19  her the link and she wasn't able to -- it didn't

20  recognize this link, so it didn't work.

21       Q.   Do you have any idea why that might have

22  been?

23       A.   It's -- aspx is OneClick.aspx.

24       Q.   Is it possible that Ms. Duncan couldn't

25  access -- couldn't access the link because she

1   wasn't logged into the CoStar database?

2           MR. GIBSON:  Object to form.  Calls for

3   speculation.

4       A.   What was the question again?

5       Q.   Is it possible that Ms. Duncan wasn't able

6   to access the link because she was not logged into

7   the CoStar database?

8           MR. GIBSON:  Same objection.

9       A.   I still don't understand your question.

10      Q.   You said that --

11      A.   I don't know if that's because --

12      Q.   You said Ms. Duncan wasn't able to access

13  the link.  She clicked on it and it didn't work.

14      A.   Right.

15      Q.   Is it possible that the reason it did not

16  work was because Ms. Duncan was not logged into the

17  CoStar database?

18          MR. GIBSON:  Form.

19      A.   I'm not sure.

20      Q.   Why did you send this e-mail to

21  Ms. Duncan?

22      A.   To see if she could open it up and the

23  image that was -- that I had saw a line was -- you

24  couldn't even hardly see it -- to see if she could

25  use, like, a photo shop or something like that to

1   make it to where you could read it -- readable,

2   visible.  It was very blurry.

3       Q.   Why did you need her to do that?

4       A.   Because it was blurry.

5       Q.   Were you going to use it as part of a

6   flier or materials or you just needed to read it?

7       A.   I needed to read it.

8       Q.   Okay.  Did you ever use this particular

9   floor plan as part of anything else?

10      A.   Did I?

11      Q.   Yes.

12      A.   I think I sent it in one e-mail, yes.

13      Q.   To a client?

14      A.   No.  Actually, I think I printed it out

15  myself.  I did not send it to a client.

16           Wait.  I'm not exactly sure.  I think I

17  -- I either e-mailed it and I think I printed it for

18  my -- I probably did both, e-mailed it and printed

19  it for myself.

20      Q.   Okay.  And you did that after Ms. Duncán

21  wasn't able to access it?

22      A.   Right.

23      Q.   And is Ms. Duncan an employee of

24  Klein & Heuchan?

25      A.   Yes.

1    Q.   Why is her e-mail tampabay.rr.com, do you

2  know?

3    A.   I don't know.

4    Q.   Why doesn't -- you don't know why she

5  doesn't have a Klein & Heuchan e-mail address?

6    A.   No.

7    Q.   Did you make a practice or did you

8  regularly send information to Ms. Duncan to print

9  out for you?

10    A.   Very -- very few occasions.

11    Q.   Do you recall if any of those other

12  occasions involved CoStar information?

13    A.   I don't remember.

14    Q.   Were you attempting to obtain this floor

15  plan that's attached with this link pursuant to an

16  earlier discussion with a client?

17    A.   We had -- this -- this particular floor

18  plan, as I recall, we got a call from a client that

19  is -- this was for 2120 Range Road, which is an

20  office building.

21         They called in and wanted to list their

22  property.  They were unable to find a floor plan for

23  their property.

24    Q.   Um-hum.

25    A.   So I tried to find it for them.  Ends up,

1    I had -- they actually ended up getting a copy --

2    because this was -- this was already listed by

3    somebody a couple years ago -- this property --

4    and it sold to these people that had bought it.

5                   They asked me to look it up to see if

6    I could find it.  And I found this, and it was a

7    poor image.

8                   So we were going to try and fix it

9    for them so that we could come up with an accurate

10   measurement.

11                  There's a disparity between what the

12   actual -- the property appraiser had it assessed for

13   -- like, the square footage.  We seemed to think it

14   was more than what it was, so --

15        Q.    More square footage?

16        A.    -- consequently, they ended up finding a

17   floor plan, and it was almost identical to this one

18   here.  It was actually the same one, but it had been

19   uploaded in the CoStar's database and it was -- it

20   had belonged to the architect that had actually

21   drawn the property that -- so it was actually the

22   architect's rendition that had appeared on here, but

23   we couldn't find it.  So we tried to make use of

24   this one.

25        Q.    And did you eventually have a listing for

1   this property?

2          A.    We already had this listed.

3          Q.    You already had the listing?

4          A.    Yes.

5                 MR. SAUERS:  Okay.  Let's mark the next

6   document.  It's 12?

7                 THE COURT REPORTER:  That is 13.

8                 MR. SAUERS:  It sure is.

9                 (The document was marked as Bell Exhibit

10  Number 13 for identification.)

11                THE WITNESS:  Okay.

12  BY MR. SAUERS:

13         Q.    Okay?

14         A.    Yeah.

15         Q.    Is this an e-mail from your

16  Klein & Heuchan account to Steven Klein, a principal

17  at Klein & Heuchan?

18         A.    Yes.  Excuse me.

19         Q.    It's dated April 5th, 2007.  Is that

20  correct?

21         A.    Correct.

22         Q.    Okay.  And it says, "Categories:  Red

23  Category."  Can you describe what that means?

24         A.    That was a marked category when I was

25  printing these off.

1       Q.   Why is it a red category as opposed to a

2  follow-up that you were using it for?

3       A.   For some reason, I had installed -- we had

4  upgraded our computer to a newer Office.  In 2007 or

5  2008 we went up, because I had an older version.

6            When I upgraded it, if you clicked on it,

7  it would put it in a red category.  And sometimes I

8  couldn't figure out how to get it off.

9            And then there's a -- when you -- you can

10  -- you can hit the flag.  But if you clicked on the

11  e-mail, for some reason it would come up as a red

12  category.

13       Q.   Okay.  So this was something you did,

14  again --

15       A.   This was during -- when I was gathering

16  archived information.

17       Q.   Okay.  And the text of that -- your e-mail

18  to Mr. Klein is, "Excel file attached."  Is that

19  referring to the attachment here?

20       A.   Yes.

21       Q.   And both this e-mail chain and this

22  attachment came from your computer.  Is that

23  correct?

24       A.   Yes.

25       Q.   Okay.  And what is this attachment?

1          A.    This is a -- looks like an Excel

2     spreadsheet of proposed and existing office

3     buildings in Hillsborough County.

4          Q.    And is this a spreadsheet that you

5     obtained from the CoStar database?

6          A.    Yes.

7          Q.    Okay.  And then looking down -- and you

8     obtained it from the CoStar database using your

9     password.  Is that correct?

10         A.    Yes.

11         Q.    And then looking down below that, there's

12    an earlier e-mail from Steven Klein to you saying

13    "Thanks."

14         A.    Um-hum.

15         Q.    And then another e-mail below that that is

16    from you to Mr. Klein saying, "Steve, Office report

17    document."

18              Is that the same chain of e-mails that

19    are in Exhibit 10, the cover e-mail of Exhibit 10?

20    Or at least the bottom e-mail is.

21         A.    Yes, it appears so.  The times and the

22    date match.

23         Q.    And so Mr. Klein responded to Exhibit 10

24    with a follow-up e-mail that said "Thanks."  Is that

25    correct then?

1      A.   You're on Exhibit -- what number now?

2      Q.   Now, I'm back to 13.  I'm sort of

3  jumping --

4      A.   Okay.  You're on 13?

5      Q.   Yes.

6      A.   Yeah.  I didn't follow you there.

7      Q.   Sorry.

8      A.   Where are we?

9      Q.   We're back on 13, and I'm looking at the

10  middle e-mail on 13.  And it says, "Thanks," and

11  it's from Steven Klein to you.  Is that him saying

12  "thanks" in response to your sending him the office

13  report document that is in Exhibit 10?

14      A.   That appears to be, yes.

15      Q.   Okay.  And then the most recent, if you

16  will, of the e-mails says, "Excel file attached,"

17  and it's this Excel CoStar spreadsheet.

18      A.   Spreadsheet.  Um-hum.

19      Q.   Why did you send this spreadsheet to

20  Mr. Klein?

21      A.   He was looking for information on office

22  -- what appears -- it's pretty much in the report

23  here.  He was looking for new and proposed buildings

24  that were available in Hillsborough County.  I'm not

25  sure what project he was working on.  He just asked

1  me for this information.

2      Q.   And that was after he sent an -- was that

3  after he sent you the e-mail saying "Thanks" that he

4  asked for that information?

5      A.   Okay.  Could you rephrase that again?

6      Q.   Sure.  Sure.  The e-mail from Steven Klein

7  to you on April 4, 2007, saying "Thanks" in response

8  to your sending him the market report, do you see

9  that?

10      A.   Okay.  Let's --

11      Q.   It's the middle of the three e-mails,

12  three-part chain on --

13      A.   It may have been for both because it looks

14  like I sent him the spread --

15      Q.   That's the next day.

16      A.   -- the spreadsheet -- it looks like that

17  went first and then the report followed behind it.

18      Q.   Well, I think actually it's a different

19  day.  Right?  It's maybe the next day, April 5th as

20  opposed to April 4th.

21      A.   Oh, okay.  Yeah.  Okay.

22      Q.   Okay.

23      A.   That's how it is.  I went the other way.

24  Okay.

25      Q.   So the chain was:  You sent the office

1  report document on April 4 at 3:39. Mr. Klein said

2  "Thank you" at 6:23.

3       A.   Um-hum.

4       Q.   And then the next day you sent him the

5  Excel sheet. Correct?

6       A.   Right.

7       Q.   Okay. Did the request for the Excel

8  spreadsheet come after Mr. Klein had said "Thanks"

9  to you for the office report document?

10       A.   I can't -- I don't remember. If I were

11  looking at this e-mail, that looks -- that could be

12  it, but I'm not sure.

13       Q.   Okay. But he did specifically ask you for

14  that report?

15            MR. GIBSON: Object to form.

16       Q.   The -- I'm sorry -- the Excel file.

17       A.   The Excel file?

18       Q.   Yes.

19       A.   Yes.

20       Q.   Do you know if you had used the CoStar

21  database in connection with any of the properties

22  that you sold during your time with Klein & Heuchan?

23       A.   The only properties that we -- I sold

24  during the time at Klein & Heuchan was, we sold

25  1250 Rogers Street, which is a listing we've

1   had for a long time, and it wasn't a result of

2   CoStar's database.  It was a drag off of the

3   Pinellas Realtor Organization.  A residential

4   realtor saw it in that database and she --

5        Q.   What -- and I'm sorry.  What was --

6   1250 --

7        A.   Rogers Street.

8        Q.   Thank you.  Did you look at that property

9   in the CoStar database while it was still available

10  for sale?

11       A.   Yes.

12       Q.   Why did you do that?

13       A.   To compare to see how the data that you

14  had in the computer versus what we had in the

15  computer, see if they were accurate.

16       Q.   So to see if Klein & Heuchan's listing

17  was -- to check the accuracy of Klein & Heuchan's

18  listing?

19       A.   Right.

20       Q.   And you said there was another -- is there

21  another -- another property that you sold during the

22  time you were with Klein & Heuchan?

23       A.   No.  That's the only property I sold.

24       Q.   Okay.  Did you lease any other properties?

25       A.   I leased two units in the 1250 Rogers

1    building.

2         Q.    Okay.

3         A.    One was from -- an associate in the office

4    had a company called Home Helpers.

5         Q.    Um-hum.

6         A.    And they're -- they're somebody he'd

7    worked with for years and already had placed, and

8    he moved them in -- he got them into one of our

9    buildings.

10              And the other one was a Mary Kay cosmetic

11   lady that drove by and called on the sign and she

12   leased it out.

13        Q.    Did you use the CoStar database in

14   connection with securing either of those leases?

15        A.    Neither.

16        Q.    Did you have any other activity during the

17   time you were with Klein & Heuchan that resulted in

18   commissions or payments to you?

19        A.    There was -- I did one transaction in

20   two thousand -- this is nine.

21              The early part of 2008 I had a friend of

22   mine that was seeking new office space.  He was over

23   in the Pinellas market, and he wanted to move to the

24   Westshore market.

25              He did -- we showed him a lot of

properties, and the property ended up going into --

he had started the communication with them, and then

he brought us in to -- more or less to help me in

the business so I could learn from the transaction.

It was -- he was being very nice. He was helping me

out.

So he brought me into the -- and we tried

to -- we went through the whole negotiating and --

he did all the negotiating, but -- he wanted to make

sure that I was involved in it and I could learn

from it.

Q.    And that resulted in a commission?

A.    Yes.

Q.    Okay.  Did you use the CoStar database to

look at that property at all?

A.    We -- I did use the CoStar database to

look at it.  It was Eola Capital, but he -- he

actually -- prior to that we never even saw that

building.  And he went driving around.  He found

the building.  The young -- the lady that worked

there, she actually showed him the building and we

didn't -- we weren't even present.  So he found the

building on his own and then we -- I think I had

used the CoStar database just to look at the

Eola Capital building.

1        Q.   Okay.  To look at -- you mean floor plans

2  or just --

3        A.   There's -- I don't believe there's any

4  floor plans.  It was just the square footage, the

5  kind of building it was, and --

6        Q.   Did you look at comparables?

7        A.   I don't believe there are any comparables

8  for office -- the office buildings.

9        Q.   Okay.  And you received a commission for

10  the 1250 Rogers Street property as well.  Is that

11  correct?

12        A.   Right.

13        Q.   Okay.

14        A.   So the 1250 Rogers Street, we leased --

15  I leased in 2007.  That was the only thing I did in

16  2007.

17            And in 2008 we sold Rogers Street, 1250,

18  and then we leased that building over there and --

19  I actually had an associate in the office that was

20  helping me with it, too, so . . .

21        Q.   Okay.  When was -- you said you sold

22  the 1250 Rogers Street address property in '08.

23        A.   Yeah.

24        Q.   And when -- do you recall when in

25  '08 that was?

1      A.   I . . .

2      Q.   Approximately.  First quarter, second

3 quarter?

4      A.   It had to have been the -- probably

5 between the first and -- between the first and

6 second quarter, probably right towards where they

7 meet, somewhere in there.

8      Q.   Okay.  Could you find out when that

9 property sold?

10      A.   I'm sure we could look in the property

11 appraiser and it would tell you instantly.

12      Q.   Okay.  Would Klein & Heuchan have records

13 related to that sale?

14      A.   Yes.

15      Q.   How about the early '08 sale of the

16 office --

17      A.   Lease.

18      Q.   Oh, the one --

19      A.   We didn't sell the office.  We leased it.

20      Q.   In '08?  I'm confused.

21      A.   In '08 we leased office space in the

22 Westshore area.

23      Q.   Okay.  The second -- yes.

24      A.   In '07 we leased office space in

25 Rogers Street.

1    Q.    The '08 lease on --

2    A.    Um-hum.

3    Q.    -- would records of that be in y

4  Klein & Heuchan?

5    A.    Yes.

6    Q.    Okay.  And how about the leases for the

7  two units in the Rogers building?  Would records of

8  that be at Klein & Heuchan?

9    A.    Yes.

10              MR. SAUERS:  Let's go ahead and mark the

11  next exhibit.

12              THE COURT REPORTER:  14.

13              MR. SAUERS:  14.

14              (The document was marked as Bell Exhibit

15  Number 14 for identification.)

16              THE WITNESS:  Okay.

17  BY MR. SAUERS:

18    Q.    Okay.  Can you tell me what this document

19  is?

20    A.    It is a spreadsheet on what appears to be

21  self storage units.

22    Q.    Do you know where you obtained this

23  spreadsheet?

24    A.    It looks like it's from CoStar's database.

25    Q.    How can you tell it's from the CoStar

database? The format?

A. Well, it says, "Research Completed Date" on it.

Q. Where --

A. About the middle end of the document -- middle end of the document, the best I can tell.

Q. Okay. What else is on that page?

A. Is that it? Wait, wait, wait. I think you went past it. Back up one.

Q. Okay.

A. Is that it?

Q. Ah. Here we go. Okay.

A. Yeah.

Q. And that indicates to you that it was from the CoStar database?

A. I'm believing so. It has a publication date and a research completed date.

Q. Okay. Now, these dates are all from prior to your time with Klein and -- these Research Completed Dates are all from prior to your start with Klein & Heuchan. Is that correct?

A. No. The way I'm reading this is, it's -- this is when CoStar completed this research, not me.

Q. Ah. Thank you. Do you know when you would have obtained this report, approximately?

1      A.   I'm not exactly sure.

2      Q.   During your time --

3      A.   I noticed here on one page Stan Newmark

4 from Klein & Heuchan has a listing on one of these

5 buildings.

6      Q.   Um-hum.

7      A.   It looks like it's the first one.  I don't

8 know if it was -- I'm not sure which one.  He had

9 sold one up there and -- up in -- I believe it was

10 New Port Richey or -- he had sold one up there, and

11 I was trying to find which one he had sold.  It's on

12 Grand -- Grand Boulevard -- to get an idea of what

13 the values might be up there.

14      Q.   I see.  And so the remainder of this

15 report lists all the other facilities up in that

16 area?

17      A.   Right.

18      Q.   And you obtained this report through use

19 of your password?

20      A.   Yes.

21      Q.   And this was during the time you were with

22 Klein & Heuchan?

23      A.   Right.

24      Q.   Did you ever provide a copy of this report

25 to anybody?

1    A. No.

2      MR. SAUERS: Okay. Let's go to the next

3 exhibit.

4      (The document was marked as Bell Exhibit

5 Number 15 for identification.)

6 BY MR. SAUERS:

7    Q. Okay. It's Exhibit 15.

8    A. Okay.

9    Q. Okay. Can you tell me what this document

10 is?

11    A. An Excel spreadsheet.

12    Q. Was this obtained from your computer?

13    A. Yes.

14    Q. Is this a CoStar -- is this a printout of

15 information from the CoStar database?

16    A. Yes.

17    Q. Did you use your password to obtain this

18 information?

19    A. Yes.

20    Q. And what -- what sort of report is this?

21    A. It doesn't look like a report. It looks

22 like a -- just a list of office buildings in the

23 metropolitan area with mailing addresses.

24    Q. And then turning back a few pages, it

25 looks like there's some more information, parking

ratios and --

A.    Building, taxes.

Q.    Why would you have downloaded this
information from the CoStar database?

A.    To learn about the buildings that are
available in our metropolitan area, to educate
myself.

Q.    And then would you use a report like this
to target and follow up on particular properties?

A.    No.  As you'll see, almost all these
buildings are represented by national firms.

Q.    Okay.

A.    And that's -- we don't -- we don't -- we
don't serve a market like that -- or I never have,
never had any intention and --

Q.    We have five minutes left on the tape.
I'm going to try and do one more exhibit before we
take a break.

            (The document was marked as Bell Exhibit
Number 16 for identification.)

BY MR. SAUERS:

Q.    Okay?

A.    Okay.

Q.    Was this a document obtained from your
computer?

1       A.   Yes.

2       Q.   And what is this document?

3       A.   This is a list we -- that was generated

4   from a mailing service that we have or software.

5   Type in SIC code numbers and it'll punch out the

6   different owners and addresses of the property and

7   where they live.

8       Q.   And did you obtain -- I'm sorry.

9   Did you obtain this from the CoStar database?

10      A.   No.

11      Q.   Did not.

12      A.   No.

13          MR. SAUERS:  Let's go ahead and take a

14  break.

15          THE VIDEOGRAPHER:  We're off the record

16  at 11:18 a.m.

17          (There was a recess from 11:18 a.m. to

18  12:34 p.m.)

19          THE VIDEOGRAPHER:  We're on the record at

20  12:34 p.m.

21          MR. SAUERS:  Okay.  I'll go ahead and

22  mark the next exhibit.

23          (The document was marked as Bell Exhibit

24  Number 17 for identification.)

25  BY MR. SAUERS:

1    Q.    All set?

2    A.    All set.

3    Q.    All right.  Can you tell me what this

4    document is?

5    A.    This is a -- a spreadsheet for industrial

6    warehouses in the Holiday area; Holiday, Florida.

7    Q.    Is this a spreadsheet obtained from the

8    CoStar database?

9    A.    No.

10   Q.    From where did you get this database?

11   A.    This is a IMAP program that we use

12   and we're able to plug in use codes for certain

13   geographical areas and it will bring up all of the

14   information you see here as the heated square feet,

15   house number, street address, and who the actual

16   owners of the property are, and give you dates of

17   last transactions.

18   Q.    Would you have gone and looked up any of

19   these properties on the CoStar database?

20   A.    I'm not sure.  It's possible, but I'm not

21   sure.

22   Q.    Okay.  How about with respect to --

23   turning to Exhibit 16, would you have --

24   A.    16?

25   Q.    Yeah.  Same question.  Would you have

1    looked up any of these properties on the CoStar

2    database?

3         A.    I mean, it would take me a couple minutes

4    to go through this to actually look.    I'm not sure.

5    It's been a long time ago.

6         Q.    Do you think if you went through you could

7    tell at least some of them that you may -- may have?

8         A.    Possibly.

9         Q.    Well, why don't we take a minute with

10   Exhibit 16 and see if you can't identify a few where

11   you --

12        A.    This one here looks like it's the Pasco

13   Industrial Park, West Pasco Industrial Park.

14        Q.    Is that on the -- which page are you on?

15        A.    This Exhibit 16, I believe, is the West

16   Pasco Industrial Park off of State Road 54.

17        Q.    Okay.

18        A.    I believe that's what all these --

19   actually, it's not.    Well, I can't tell.

20             I mean, I'm having to go by addresses.

21   I just don't know.

22        Q.    Okay.

23        A.    I don't know.

24        Q.    That's fine.    You mentioned you might be

25   able to tell, so I figured --

1    A.   Yeah.   I mean, looking at it, it's --

2    they're just addresses.   There's no names of

3    buildings or anything like that.   It's just an

4    address, so -- I mean, I've researched, like, tens

5    of thousands of addresses.   I just can't remember.

6    Q.   Sure.   What about on Exhibit 17?   It looks

7    like there's a little more identifying information

8    associated with that, subdivision and address and

9    use descriptions and -- does that provide enough

10   information to know whether you might have looked

11   any of them up on CoStar?

12   A.   Not really.   It's -- I mean, I just -- I

13   know all these properties because I just live in the

14   area.   Nothing stands out, like, special to me.

15   Q.   Okay.   That's fine.

16   A.   I don't see it.

17        MR. SAUERS:   Okay.   I'll mark the next

18   three exhibits.

19        That's 18.   I'm sorry.   Which one is --

20   what's the first line on that one?   Thank you.

21        (The documents were marked as Bell

22   Exhibit Numbers 18, 19 and 20 for identification.)

23        THE WITNESS:   Okay.

24   BY MR. SAUERS:

25   Q.   Are all of these documents obtained --

1    were all of these documents obtained from your

2    computer?

3         A.    Yes.

4         Q.    Okay.  Are any of these documents reports

5    that were obtained from the CoStar database?

6         A.    No.

7               MR. SAUERS:  I'll mark the next set of

8    exhibits.  21.

9               (The document was marked as Bell Exhibit

10   Number 21 for identification.)

11              MR. SAUERS:  22.

12              (The document was marked as Bell Exhibit

13   Number 22 for identification.)

14              MR. SAUERS:  And 23.

15              (The document was marked as Bell Exhibit

16   Number 23 for identification.)

17              MR. LOVE:  Do you have Exhibit 22 there?

18              THE WITNESS:  22?  Yes.

19              MR. LOVE:  What's the first -- okay.

20              THE WITNESS:  It's Pat Clark.

21   BY MR. SAUERS:

22        Q.    Are any of those --

23        A.    All set.

24        Q.    All right.  Great.  Thanks.

25              Are any of those documents from the

CoStar database?

A.    Let's see.  What exhibits are we looking

at here?  What are the numbers again?

Q.    21, 22, 23.

A.    21, 22 -- 21 and 22, yes.

Q.    Okay.  Great.  You can put 23 aside.

Was Exhibit 21 obtained from your computer?

A.    Yes.

Q.    And did you use the CoStar -- your CoStar

password to access the information that you printed

out?

A.    Yes.

Q.    And were you -- do you recall where you

did that?  Would that have been at the CoStar -- or

the Klein & Heuchan offices?

A.    I believe so, yes.

Q.    Okay.  And what is Exhibit 21?

A.    Exhibit 21 looks like a spreadsheet

with office buildings in Clearwater and Tampa,

the metropolitan area.

Q.    Okay.  And why would you have obtained

this database?

A.    You can look at the -- the actual square

footage of the building -- let's see.

What else is on here?  Look at who --

1    who the leasing company is and the address, yeah.

2         Q.   And the types of properties that

3    are listed on this report, are they the types of

4    properties that you would have sought to list or

5    lease?

6         A.   The -- most of the -- most of these

7    properties are a lease by national companies.  Most

8    likely not.  These don't fit -- didn't fit my type

9    of -- what I would pursue as a listing.  They're way

10   out of our -- our ball game as far as -- you need a

11   huge staff, like C.B. Richard Ellis would.  They're

12   more fit for something like this.  We couldn't

13   handle something like that and --

14        Q.   So this was more, again, to just inform

15   yourself and become educated about the -- about the

16   market?

17        A.   Correct.

18        Q.   And, of course, you would use that

19   knowledge in your -- in your job?

20        A.   Yes.

21        Q.   Okay.  And you said Bell twenty -- or you

22   said Exhibit 22 was also from the CoStar database?

23        A.   Yes.

24        Q.   And was Exhibit 22 obtained from your

25   computer?

1        A.   Yes.

2        Q.   And what is Exhibit 22?

3        A.   It's a -- same thing as Exhibit 21.

4  This has different -- this pertains to developers

5  and property managers and some brokers.

6        Q.   And for what purpose would you use this

7  list?

8        A.   Again, to see which -- who the -- who

9  might be the contact person at a particular

10  property.

11        Q.   Did you ever contact any of these folks

12  as a result of finding them on this list?

13        A.   Pardon me?

14        Q.   Did you ever -- sorry.  Did you ever

15  contact any of the people identified on this list?

16        A.   I'm not -- I'm not sure.  These are people

17  that we work with and we network with at functions.

18  Some of those names appear on here.  Most likely

19  not.  I mean, most of these people we have seen

20  at meetings or interacted with them at one time or

21  another.

22             MR. SAUERS:  I'll mark the next exhibit.

23             THE COURT REPORTER:  Number 24.

24             (The document was marked as Bell Exhibit

25  Number 24 for identification.)

1          MR. SAUERS:  Oh-oh.  That's only three.

2    Hang on a second.  I need a copy for --

3          I apologize.  I may be short a copy

4    of this particular e-mail.  In fact, I am.

5    BY MR. SAUERS:

6        Q.   Have you had a chance to look at this?

7        A.   Yes.

8        Q.   Can you tell me why you chose this to

9    produce in this litigation?

10       A.   You asked to see all the potential clients

11   and people that I've had contact with.

12       Q.   Okay.  Did --

13       A.   And this is -- as far as what I had in my

14   archives, some of these things fell into it.  So I

15   wanted to try and make sure I didn't leave anything

16   out and give you everything that I had.

17       Q.   Understood.  So in all of the various

18   e-mails you provided, do you know whether you used

19   CoStar in reviewing the properties that were listed

20   in these e-mails?

21          And I can get a whole stack of them,

22   but I'm just looking for --

23       A.   If you're asking me to recall from direct

24   memory, I can't do that.

25       Q.   Okay.

1    A.   We'd have to -- I'd have to look.

2    Q.   At each individual one.   Well, for

3  example, this property, did you -- would you have

4  used CoStar in connection with this one?

5    A.   I'm not sure.

6        MR. SAUERS:  We can go off the record for

7  one minute.

8        THE VIDEOGRAPHER:  We're off the record

9  at 12:52 p.m.

10       (Discussion off the record.)

11       MR. SAUERS:  Okay.  We can go back on.

12       THE VIDEOGRAPHER:  We are on the record

13  at 12:54 p.m.

14       MR. SAUERS:  I'll mark the next exhibit.

15       THE COURT REPORTER:  25.

16       (The document was marked as Bell Exhibit

17  Number 25 for identification.)

18       MR. SAUERS:  And I apologize.  I only

19  have three of these, but --

20       THE WITNESS:  Okay.

21  BY MR. SAUERS:

22    Q.   Have you seen this document before?

23    A.   I saw a little bit of it.  I haven't seen

24  the whole thing.

25    Q.   Which part did you see?

1     A.    Let's see.  I'd say probably just the

2 first part from Curtis Ricketts here, the first

3 three pages.

4     Q.    Okay.  And when did you see it?

5     A.    When he had called and -- called the

6 Klein & Heuchan office.

7     Q.    Did someone bring it to you or was it sent

8 to you from CoStar?

9     A.    Did somebody bring it to me?

10     Q.    Yes.

11     A.    No.

12     Q.    Well, how did you become aware of

13 this document?

14     A.    When we talked to Mr. Ricketts --

15 Mark Klein -- we reviewed this document.

16     Q.    Prior to that phone call?

17     A.    Yes.

18     Q.    Okay.  And what did Mr. Klein say

19 to you about this document?

20     A.    He felt as if he was being extorted for

21 money.

22     Q.    Did he say anything else?

23     A.    No.  That was about it.

24     Q.    Did you discuss your use of the

25 CoStar database?

1    A.    We knew -- he -- we knew we'd been using

2    it for some time.

3    Q.    Well -- right.  I understand that he knew

4    that you were using the CoStar database for some

5    time.

6    A.    Yeah.  I mean, we just -- we did use the

7    database.  Correct.

8    Q.    Right.

9    A.    Right.

10    Q.    Did you discuss that use of the database

11    in the context of this letter?

12    A.    I'm not sure I understand your question.

13    Q.    Did you discuss whether your -- whether

14    you thought it was authorized or whether the two of

15    you thought the use was authorized or not?

16    A.    We discussed the authorized and we

17    recounted when Coldwell Banker -- they had rolled

18    this out in front of a large number of people

19    that --

20    Q.    Um-hum.

21    A.    -- just a few months before I left

22    there, and that they had bought us a subscription to

23    CoStar's database.  And that came from Jay Love, the

24    Director of Coldwell Banker at that time.  She was

25    the Director of Florida Operations.

1    Q.   Okay.  And that's -- that's your basis for

2    a belief that you were -- your use was authorized?

3        A.   Correct.

4        Q.   Anything else?

5        A.   No.

6        Q.   Did you ever get any e-mails telling you

7    you were authorized?

8        A.   Never.

9        Q.   Phone calls?

10       A.   Never.

11       Q.   Written letters telling you?

12       A.   Never.

13       Q.   Did you ever discuss whether you

14   were authorized -- prior to your -- prior to

15   Klein & Heuchan's receipt of this letter, did you

16   ever discuss whether you were authorized with

17   anyone at Klein & Heuchan?

18       A.   Repeat that, please.

19       Q.   Sure.  Prior to Klein & Heuchan's receipt

20   of this letter --

21       A.   Okay.

22       Q.   -- had you ever discussed whether or not

23   your of the CoStar database was authorized with

24   anyone at Klein & Heuchan?

25       A.   Mark had asked me -- he said, "How did --

1    how did you get -- how do you have access?"

2         And I told him Coldwell Banker Commercial

3    had -- had bought a license for me while I was

4    there, and they put it on -- it was installed on my

5    laptop with the security certificate and that  --

6    and I -- it went -- it went with -- it was my

7    computer, so I took it.

8         They didn't say I couldn't use it.  They

9    didn't turn it off or change the password or

10   anything.  It -- I -- I believe that was -- you

11   know, they said they had bought us one and I --

12   they bought us a subscription.

13   Q.   Well, do you know if you are listed on that

14   subscription as part of Coldwell Banker?

15        MR. GIBSON:  Object to the form.

16   A.   Do I --

17   Q.   Do you know if you are listed on that

18   subscription as associated with Coldwell Banker?

19        MR. GIBSON:  Object to form.  Calls for

20   speculation.

21   Q.   You can answer.

22   A.   I don't understand the question.

23   Q.   Do you know if your use of the CoStar

24   database --

25   A.   Okay.

1      Q.    -- was pursuant to your association with

2    Coldwell Banker?

3      A.    They bought it for me, so --

4      Q.    Um-hum.  And do you know if your access to

5    the CoStar database base was pursuant to being

6    identified as associated with Coldwell Banker?

7            MR. GIBSON:  Object to form.

8            MR. LOVE:  Object to form.  Calls for

9    speculation.

10           MR. GIBSON:  Asked and answered.

11           MR. SAUERS:  I'm asking if he knows.

12   BY MR. SAUERS:

13     Q.    Do you know?  Did --

14           MR. LOVE:  My objection is to form.  Go

15   ahead and answer.

16   BY MR. SAUERS:

17     Q.    Did CoStar -- did CoStar think you were

18   part of Coldwell Banker?

19           MR. LOVE:  Object to form.

20     A.    I don't know what they thought.

21     Q.    When you received your access e-mail from

22   Coldwell Banker, did it include with it terms of

23   use?

24           MR. GIBSON:  Object to form.  Lack of

25   predicate.

1   A. I don't recall.

2   Q. Did you have a key token access to CoStar's

3 database?

4   A. No.

5   Q. When you left Coldwell Banker, did you have

6 access to any other databases?

7   A. Such as?

8   Q. Any other databases, proprietary databases.

9   A. No.

10   Q. Did you ever contact CoStar for customer

11 service support?

12   A. I think I called them one time and asked

13 them how much the CoStar tenant -- the CoStar

14 tenant package is.  Never called for support.

15   Q. Never called for support.

16   A. Simple inquiry about how much it would cost

17 to add.

18   Q. And when you called to ask about how much

19 it would cost to add that, did you -- what did they

20 ask you?

21   A. There was a -- they asked me what markets I

22 was looking for.  It was Tampa.  And they said, "We

23 could send somebody out."

24   Q. Did you tell them what services you already

25 had?

1     A.   No.

2     Q.   Did they ask you if you were already a

3  subscriber to CoStar's services?

4     A.   I don't recall them asking.

5     Q.   Did CoStar ever approach you about -- make

6  a sales call to you?

7     A.   Never.

8     Q.   But you know they made sales calls

9  to Klein & Heuchan?

10    A.   I -- Mark had told me in the past they had

11  made sales calls on them.  I imagine they've made

12  sales calls on every commercial real estate company

13  in the metropolitan area.

14    Q.   Why would they be contacting the real

15  estate companies, real estate agencies?

16          MR. GIBSON:  Object to form.

17    A.   I don't know.

18    Q.   Why wouldn't they contact individual

19  agents?

20          MR. GIBSON:  Object to form.

21    A.   Because I'm not a -- I'm not a broker.

22    Q.   Is it your understanding that CoStar gets

23  -- enters into contracts with the brokers?

24          MR. GIBSON:  Object to form.

25    A.   I don't know.

1      Q.   Did you have a contract with CoStar?

2      A.   Not -- I didn't have a contract with it.

3  Coldwell Banker Commercial bought me a

4  subscription.

5      Q.   When you say they -- when you say "they

6  bought you a subscription," how --

7      A.   And everybody that was in the organization

8  they bought a subscription to.  They rolled it out

9  at a meeting.

10      Q.   Did they buy them access or individual

11  subscriptions?

12          MR. GIBSON:  Object to form.

13      A.   I didn't -- I don't know.

14      Q.   But did you sign a --

15      A.   I wouldn't --

16      Q.   Did you sign a contract?

17      A.   I didn't sign a contract, no.

18      Q.   So you didn't have a subscription?

19          MR. GIBSON:  Object to form.

20      Q.   Did you have a subscription?

21          MR. GIBSON:  Object to form.

22      A.   They bought me a subscription.  Did I have

23  a subscription?  They assigned a subscription to

24  me.

25      Q.   They assigned a subscription to you?  So

1    they --

2        A.   They bought it and said, "Here you go.

3    It's yours to use."

4        Q.   And they didn't say anything about your use

5    of that database?

6        A.   Nope.  No.

7        Q.   Did they e-mail you your password?

8        A.   Yes.

9        Q.   Do you have that e-mail?

10       A.   No.

11       Q.   Do you recall when you received that e-mail

12   from Coldwell Banker?

13       A.   I do not.

14       Q.   Do you know when you first had access to

15   CoStar's services?

16       A.   I don't remember.

17       Q.   Approximately?

18       A.   I don't --

19       Q.   A year before you left?  Six months before

20   you left?

21       A.   I don't know.

22       Q.   Was it the first thing when you walked in

23   the door?  It happened after you were there?

24       A.   Again, I don't remember.  It's been over

25   two, two-and-a-half years now.  I don't remember.

1    Q.   Well, you said --

2    A.   I know Coldwell Banker sent me an e-mail,

3    and I don't recall when I got it.  We used to -- I

4    don't know when I started using it or not.  When

5    they sent it to me, that's when I -- which is

6    when -- it could have been shortly thereafter.

7    Q.   The e-mail with the password came from

8    Coldwell Banker and not from CoStar?

9    A.   I believe it came from Coldwell Banker,

10   yes.

11   Q.   Was it a forwarded e-mail with the password

12   and user name attached?

13   A.   I don't recall.

14   Q.   You said there was a -- they told

15   everyone in the office, "We've got subscriptions

16   for everybody and you can use it."  When was that?

17        MR. LOVE:  Object to form.  Go ahead and

18   answer.

19   A.   Probably somewhere around --

20   John Skicewicz was the director and he stepped

21   down -- it must have been somewhere around July

22   or August they announced that.

23   Q.   Of what year?  I'm sorry.

24   A.   '06.

25   Q.   '06.  And how long after that was it that

1 you got your password?

2     A.   I don't recall.

3     Q.   Months?

4     A.   Maybe a month. I don't know.

5         MR. GIBSON: Do you mind if we take a

6 break?

7         MR. SAUERS: Yeah. That's fine.

8         THE VIDEOGRAPHER: We're off the record at

9 1:07 p.m.

10        (There was a recess.)

11         THE VIDEOGRAPHER: We're on the record at

12 1:14 p.m.

13 BY MR. SAUERS:

14     Q.   When did you discuss your belief that you

15 were authorized to use the CoStar database with

16 Mr. Klein?

17     A.   Shortly after I joined the firm when I had

18 showed him the database.

19     Q.   When was that?

20     A.   The first quarter of '07.

21     Q.   Okay. Did you ever have such a discussion

22 with Steven Klein?

23     A.   I don't -- I don't recall, no. I'm not

24 sure.

25     Q.   How about anybody else in the office?

1      A.    No.

2      Q.    Not -- not Judi -- is it Healey?

3      A.    No.  Judi Healey is the name.

4      Q.    Yes.

5      A.    But I didn't, no.

6      Q.    Do you know if at the time you had your

7      discussion regarding your belief that you were

8      authorized with Mr. Klein, Mr. Klein had already --

9      had received sales presentations from CoStar?

10     A.    No, I was not.  No.

11     Q.    No, you don't know?

12     A.    I don't -- I don't know if he had or not,

13     no.

14     Q.    Okay.  How did you store your CoStar

15     password?

16     A.    It was automatically recalled when you

17     clicked on a web site.  All the information was

18     there.  You just --

19     Q.    You didn't keep it written anywhere or

20     anything like that?

21     A.    No.

22     Q.    So if you had lost that, what would you

23     have done?

24     A.    I don't know.

25            MR. SAUERS:  I'll mark the next exhibit.

1    This is twenty --

2              THE COURT REPORTER:   26.

3              MR. SAUERS:   Thank you.

4              (The document was marked as Bell Exhibit

5    Number 26 for identification.)

6    BY MR. SAUERS:

7         Q.   Can you -- is this -- this is a document

8    that was produced by Klein & Heuchan to us as a

9    summary of your commissions in 2007 and 2008?

10        A.   Yes.

11        Q.   Is this an accurate summation of all the

12   commissions you received during your time with

13   Klein & Heuchan?

14        A.   Yes.  Yes.

15        Q.   Okay.  And on the second page there's a

16   reference to 1250 Rogers.

17        A.   Um-hum.

18        Q.   And that's the property for which you

19   testified earlier, I believe, that you used the

20   CoStar database to conduct research?

21             MR. LOVE:   Object to form.  Go ahead and

22   answer.

23        A.   Which property?  I'm sorry.

24        Q.   1250 -- the 29-Feb-'08,

25   1250 Rogers/Entrust entry.

1    A.   What's the question?

2    Q.   Is that the one for which you used the

3    CoStar database to conduct research?

4    A.   No.  I did not conduct research on that

5    property.  I compared the information of the

6    property to what we had on ours.

7    Q.   Okay.  So in the process of consummating

8    that deal, you used the CoStar --

9    A.   It was not a result of CoStar, no.

10   Q.   No, no, no.  I'm just asking:  In the

11   process of consummating that deal, you used the

12   CoStar database --

13           MR. LOVE:  Object to form.

14           MR. GIBSON:  Object to form.

15   Q.   -- to conduct research?

16           MR. GIBSON:  Object to form.

17   Mischaracterizes his testimony.

18           THE WITNESS:  Yeah.

19   Q.   I'm asking you the question.

20           Is that true?

21           MR. GIBSON:  And he's answered it.

22   Q.   You can answer it.

23           MR. GIBSON:  He already has.  He said no.

24           THE WITNESS:  No.

25           MR. SAUERS:  He said he didn't understand

1    the question.

2          MR. GIBSON:  No.  He said "no."  We can

3    have the court reporter read it back.

4          MR. SAUERS:  Can you read the question

5    back?  I couldn't hear over all the objecting.

6          THE COURT REPORTER:  He said, "It was not a

7    result of CoStar, no."

8          MR. SAUERS:  Right.  And that's different

9    than the question I asked.

10          MR. GIBSON:  Then there was another

11    question after that.

12          THE COURT REPORTER:  And I don't see an

13    answer to the next question.

14          MR. GIBSON:  I guess the court reporter

15    didn't hear it.

16          MR. SAUERS:  Because of all the objecting.

17          THE COURT REPORTER:  Well, there were four

18    people talking at once, so --

19          MR. GIBSON:  And I -- there's a reason you

20    may not have heard it, but --

21          MR. SAUERS:  Can you read back the

22    question, the last question, the one -- the

23    disputed question?

24          THE COURT REPORTER:  "No, no.  I'm just

25    asking:  In the process of consummating that deal,

1 you used the CoStar database" --

2         THE WITNESS:  In the process of --

3         MR. LOVE:  Is that the question?

4         MR. SAUERS:  Well, that's as far as I got

5 before everyone objected.

6         MR. LOVE:  Objection to form.  Go ahead and

7 answer.

8         MR. SAUERS:  Okay.

9         THE WITNESS:  No.

10 BY MR. SAUERS:

11    Q.  You did not use the CoStar database at all

12 during the process of negotiating that deal for any

13 purpose?

14    A.  No.

15         MR. GIBSON:  Object to form.

16    Q.  What did you use it for during the process

17 of that deal?

18    A.  To compare the information that we had on

19 our -- in our data, in our flier.

20    Q.  Okay.  And why would you do that?

21    A.  To see how accurate CoStar's reporting was.

22 They would call and ask about the different

23 listings we would have and they would gather the

24 information.  Sometimes we might be under a belief

25 that might be wrong or misleading.

1   Q.   What data?

2   A.   That CoStar collects from Klein & Heuchan

3   about their listing.

4   Q.   I see.  So you were checking to make

5   sure that CoStar was properly listing your -- was

6   accurately reflecting your listing?

7   A.   Klein & Heuchan's listing.

8   Q.   Klein & Heuchan's listing?

9   A.   Right.

10   Q.   I see.  To what end?

11   A.   To what end?

12   Q.   Why were you checking to see if it was

13   accurate?

14   A.   To see if there's any inconsistencies, the

15   square footage.

16   Q.   What if it was inconsistent?

17   A.   The next time she would call, I'd correct

18   her.

19   Q.   Did you conduct any other research using

20   the CoStar database in connection with any of these

21   listings on either of these pages --

22          MR. LOVE:  Objection --

23   Q.   -- or commissions earned on either of these

24   pages?

25          MR. LOVE:  Objection to form.  Go ahead and

1   answer.

2      A.   I used the CoStar database to access

3   and look at office buildings.  As a result of these

4   transactions, my client discovered the office and

5   negotiated the deal himself, and merely as a -- to

6   help me understand the business, brought me into

7   the deal.

8      Q.   Okay.  And which -- which entries are you

9   referring to?  Which seller/buyer?

10     A.   The CAT-Florida/Intellect Technical.

11     Q.   Okay.

12     A.   Page 2.

13     Q.   Both of those?

14     A.   Items 1 and 2.  They're one transaction,

15  paid on two dates.

16     Q.   I see in -- on the first page you received

17  a bonus.

18     A.   Um-hum.

19     Q.   What was that for?

20     A.   I can't -- I can't explain it precisely.

21  But if we -- if we have the company manual, it's a

22  -- when you are a full-time associate or when you

23  work there and you take floor calls, help other

24  people out, it's like a -- almost like a

25  revenue-sharing pool.

1     Q.  I see.

2     A.  So however much you pay in or how much is

3 in the pool, depending on what you contributed, you

4 get a little bit back.

5     Q.  Okay.  And so why wasn't there one -- why

6 didn't you receive a commission -- or, I'm sorry --

7 a bonus in 2008?

8     A.  I was not -- I left shortly -- like, midway

9 through the year.  I was no longer a full-time

10 associate.

11     Q.  And they don't prorate.  I see.

12     A.  Right.

13     MR. SAUERS:  Okay.  I'll mark the next

14 exhibit.

15     (The document was marked as Bell Exhibit

16 Number 27 for identification.)

17 BY MR. SAUERS:

18     Q.  This is a document produced to us from

19 Klein & Heuchan providing a list of associates,

20 K&H associates, in -- well, I believe providing

21 a list of K&H associates in 2007 and 2008.

22     Can you please identify any person or

23 persons on here to whom you provided information

24 from the CoStar database?

25     A.  It would be myself, Mark Klein and

1    Steve Klein.

2        Q.   Okay.  Now, I don't see -- what about

3    Judi Healey?

4        A.   I don't see her on 2007.

5        Q.   Okay.  I see her on eight.

6        A.   And then on 2008, yes.

7        Q.   Okay.  Anybody else?

8        A.   No.

9             MR. SAUERS:  Okay.  If we can go off the

10   record for a second.

11            THE VIDEOGRAPHER:  We're off the record at

12   1:28 p.m.

13            (Discussion off the record.)

14            MR. SAUERS:  Okay.  Go back on the record.

15            THE VIDEOGRAPHER:  We're on the record at

16   1:30 p.m.

17            MR. SAUERS:  No further questions.

18                      EXAMINATION

19   BY MR. GIBSON:

20       Q.   Mr. Bell, I have some -- I have some

21   questions.

22       A.   Okay.

23       Q.   I want to take you back to your days at

24   Coldwell Banker, that time period.

25            As I understand it, you received your

1   real estate license in 2005. Is that correct?

2     A.   Yes. Yes.

3     Q.   Okay. And soon thereafter you went to work

4   for Coldwell Banker. Is that correct?

5     A.   The commercial, yes.

6     Q.   Coldwell Banker NRT?

7     A.   Right.

8     Q.   Okay. And when I say "Coldwell Banker"

9   from now on, we'll know -- we'll know what it is.

10     A.   Okay.

11     Q.   And your position at Coldwell Banker was

12   similar to your position at Klein & Heuchan. Is

13   that correct?

14     A.   Yeah. It's virtually the same.

15     Q.   Sales associate, selling and leasing

16   commercial -- commercial real estate?

17     A.   Correct.

18     Q.   Okay. When you arrived at Coldwell Banker,

19   you were not provided a subscription to CoStar?

20     A.   No.

21     Q.   At some point during your tenure there,

22   you were provided a subscription to CoStar?

23     A.   Yes.

24     Q.   Now, as I understand it, at some point

25   somebody put something on your computer to let you

1    have access to CoStar.  Is that right?

2        A.    I'm not sure.

3        Q.    Okay.

4        A.    I'm not sure I remember right.  They had IT

5    guys that would do a lot of things on my computer,

6    and then we also got e-mail with a password.  So

7    I'm not -- I'm not entirely sure.

8        Q.    Okay.

9        A.    I can't -- I don't recall.

10       Q.    Let me back up, just so that we're clear.

11   When you started at Coldwell Banker, you used your

12   own laptop.  Correct?

13       A.    Correct.

14       Q.    You weren't provided one by

15   Coldwell Banker?

16       A.    No.

17       Q.    Just like you weren't provided one by

18   Klein & Heuchan.  Correct?

19       A.    Right.

20       Q.    Correct.  Okay.

21             So you don't know what they put on it.  But

22   Coldwell Banker IT individuals did install certain

23   software on your computer?

24       A.    Yes.

25       Q.    Do you know if at some point one of those

1  installations occurred around the time that CoStar

2  was given -- granted access to you?

3     A.   I'm not --

4     MR. SAUERS:  Objection.  Form.

5     A.   I'm not sure.

6     Q.   How is it that you accessed CoStar?  Do you

7  go through the web site?  Is there a proprietary

8  software?  How is it -- what is your interface with

9  CoStar on your computer?

10     A.   If I can recall back, it -- I believe it is

11  a bookmark on  -- web site bookmark.  You click on

12  it.  It recognizes who you are and you just hit --

13  it just lets you right in.

14     Q.   Because, as I think you've testified, your

15  password was saved in the bowels of the computer.

16     A.   Right.

17     Q.   You'd just hit "enter" --

18     A.   Right.

19     Q.   -- and you were granted access to the

20  variety of databases that you had access to?

21     A.   Yes.

22     Q.   And it was your understanding that

23  Coldwell Banker was giving you a subscription

24  to CoStar?

25     A.   Yes.

1    Q.   Okay.   Prior to the time that you were

2    given a subscription to CoStar, do you know if

3    anybody else at Coldwell Banker had access to

4    CoStar?

5    A.   Prior -- I'm sorry.   Could you repeat the

6    question?

7    Q.   Yeah.   At some point during your tenure at

8    Coldwell Banker you were provided a subscription to

9    CoStar.   Correct?

10   A.   Yes.

11   Q.   Prior to that moment, were you --

12   A.   Prior to the subscription -- when they gave

13   it to me?

14   Q.   -- were you aware of anybody else at

15   Coldwell Banker who had CoStar?

16   A.   There was -- his name was Syd Schuster,

17   and he had a subscription that -- and they used

18   a computer in the -- what they call the research

19   room.   There was three -- or could be four --

20   computers in their research room and you accessed

21   it through there.

22   Q.   Okay.   Who is Syd Schuster?

23   A.   He's an associate with them.

24   Q.   Okay.   So when you were granted a

25   subscription to CoStar, you knew what CoStar was?

1     A.    Right.

2     Q.    And you knew that because you knew that

3     one other Coldwell Banker associate had access

4     to it prior to you be giving -- been given a

5     subscription?

6     A.    Yes.

7     Q.    Okay.   Then you were granted a subscription

8     by Coldwell Banker?

9     A.    Yes.

10    Q.    Were you told at that time, "This is

11    a six-month subscription.   This is a 12-month

12    subscription," any kind of time frame with regard

13    to the subscription?

14    A.    No.

15    Q.    Were you told that it would expire at any

16    time?

17    A.    No.

18    Q.    Were you told, "You can only use this

19    when you're inside the Coldwell Banker property"?

20    A.    No.

21    Q.    Were you told, "You can only use it if

22    you're logged in from a Coldwell Banker authorized

23    terminal"?

24    A.    No.

25    Q.    Were you told that at some point -- at any

1   point it would not be possible for you to access

2   the subscription?

3       A.   No.

4       Q.   Okay.  You weren't provided any information

5   about the length of time, the parameters with which

6   you had a subscription to CoStar?

7       A.   Correct.

8       Q.   And I want to be clear because counsel

9   asked you.  You were never provided that orally.

10  Correct?

11      A.   Correct.

12      Q.   You never received an e-mail that you can

13  recall about that.  Is that correct?

14      A.   Correct.

15      Q.   You never received a letter about that.

16  Is that correct?

17      A.   Correct.

18      Q.   And you never received a telephone call

19  from anybody about that.  Is that correct?

20      A.   That's correct.

21      Q.   Can I also -- is it true, then, once you

22  ceased being affiliated with Coldwell Banker, did

23  you receive an e-mail saying, "You no longer have

24  access to your subscription to CoStar"?

25      A.   No.

1     Q.   Did you receive a telephone call that says,

2    "Mr. Bell, I just want to remind you, you no longer

3    have access to your subscription to CoStar"?

4     A.   No.

5     Q.   Did you receive a letter --

6     A.   No.

7     Q.   -- that said "you no longer have a

8    subscription"?

9     A.   No.

10     Q.   And can I assume that you didn't receive a

11    telephone call either?

12     A.   No telephone call.

13     Q.   Okay.  Tell me about when you left

14    Coldwell Banker.  Were there issues with getting

15    your -- for example, getting your name off of their

16    web site?

17     A.   Yes.

18     Q.   Tell me about that.

19     A.   After I left and, you know, I saw -- I'd

20    see a few of the people that used to be there,

21    and they had left.  And my name still appeared on

22    the web site, and I had sent -- put calls in to

23    Jerry Lamb, who's -- took over for John Skicewioz

24    -- and told him that "Could you please take my name

25    off your web site?  It's -- I'm not -- I'm no

longer there."  Didn't get any action on that.

So then I finally -- somebody provided
me with -- and her name is Peggy Kronos,
and I placed a call -- it could have been the
first quarter of '07 -- to the headquarters in
Sarasota asking them if -- and she took care of it
immediately there and took it off and that was it.

Q.  Okay.  Was there any other sort of
lingering association with Coldwell Banker that you
had an issue with after you left Coldwell Banker?

A.  I still received some sporadic e-mails with
scott.bell@coldwellbanker.com.  I still received
sporadic e-mails from various -- it's almost like
spam or junk, but I still get e-mails from
Coldwell.  I still -- so I just kind of gave up on
that.

Q.  But did you make contact with anybody at
Coldwell Banker at some point saying, "Can you make
this stop?"

A.  Yes, I did.  Like, Peggy Kronos,
Jerry Lamb a number of times.  I even talked to
Jim Parker and told him about it.

And he said, "I'm not in charge here.  I
can't help you with that.  But maybe call somebody
down at corporate and they'll take care of it for

you."

Q. So, if I understand it, you made at least three telephone calls to individuals at Coldwell Banker in an attempt to sever -- completely sever your relationship with Coldwell Banker?

A. Correct.

Q. And you had to make those calls on numerous occasions?

A. Yes.

Q. And it took some doing, but they did take your name off the web site. Correct?

A. Yes, after --

Q. But to -- go ahead.

A. Yes. After several months, yes.

Q. But, as I understand it, to this day you still get the random spam e-mails?

A. Yes.

Q. You still have some scott.bell@coldwellbanker e-mail address?

A. Correct.

Q. Okay. So you're still in some way affiliated with Coldwell Banker whether you want to be or not?

A. Right.

MR. SAUERS: Objection.

BY MR. GIBSON:

Q. Now, were you involved in any way in the decision to sign up for CoStar while you were at Coldwell Banker?

A. No.

Q. You weren't involved in any of the negotiations with anybody from CoStar?

A. No.

Q. As I understand it, you were told "We're giving you a subscription to CoStar"?

A. Yes.

Q. "Here it is"?

A. Yes.

Q. Okay. Were you given training on it?

A. No.

Q. Okay. How did you -- how did you learn about how to use it?

A. Just by way of accessing the web site and you type in different -- you just -- by using the site itself, that's the only way you can learn.

Q. Trial and error?

A. Yes.

Q. Okay. Now, we know that you had your own computer.

A. Um-hum.

1    Q.    And is that the same computer that you used

2    when you went to Klein & Heuchan?

3        A.    Yes.

4        Q.    Okay.  Counsel asked you about the office

5    suite that was on the computer and specifically

6    about the Outlook program that you use to access

7    your e-mail.

8        A.    Yes.

9        Q.    Do you remember that?

10        A.    Yes.

11        Q.    And he -- you testified that you used that

12    Outlook program to access your Klein & Heuchan

13    e-mail.  Is that correct?

14        A.    Yes.

15        Q.    Did Klein & Heuchan provide you with the

16    Outlook program?

17        A.    No.

18        Q.    That was something that you had when you

19    came to Klein & Heuchan?

20        A.    Yes.

21        Q.    Okay.  Did Klein & Heuchan provide

22    any software services when you started work at

23    Klein & Heuchan?  Did they -- and let me strike

24    that.

25            Did they install any software on your

1    computer when you came to work for them?

2        A.    No.

3        Q.    Okay.

4            MR. GIBSON:  Can we take a break now?

5            MR. SAUERS:  We can take a break.  We need

6    some tape.

7            THE VIDEOGRAPHER:  We're off the record at

8    1:40 p.m.

9            (Discussion off the record.)

10           THE VIDEOGRAPHER:  We're on the record at

11   1:43 p.m.

12           MR. GIBSON:  Thank you.

13   BY MR. GIBSON:

14       Q.    When you left Coldwell Banker, you believed

15   that you continued to have the authority to access

16   the CoStar database.  Is that correct?

17       A.    Yes.

18       Q.    Can you look at -- pull out Exhibit 25.

19       A.    Okay.

20       Q.    Prior to -- and it's your testimony that

21   after that is received -- that exhibit was received

22   by Mr. Klein, Mr. Klein called you -- is that

23   correct? --

24       A.    Correct.

25       Q.    -- and showed you at least some of the

1    documents that make up Exhibit 5, specifically the

2    first couple pages.  Is that correct?

3       A.   Yes.

4       Q.   Okay.  Prior to you seeing that, did you

5    have any inclination that you were at any time not

6    authorized to access the CoStar database?

7       A.   No.

8       Q.   Do you have any reason to believe that

9    Mark Klein had any reason to believe you didn't

10   have access to the CoStar database?

11      A.   No.

12      Q.   Did you ever tell Mark Klein, "I'm

13   accessing the CoStar database and I shouldn't be"?

14      A.   No.

15      Q.   Did Mark Klein ever tell you, "I don't

16   think you should be accessing the CoStar database"?

17      A.   No.

18      Q.   How about Steve Klein?  Did you ever have

19   any type of conversations like that with Mr. Klein,

20   Steve Klein?

21      A.   No.

22      Q.   How about Ms. Healey?

23      A.   No.

24      Q.   So -- and what's the date of that letter?

25      A.   April 16th, 2008.

1    Q.    So am I correct that prior to the time

2    that you had a discussion with Mr. Klein about that

3    letter, you had no idea that you could not -- you

4    could not access the database?

5    A.    Correct.

6    Q.    After you had the conversation about that

7    letter, did you access the CoStar database?

8    A.    No.

9    Q.    So from the moment you had an inclination

10   that you were not authorized to access the

11   database, you ceased accessing the database?

12   A.    Yes.

13   Q.    Prior to your discussion about that letter,

14   am I correct that CoStar never turned your access

15   off to the CoStar database?

16   A.    They did not, no.

17   Q.    Do you assume that they had the ability to

18   do that?

19   A.    Yes.

20         MR. SAUERS:  Objection.  Calls for

21   speculation.

22   Q.    Let's talk about -- let's go to 26,

23   Exhibit 26.

24   A.    Okay.

25   Q.    Counsel asked you about the sale on the

1    second page, the Rogers sale --

2        A.    Yes.

3        Q.    -- 1250 Rogers.

4        A.    Yes.

5        Q.    What was your involvement in that sale?

6        A.    Mark and I were the -- it was Mark's --

7    primarily Mark's listing, and he assigned me to

8    help him lease it out and -- actually, it was more

9    of a -- like, a learning experience.  You get your

10   feet wet in the business.

11            It was his -- it's his client and it's been

12   his listing for quite a long time, and he assigned

13   it to me.  And Mark actually closed it.

14            Sonia Boutros was the one that purchased

15   it and it was -- Mark pretty much handled all --

16   I did some of the -- showed the property and do

17   things like that, but that -- that's it.

18       Q.    Sonia Boutros?

19       A.    Yes.

20       Q.    Who's that?

21       A.    She's a Charles Rutenberg realtor.

22       Q.    So somebody from another real estate

23   company contacted Klein & Heuchan about a

24   Klein & Heuchan listing?

25       A.    Correct.

1    Q.   And it was that communication, and then

2    Mr. Klein had you do some of the legwork in showing

3    the property?

4    A.   Correct.

5    Q.   It wasn't a Klein & Heuchan client who

6    purchased or leased the property.  Correct?

7    A.   Repeat the question, please.

8    Q.   If I understand it, it was not a

9    Klein & Heuchan client who leased or purchased the

10   property?

11   A.   Right.  Correct.

12   Q.   It was another company that came to

13   Klein & Heuchan?

14   A.   Correct.

15   Q.   You don't know if they used CoStar to find

16   the property.  Right?

17   A.   Correct.

18   Q.   But you at some point accessed

19   CoStar looking at the data they had?

20   A.   Yes.

21   Q.   CoStar's information had absolutely

22   no bearing on the closing of that transaction.

23   Correct?

24   A.   Correct.

25   Q.   So it would be safe to say, then, that

1    Klein & Heuchan and you did not benefit monetarily

2    from CoStar's information with respect to the

3    Rogers transaction?

4        A.    Correct.

5            MR. GIBSON:  I apologize.  I do only have

6    one copy.

7    BY MR. GIBSON:

8        Q.    But I'm going to hold -- I'm going to hand

9    you a document that's been previously produced and

10   has a Bates number of K&H 0033.

11           MR. GIBSON:  Counsel, do you need to see

12   this before I ask about it?

13           MR. SAUERS:  Which is it?  No.  I have a

14   copy.  That's fine.

15   BY MR. GIBSON:

16       Q.    Do you recognize that document?

17       A.    Yes.

18       Q.    And am I correct that in the lower

19   right-hand corner there's a Bates number of

20   K&H 0033, very small there?

21       A.    Um-hum.

22       Q.    Yes?

23       A.    K&H 0033.

24       Q.    Okay.

25       A.    Yes.

1    Q.    What is that?

2    A.    Independent Contract or Agreement Between

3    Broker and Salesman.

4    Q.    Who are the parties to that agreement?

5    A.    It looks like Mark Klein.  I can't read --

6    it would be the firm and myself.

7    Q.    Okay.  This is your Independent Contractor

8    Agreement with Klein & Heuchan.  Is that correct?

9    A.    Yes.

10   Q.    Is your signature on the bottom of the

11   document?

12   A.    Yes.

13   Q.    Do you recall signing that document --

14   A.    Yes.

15   Q.    -- prior to your beginning your association

16   with Klein & Heuchan?

17   A.    Yes.

18   Q.    Okay.  Can you read for us out loud -- out

19   loud number -- paragraph number 10 of the

20   agreement?

21   A.    "It is intended that the salesman shall

22   be an independent contractor not an employee for

23   federal tax purposes or any other purposes and

24   it shall, at all times during the term of this

25   agreement, perform his duties and responsibilities

1    without any supervision or control by the broker."

2        Q.    Isn't it true that Mr. Mark Klein and

3    Mr. Steve Klein did not control your daily

4    activities during your association with

5    Klein & Heuchan?

6        A.    We -- could you -- could you repeat the

7    question again?

8        Q.    Did Mr. Klein -- Mark Klein and

9    Mr. Steve Klein -- control your daily activities

10    during your association with Klein & Heuchan?

11        A.    No.

12        Q.    Did you have to be at work at a certain

13    time --

14        A.    We had to be at --

15        Q.    -- every day?

16        A.    We had to be at meetings on Mondays and

17    Wednesdays.

18        Q.    Okay.  So you needed to appear at sales

19    meetings?

20        A.    Yes.

21        Q.    But did you have to be at the office at

22    8:30 every single day?

23        A.    No.

24        Q.    Okay.  You controlled the hours that you

25    worked.  Is that correct?

1    A.   Yes.

2    Q.   You didn't have to stay at the office until

3    5:30 every day and never a minute before.  Is that

4    correct?

5    A.   Correct.

6    Q.   During your day you could go in and out

7    as you pleased doing your work.  Is that correct?

8    A.   Yes.

9    Q.   Okay.  While you were at Klein & Heuchan, I

10   believe we know that internet service was provided

11   to you.  Is that correct?

12   A.   Yes.

13   Q.   Am I correct that you would show up with

14   your laptop and connect a cable and you'd have

15   internet service?

16   A.   Correct.

17   Q.   Did you log in through some process,

18   or did you just plug in and it was live?

19   A.   Plug in and go.

20   Q.   Okay.  So you didn't actually log into some

21   server or some Klein & Heuchan system?

22   A.   No.

23   Q.   Okay.  You also testified that, in addition

24   to your own laptop, you had your own printer?

25   A.   Correct.

1    Q.    All of the associates had their own

2    printer?

3    A.    Yes.

4    Q.    Okay.  You did have a copy machine/scanner

5    that you had -- were granted access to by

6    Klein & Heuchan.  Correct?

7    A.    Yes.

8    Q.    Okay.  And you were provided a desk.

9    Is that correct?

10   A.    Yes.

11   Q.    All right.  Now, as I understand it, all

12   you needed was a live internet connection in order

13   to access the CoStar database.  Is that correct?

14   A.    Correct.

15   Q.    So, once you plugged into Klein & Heuchan,

16   you could access the CoStar database?

17   A.    Yes.

18   Q.    Just like you could access CNN?

19   A.    Yes.

20   Q.    Okay.  And if you went to a Starbucks and

21   logged in and used Wi-Fi, could you access CoStar

22   from such an internet portal?

23   A.    I believe so.  I'm not sure.  I would

24   believe so, yes.

25   Q.    How -- did you ever access CoStar at home?

1     A.    Yes.

2     Q.    Okay.  How did you do that?

3     A.    Same way.  Just plug into the internet and

4  go.

5     Q.    Okay.  So as far as you knew, anywhere that

6  you had access to live internet, you could access

7  the CoStar database?

8     A.    Yes.

9     Q.    Okay.

10          MR. GIBSON:  Can I get that document back,

11  please?

12  BY MR. GIBSON:

13     Q.    Can you tell me what LoopNet is?

14     A.    LoopNet is a -- very similar to CoStar.

15  They have the sales.  It's the listing.  We would

16  use that as our primary listing, external database,

17  a list in there.

18          And you could get a basic membership for

19  free and you could upgrade to a premium membership.

20  And they had different suites and different

21  amounts, but you could -- it was your choice what

22  you wanted to go with, and you didn't have to use

23  it at all.

24     Q.    So do I understand you that LoopNet is a

25  database.  Correct?

1      A.    Yes.

2      Q.    And is it a database of commercial

3  properties available in the area?

4      A.    Yes.

5      Q.    It sounds like similar to CoStar.  Correct?

6      A.    Yes.

7      Q.    Okay.  Did you access LoopNet while at

8  Klein & Heuchan?

9      A.    Yes.

10     Q.    Did Klein & Heuchan pay to have you

11 permitted access?

12     A.    No.

13     Q.    Okay.  Did you have the free access to

14 LoopNet?

15     A.    Yes.

16     Q.    Did you have any additional access to

17 LoopNet?

18     A.    I had a premium package for quite sometime,

19 yes.

20     Q.    Okay.  And who paid for that?

21     A.    I did.

22     Q.    Klein & Heuchan didn't pay for that?

23     A.    No.

24     Q.    So each individual associate could make the

25 decision as to what subscription they did or did

1    not want?

2        A.    Yes.

3        Q.    And each -- each associate could make the

4    decision as to what level of subscription they

5    wanted or not?

6        A.    Yes.

7        Q.    Is that true?

8              The difference is, is that with

9    Coldwell Banker, Coldwell Banker paid for CoStar.

10   Correct?

11       A.    Yes.

12       Q.    And with LoopNet, you had to pay whatever

13   level you wanted?

14       A.    Yes.

15       Q.    Okay.

16             MR. SAUERS:   Objection.   Calls for

17   speculation.

18             MR. GIBSON:   What was the -- can you read

19   back the last question?

20             (The requested portion was read back by the

21   reporter.)

22   BY MR. GIBSON:

23       Q.    Okay.   With LoopNet, during your employ

24   with Klein & Heuchan --

25       A.    You chose --

1     Q.    Well, let me ask, so that we can get the --

2     A.    All right.

3     Q.    -- and I'm not trying to be rude.

4     But with LoopNet during your employ with

5 Klein & Heuchan you made the determination as to

6 what subscription level and access you wanted?

7     A.    Yes.

8     Q.    And you paid for it?

9     A.    Yes.

10     Q.    Okay.  Did you have any communication

11 with anybody at Coldwell Banker after receiving

12 or discussing with Mr. Klein the letter from

13 Mr. Ricketts?

14     A.    No.

15     Q.    Okay.  You've discussed a conversation

16 that you had with Mr. Ricketts on the telephone

17 with Mr. Klein.  Am I correct?

18     A.    Yes.

19     Q.    There was one telephone conversation?

20     A.    With -- yes.  With me, yes.

21     Q.    With Mr. Ricketts?

22     A.    Yes.

23     Q.    After that telephone conversation, any

24 further conversation with anybody from CoStar?

25     A.    Me, no.  No.  No.

1      Q.   Okay.   And I guess I should say before you

2   got sued.

3      A.   Yes.

4      Q.   Okay.   No communication with anybody at

5   CoStar?

6      A.   No.

7      Q.   Can you look at Exhibit 7?

8      A.   Okay.

9      Q.   Who is Gus?

10     A.   I believe Gus is somebody that had called

11  and asked about -- was inquiring about perhaps

12  moving his business or leasing somewhere.   And he

13  was inquiring about, do you have any information

14  that gives -- tells me what the different rates

15  might be around, and I sent him this.

16     Q.   Okay.   Now, back up just a second.

17          During your association with Klein &

18  Heuchan, is it accurate that you sent and received

19  numerous e-mails on a daily basis?

20     A.   Yes.

21     Q.   Did you inform or cc a Klein & Heuchan

22  individual or associate on every e-mail that you

23  sent?

24     A.   No.

25     Q.   Okay.   Is there any reason to believe that

1    Klein & Heuchan, Mr. Klein or Steve Klein knew that

2    you were sending that e-mail on that day?

3        A.   No.

4        Q.   Okay.  They aren't cc'd on it.  Is that

5    correct?

6        A.   Correct.

7        Q.   Okay.  Exhibit 8, if you could.

8             As I understand it, this is an e-mail --

9    the first e-mail on the chain, if you will, is an

10   e-mail that you received from CoStar.

11       A.   Yes.

12       Q.   Did you ask for that e-mail?

13       A.   No.

14       Q.   It is an unsolicited e-mail?

15       A.   Yes.

16       Q.   In fact, it appears as though there's some

17   program that classifies that at some level of spam

18   in the regarding line, doesn't it?

19       A.   Um-hum.

20       Q.   Yes?

21       A.   In the subject line, "spam-low."

22       Q.   Okay.  It didn't require your password to

23   see that e-mail?

24       A.   No.

25       Q.   And it didn't require your password to

1     forward that e-mail to the individual you forwarded

2     it to?

3     A.    No.

4     Q.    Exhibit 11.

5     A.    Okay.

6     Q.    This is an e-mail, as I understand it, to a

7     Tracy McMurray. Is that correct?

8     A.    Yes.

9     Q.    Tracy McMurray was a client of yours for

10     over 10 years. Is that correct?

11     A.    Yes.

12     Q.    Well, I guess more accurate, you knew him

13     for more than 10 years. Correct?

14     A.    I would say approximately 10 years.

15     Q.    And he was a client of yours?

16     A.    Yes.

17     Q.    Did you make the sale associated with the

18     property listed in this e-mail?

19     A.    No. No.

20     Q.    Did you make any commission based on the

21     property listed in that e-mail?

22     A.    No.

23     Q.    Did Klein & Heuchan make any money with

24     regard to that property listed in the e-mail?

25     A.    No.

1    Q.   I want to -- we talked about a transaction

2    that you had with regard to a space in Westshore --

3    in the Westshore area.

4    A.   Yes.

5    Q.   I understand that you had a client who

6    wanted to move from the Pinellas area to the

7    Westshore market.  Is that correct?

8    A.   Yes.

9    Q.   And there was a closing of that transaction

10   at some point.  Is that correct?

11   A.   Yes.

12   Q.   Did I understand you that the client

13   of yours brought to you the building that he

14   eventually closed on?

15   A.   Yes.

16   Q.   You didn't provide him information with

17   which he then selected that building?

18   A.   No.

19   Q.   He came to you with a property and you

20   assisted him in closing that property?

21   A.   Yes.

22   Q.   You did at some point look at the CoStar

23   database with regard to that building?

24   A.   Yes.

25   Q.   CoStar and the information on the database

1  had no impact on the closing of that transaction?

2      A.   No.

3      Q.   You talked about a call to CoStar

4  corporate --

5      A.   Yes.

6      Q.   -- at some point.  And you called them

7  in an effort to find out how much an additional

8  package would be that you didn't currently have

9  with your subscription.  Correct?

10     A.   Yes.

11     Q.   Did they ask you, for example, your user

12 name or password?

13     A.   No.

14     Q.   Did they ask you what level of service you

15 currently had?

16     A.   No.

17          MR. SAUERS:  Asked and answered.

18     Q.   Did they ask you how long you had been a

19 CoStar subscriber?

20     A.   No.

21     Q.   They didn't ask you any information about

22 your subscription to CoStar?

23     A.   No.

24     Q.   And am I correct that they told you that

25 they could send a sales associate to you to provide

1    you additional information?

2       A.   Yes.

3       Q.   Did that ever happen?

4       A.   No.

5       Q.   Did you not want it or did they just never

6    follow up to it and do it?

7       A.   No, I didn't want it.   No.

8       Q.   You didn't ask for the follow-up?

9       A.   No.

10           MR. SAUERS:  Objection.  Foundation to

11   this line of questioning.  I don't think he ever

12   testified in this deposition that anyone was

13   offered to come to his facility.

14           MR. GIBSON:  Yes, he did.

15           All right.  Can we take a break?

16           THE VIDEOGRAPHER:  We're off the record at

17   2:02 p.m.

18           (There was a recess.)

19           THE VIDEOGRAPHER:  We're on the record at

20   2:11 p.m.

21   BY MR. GIBSON:

22      Q.   During your association with

23   Klein & Heuchan, did you access the IMAP database?

24      A.   Yes.

25      Q.   Do you have any personal knowledge that

1    Klein & Heuchan, during your association with

2    Klein & Heuchan, benefitted financially because

3    of your access to CoStar's database?

4        A.   No.

5            MR. GIBSON:  I don't have any other

6    questions.

7            MR. SAUERS:  I just have a few.

8                         EXAMINATION

9    BY MR. SAUERS:

10       Q.   Do you believe you're affiliated with

11   Coldwell Banker?

12       A.   No.

13       Q.   Did you believe you were affiliated with

14   Coldwell Banker when you joined Klein & Heuchan?

15       A.   No.

16       Q.   In the course of your employment with

17   Klein & Heuchan, did you have to comply with the

18   requirements set forth in Exhibit 2, which is the

19   Office Policy Manual and Commission Schedule?

20           I suppose we could just look at the first

21   page where you -- does it state that you understand

22   it completely --

23       A.   Yes.

24       Q.   -- and agree to abide by it in every

25   respect?

1      A.   Yes.

2      Q.   Is that your signature on the bottom?

3      A.   Yes.

4      Q.   Who paid for your premium access to

5  LoopNet?

6      A.   I did.

7      Q.   Who had a contract with LoopNet?

8      A.   I would.  Me.

9      Q.   Did you get a password and user name for

10  your access to the premium content?

11     A.   No.  You create it yourself.  You -- they

12  log you in; you create it yourself.

13     Q.   But it was a password-protected setup?

14  You had to use a password and user name in order to

15  access the premium content?

16     A.   It depends on what you had.  If you had the

17  -- like, when I had the -- I had the basic, it's --

18     Q.   Sure.

19     A.   -- it's not -- anybody can use it.

20     Q.   My question is limited to the premium

21  access content.

22     A.   Okay.

23     Q.   For your premium access content, you had

24  to use a user name and password to access it?

25     A.   Yes.

1    Q.   And you paid -- you paid for that access?

2    A.   Yes.

3    Q.   And you had a contract?

4         MR. GIBSON:  Objection.  Asked and

5    answered.

6    Q.   You had a contract with LoopNet?

7    A.   Whatever their terms of use, I guess, would

8    be.

9    Q.   Okay.  And you would be -- you would -- you

10   would be required to comply with those terms of

11   use.  Correct?

12   A.   Yes.

13        MR. SAUERS:  No further questions.

14        MR. GIBSON:  One follow-up.

15                  EXAMINATION

16   BY MR. GIBSON:

17   Q.   As I understand it from questioning, you

18   agreed to use some sort of terms of use when

19   accessing CoStar.  Is that correct?

20   A.   Yes.

21   Q.   And, likewise, you agreed to use some terms

22   of use when you accessed LoopNet.  Correct?

23   A.   Yes.

24        MR. GIBSON:  That's all I've got.  Thanks.

25        MR. LOVE:  One follow-up.

1    <u>EXAMINATION</u>

2    BY MR. LOVE:

3        Q.    Any discernible difference between your

4    access to LoopNet and your access to CoStar as a

5    user?

6        A.    No.

7            MR. LOVE:   No further questions.

8            MR. SAUERS:   All set.

9            THE VIDEOGRAPHER:   We're off the record at

10    2:14 p.m.

11            (The deposition was adjourned at 2:14 p.m.)

12

13

14

15

## CERTIFICATE OF OATH

STATE OF FLORIDA        )
COUNTY OF HILLSBOROUGH)

    I, the undersigned authority, certify that CHRISTOPHER SCOTT BELL personally appeared before me and was duly sworn.

    WITNESS my hand and official seal this 5th day of September, 2009.

             JEAN M. WILKES, RPR-CP
             Notary Public - State of Florida
             My Commission No. DD 752848
             Expires:  Januray 28, 2012


## REPORTER'S DEPOSITION CERTIFICATE WITH ACKNOWLEDGMENT

STATE OF FLORIDA        )
COUNTY OF HILLSBOROUGH)

    I, JEAN M. WILKES, RPR-CP, Certified Shorthand Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness.

    I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

    DATED this 5th day of September, 2009.

             JEAN M. WILKES, RPR-CP
             Notary Public - State of Florida
             My Commission No. DD 752848
             Expires:  January 28, 2012