KLEIN & HEUCHAN, INC.,

     **Plaintiff,**

v.                          **Case No.  8:08-cv-1227-T-30EAJ**

COSTAR REALTY INFORMATION,
INC., and COSTAR GROUP, INC.,

     **Defendants.**

_____/

## FINAL JUDGMENT

Klein & Heuchan, Inc. ("Klein"), a real estate brokerage office, filed for declaratory relief concerning any obligation it may have to CoStar Realty Information, Inc. or CoStar Group, Inc. ("CoStar"), providers of real estate information services. CoStar counter-claimed for damages asserting copyright infringement against Scott Bell ("Bell") and Klein. The issues were tried by the Court without a jury on March 1 and 2, 2010.

Bell, an independent contractor real estate associate, moved his license from Coldwell Banker to Klein. Coldwell Banker subscribed to CoStar's real estate information service for all of its sales associates. Klein had never subscribed to CoStar's service. When Bell left Coldwell Banker, he took his personal laptop computer and his CoStar password. Bell continued to access CoStar's database for over a year while at Klein until CoStar notified Klein that the use was unauthorized. Bell ceased accessing CoStar's website immediately.

CoStar contends both Bell and Klein are liable for damages under the Copyright Act, Bell for direct infringement and Klein for contributory and vicarious infringement. The Court ruled on summary judgment that Bell directly infringed. Bell settled with CoStar for $5,000, the entry of a permanent injunction, and his agreement to testify at trial. Klein contends that CoStar's release of Bell also released it as a matter of law, but even if not released, it is not liable for either contributory or vicarious infringement.

Although its claim of release fails, Klein is not liable for either contributory or vicarious infringement. A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Cascella v. Morris*, 820 F. 2d 362, 365 (11th Cir. 1987) (quoting *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F. 2d 1159, 1162 (2nd Cir. 1971)). Klein neither knew nor should have known that Bell's use of the CoStar's service was unauthorized. And Klein did not cause or materially contribute to the infringement. Therefore, Klein is not liable for contributory infringement. Vicarious infringement occurs "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Klein did not profit directly from Bell's use of CoStar's service and therefore is not liable for vicarious infringement.

## Background and Findings of Fact

CoStar is in the real estate information business. It creates, maintains, and licenses access to commercial real estate data regarding office, industrial, and retail properties

throughout the United States and parts of Europe. It employs photographers and a team of over 800 trained researchers to create and update its database. It claims that 90% of the real estate brokers in Florida use its services. CoStar protects its informational base by registering its copyrights, photographs, and databases.

CoStar customers pay a license fee based on the number of commercial real estate professionals who work in the customer's office as well as the number of CoStar products subscribed. Customers register each professional for each license site and obtain individual passwords. The fee is computed annually. The price does not change during the year if users come or go. The individual users access CoStar's products through its website by entering their user name and password.

Real estate sales associates are required to place their license with a licensed real estate broker like Coldwell Banker. Coldwell Banker paid CoStar a license fee covering all of its independent sales associates, including Bell. Bell used his own personal laptop computer at Coldwell Banker and was given a CoStar password. Bell became comfortable using CoStar's website, liked its informational service, and used it frequently. In November of 2006, Bell left Coldwell Banker, taking his personal laptop computer and CoStar password.

Coldwell Banker's license provided that an individual's right to use the password ended when the individual left Coldwell Banker. Coldwell Banker was required to notify CoStar of any individual that left, but Coldwell Banker failed to notify CoStar about Bell. Coldwell Banker had little incentive to do so -- the price it paid for the service was not

reduced when someone left.  As a back-up plan, CoStar intended to review the names of people leaving at the renewal date when the customer had to supply a list of its users for the upcoming year.  For some reason, at Coldwell Banker's renewal, CoStar still was unaware that Bell had left.  Usually that would not be a problem because, according to CoStar, when a real estate professional leaves an office, the odds are strong that he or she will relocate to another CoStar customer because it serves about 90% of the real estate offices in Florida.

Despite those odds, Bell placed his license with Klein, a small, privately held real estate brokerage firm in Clearwater, Florida.  Klein had never subscribed to CoStar's informational services even though CoStar representatives had made several sales presentations.  Mark Klein, president of the firm, never thought CoStar's service was worth the money.  CoStar would have charged $5,381 per month for an office the size of Klein's. Mark Klein testified that most of the information was available from other sources, either public records or other real estate information services that, while not as extensive or available as quickly, were much less expensive.  All agents in Klein's office, except Bell, used other available information sources.  These same sources were available for Bell's use as well.

CoStar argues that Mark and Steve Klein  are experienced professionals and know or should have known that Bell's authorized use terminated when he left Coldwell Banker. CoStar points out that at least one of the information services to which Klein subscribed billed in the same manner as CoStar, requiring a fee to be paid for all professionals at a site and the termination of services when a professional left.  But CoStar omits mention that

another information service to which Klein subscribed operated like a magazine subscription. That is, a fee was paid for only the individual professional that desired the service, and use was authorized to a specific date in the future at which time use was terminated by the service provider.

CoStar also contends that the Kleins should have known when Bell's service terminated because of the sales calls made on Klein by CoStar representatives. While Mark Klein knew what it took to begin receiving service, there is no evidence showing he had information about when the right to use the service terminated. Both Mark and Steve Klein testified that they did not know that Bell's use was unauthorized and would have stopped such use had they known. After hearing their testimony and observing their demeanor, the Court finds their testimony credible and makes a finding of fact that Mark and Steve Klein neither knew nor should have known that Bell's use was unauthorized.

CoStar's termination provision in Coldwell Banker's license was never shown or explained to Bell. CoStar provides for this eventuality by having a pop-up screen appear each time a user logs in explaining that authorized use terminates when a user is no longer associated with the license holder. Bell never read the pop-up screen but, of course, is legally responsible for the information it contained. Therefore, when Bell left Coldwell Banker, despite the pop-up screen, he did not know whether a continued use of CoStar was authorized. He assumed his authorization was akin to a magazine subscription and that when his right to use the service expired, his password would be blocked by CoStar.

Bell continued to use the CoStar information services after he left Coldwell Banker in November of 2006. He first accessed the website again in January of 2007. In February of 2007, Sylvia Albarenga ("Albarenga"), a CoStar researcher, contacted Coldwell Banker to get information from Bell. Albarenga made a note in her database which states: "(R)eceptionist said he was no longer at Coldwell, did not give further info as to where he transferred to. Re-assigned his listings." CoStar claims Albarenga did not pass this information along to its compliance department and therefore no one verified the information to cancel Bell's password. Bell continued to use his password and access CoStar's database for over a year.

Real estate sales associates are considered independent contractors by real estate brokers. Bell used his own equipment, attempted to obtain his own listings, set his own schedule, and was, in general, self-directed. But Bell was subject to supervisory control at Coldwell Banker and Klein. At Klein, Bell was required to attend two mandatory sales meetings each week. He would have been disciplined for missing the meetings without proper reason. Any property listings obtained by Bell had to be accepted by either Mark Klein or his son, Steven Klein, the executive vice-president. Mark and Steve Klein oversaw Bell's work and gave constructive feedback on his performance. And Klein had the right to terminate Bell's association with its office for violations of its policies.

At some point after January, 2007, and before April of 2008, Klein became aware that Bell was obtaining information through CoStar's service by the use of his Coldwell Banker password. But Klein did not realize that the use was unauthorized. CoStar discovered the

unauthorized use in March of 2008. It notified Mark Klein of the unauthorized use by letter in April of 2008. Mark Klein requested Bell come to his office and they called CoStar. CoStar explained that Bell's authorization ended when he left Coldwell Banker. Klein and Bell both agreed that Bell's use would stop immediately.

CoStar followed this telephone conversation by again contacting Mark Klein to encourage him to become a subscribing customer to CoStar's services. CoStar stated that if Klein would begin subscribing, CoStar would not seek damages for past use. Klein declined. CoStar then sent a letter to Klein threatening to sue for damages. Klein responded by filing its complaint seeking declaratory relief in state court on June 4, 2008. CoStar removed the action to this Court on June 25, 2008, and filed its counter-claims against Klein and Bell asserting copyright infringement.

Bell, having little success in the real estate business, left Klein in August 2008 and went into a different line of work. While Bell was with Klein, he accessed the CoStar database about 130 times. At issue in this case is his downloading of forty-one (41) photographs and four (4) market reports. Market reports are either quarterly or annual summaries of market activity in the geographic region selected by the user. Other than Bell, no one in the Klein office ever accessed the CoStar database. Sometimes though, either in response to a question or on his own initiative, Bell would obtain information through CoStar and provide it to Mark or Steve Klein, or use it as general information in a sales meeting. For example, on one occasion, a client of Mark Klein had seen a property with a different real estate office's (not Klein's) For Sale sign. The client could not tell from the sign which

sales agent was handling the property.  He asked Mark Klein to see if he could find the listing agent.  Klein in turn asked Bell, and Bell found the information on the CoStar database.  The Klein office was not involved with the property in question and had nothing to do with any further transaction concerning it.

Bell was involved in only four transactions while he was with Klein, none of which involved the use of CoStar information.  The first was the listing and sale of an office building.  It was Mark Klein's listing and Bell had been added as co-listing agent as a favor. The listing came from Mark Klein's client and had nothing to do with CoStar.  The second and third transactions were two leases that Bell obtained for space in the same office building.  One lease came from a long-time client of another agent in the office and the second from a telephone call generated from a sign in front of the building.  The fourth transaction involved a friend of Bell's who leased a commercial property.  The friend found the property on his own and did the negotiating for the rent.  He listed Bell as his agent so that Bell could earn a commission.  No CoStar information was involved.

CoStar's claims against Bell were settled with Bell agreeing to the entry of a permanent injunction, payment of $5,000, and providing testimony at the trial.  Pertinent to Klein's release argument, the settlement agreement provided:

> 2.      Bell agrees to pay CoStar the sum of $5,000 (the "Payment").
> The Payment does not constitute, represent, or in any way quantify the
> damages that CoStar is entitled to receive as a result of the copyright
> infringement committed by Bell or any other party.  Rather, this figure
> represents a compromise based on a number of considerations, including,
> without limitation, recognition of Bell's inability to pay a more significant
> amount.

3. Subject to Bell's fulfillment of the provisions set forth in this Agreement, CoStar hereby releases Bell from any liability for the claims asserted against Bell in the Litigation, subject to the following conditions:

(a) CoStar's release shall only cover Bell's unauthorized use, copying and distribution to the extent such activity would have complied with each and every term and condition of the standard CoStar license agreement for the CoStar Products, as if Bell had been a fully licensed subscriber at all relevant times;

(b) CoStar's release does not cover Bell or any third party from (i) any resale of any portion of any CoStar product or service, (ii) use of any portion of any of CoStar product or service to create or maintain directly or indirectly any database or other product directly or indirectly competitive with any portion of any CoStar product or service, or (iii) any provision, disclosure or transmission of any portion of any CoStar product or service to a direct or indirect competitor of CoStar, or any access or use of any CoStar product or service by any direct or indirect competitor of CoStar; and

(c) CoStar's release shall be limited to Bell alone, and shall not cover any third parties who may have made unauthorized or unlicensed use of the CoStar Products with or without Bell's assistance, authorization, or facilitation, including, without limitation, K&H.

## <u>Discussion</u>

## I.      Settlement Agreement Did Not Release Klein

Klein filed a motion asking this Court to rule as a matter of law that CoStar's settlement agreement with Bell released it from liability.  In support, Klein contends (1) the release of a primarily liable tortfeasor discharges the secondarily liable tortfeasor despite an express reservation of rights, and (2) CoStar has received its damages from Bell and is not entitled to recover twice for the same injury.

To support its contention that the release of a primarily liable tortfeasor releases a secondarily liable tortfeasor, Klein cites, among others, *Bacon v. United States*, 321 F. 2d 880 (8th Cir. 1963). In *Bacon*, a government employee negligently struck the vehicle of Florence Bacon. Bacon sued the employee and the United States for her personal injuries. She settled with the employee under a "Covenant Not to Sue" that released the employee from liability and specifically provided:

> We further agree that this covenant may be pleaded as a defense, counterclaim, or cross-claim to any action or suit brought by us or anyone on our behalf against (the employee or his insurance company) which arises out of, or may arise out of, said collision.

The agreement stated it was not intended to release the United States. Applying the law of Missouri, the Eighth Circuit held that the United States was released as a matter of law despite the provision to the contrary.

Bacon argued that a Missouri statute provided that a release of one of several joint tortfeasors did not release them all, citing 37 R.S.MO., § 537.060 (VAMS, 1949 ed.). The Eighth Circuit held the statute did not apply because the United States and its employee were not "joint tortfeasors." The United States was liable, if at all, under the theory of *respondeat superior* and, under Missouri law, a valid release of a servant from liability for tort operates to release the master.

*Bacon* was distinguished by a state appellate court in Georgia, *Otis v. Wren Mobile Homes, Inc.*, 143 S.E. 2d 8 (Ga. App. 1965). The *Wren* court reasoned that *Bacon* was based on the proposition that an employer has the right to sue its tortious employee for

indemnification by subrogating to the rights of the injured plaintiff. The covenant not to sue in *Bacon* prevented anyone, including a subrogating employer, from suing the employee. It concluded that such covenants not to sue would release both the servant and the master, but agreements releasing only the injured party's right to sue, and not others subrogated to their rights, would not release the employer.

In analyzing the effect of an employee's release on an employer, one must start with the applicable state law. Here, the Court must apply the law of Florida. Florida has a statute concerning releases but, unlike Missouri, its language is not limited to joint tortfeasors. Florida Statute § 768.31(5) states:

> (5) Release or covenant not to sue. – When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and,
>
> (b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

The Florida Supreme Court in *JFK Medical Center, Inc. v. Stacy Price*, 647 So. 2d 833 (Fla. 1994), held this statute applied to a *respondeat superior* situation and that a release of a primary tortfeasor would not release a secondarily liable tortfeasor. In *JFK Medical Center*, Stacy Price sued her doctor for medical malpractice and the medical center as the doctor's employer. Price settled with the doctor and dismissed the lawsuit against him with

prejudice.  The medical center sought dismissal of the lawsuit against it arguing that a release of the employee also released the employer.  The Florida Supreme Court disagreed.  It held the release of the employee neither released the employer nor impaired the employer's right to indemnification.

Klein urges *Caccavella v. Silverman*, 814 So. 2d 1145 (Fla. 4th DCA 2002), as an accurate statement of Florida law on this issue.  Klein argues that *Caccavella* required CoStar to specifically state which claims and damages were being settled and which remained to avoid releasing Klein as a matter of law.   But Klein misapprehends the holding of *Caccavella*.    That case involved not *respondeat superior* liability, but initial tortfeasor/subsequent tortfeasor liability.   In Florida, an initial tortfeasor is liable for the entire damage and has a right of equitable subrogation against the subsequent tortfeasor.

Caccavella sued two physicians for medical malpractice, the initial surgeon and a subsequent treating physician alleged to have misdiagnosed the injury caused by the surgeon.  If the initial tortfeasor is held liable for the entirety of the plaintiff's damages, he may sue the subsequent tortfeasor.  *Underwriters at Lloyds v. City of Lauderdale Lakes*, 382 So. 2d 702 (Fla. 1980).  A release of the initial tortfeasor will also release the subsequent tortfeasor unless the plaintiff clearly reserves to himself his cause of action against the subsequent tortfeasor.  Otherwise, having paid the entire damage, the initial tortfeasor is subrogated to the plaintiff's claim against the subsequent tortfeasor.  And the subsequent tortfeasor does not have to face a claim for the same damage from both the plaintiff and the initial tortfeasor. *Mosley v. American Medical International, Inc.*, 712 So. 2d 1149 (Fla. 4th DCA) (on motion

for rehearing), review denied, 719 So. 2d 893 (Fla. 1998). Since *Caccavella* does not apply

to *respondeat superior* liability, it does not apply to the case at bar.

Klein makes an additional argument from the following language of the release:

> CoStar's release shall only cover Bell's authorized use, copying and distribution to the extent such activity would have complied with each and every term and condition of the standard CoStar license agreement for the CoStar products, as if Bell had been a fully licensed subscriber at all relevant times;

Settlement Agreement, paragraph 3(a). Klein contends that the effect of this language makes

"Bell a licensee for a period covering all relevant times of this litigation." From this premise,

Klein then postulates that since "Bell has been retroactively conferred a license to access the

copyrighted CoStar products," there could have been no direct infringement by him and,

thus, no vicarious infringement by Klein. The Court disagrees. A careful reading of the

language reveals that it describes the scope of the release. That is, the terms "as if" and

"licensed subscriber" are used to describe the acts the release covers, not to make Bell a

retroactive licensee.

Klein's contention that CoStar is only entitled to recover once for its injury is a correct

statement of the law, but does not apply in this case. The Florida Statute expressly provides

that payment by one tortfeasor will reduce the claim against the other tortfeasors but will not

release them. And paragraph two of the settlement agreement makes it clear that the $5,000

paid by Bell was not intended to cover the total damage, but rather was a compromise in

"recognition of Bell's inability to pay a more significant amount."

For the reasons stated above, the settlement agreement with Bell does not release Klein from liability.

## II.    Klein is Not Liable Under the Theory of Contributory Infringement

A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Casella v. Morris*, 820 F. 2d 362, 365 (11th Cir. 1987) (quoting *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F. 2d 1159, 1162 (2d Cir. 1971)).  In the copyright context, knowledge means that either the alleged contributory infringer has actual knowledge or has reason to know of the infringing activity.  *Id.*

This Court's findings of facts undermine this claim.  Klein neither knew nor should have known that Bell's access of CoStar's information service was unauthorized.  And Klein did nothing to induce, cause, or materially contribute to the infringing conduct of Bell. Therefore, Klein is entitled to judgment in its favor on this claim.

## III.    Klein is Not Liable Under the Theory of Vicarious Liability

Vicarious infringement occurs "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  Knowledge of the infringement is not necessary to a finding of vicarious infringement.  *So. Bell Tel. and Tel. Co. v. Associated Tel. Directory Publishers*, 756 F. 2d 801, 811 (11th Cir. 1985).

The Copyright Act does not expressly render one vicariously liable for copyright infringement under the theory of *respondeat superior*.  The Copyright Act, in 17 U.S.C. §

501(a) states that "anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright." But the United States Supreme Court has made clear that the absence of such express language does not prevent vicarious liability in circumstances in which it is just to hold one individual accountable for the actions of another. *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). In *Sony*, the Supreme Court specifically noted in footnote 17:

> As the district court correctly observed, however, "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn . . . ." (citation omitted) The lack of clarity in this area may, in part, be attributable to the fact that an infringer is not merely one who uses a work without authorization by the copyright owner, but also one who authorizes the use of a copyrighted work without actual authority from the copyright owner.

464 at p 435.

### Right and Ability to Supervise

The Court turns first to a consideration of whether Klein had a right and ability to supervise Bell, the direct infringer. Real estate brokers consider the licensed real estate sales persons in their office to be independent contractors. But under the Copyright Act, it is not the label of a party's legal status that controls, but rather, after an examination of all of the facts, a determination whether one actually exercised sufficient control that it is just to hold him liable for the actions of the offending party.

On this issue, CoStar submits *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F. 2d 304 (2d Cir. 1963) as the "clearest articulation" of vicarious liability. *Shapiro* involved a store owner which leased a portion of its premises to a party who sold record albums. The

records seller was sued for direct infringement. The store owner was sued because it was alleged to have "sold, or contributed to and participated actively in the sale of" the infringing records. The *Shapiro* court analyzed the case as one arising under general agency principles of *respondeat superior*. It noted that "(r)ealistically, the courts have not drawn a rigid line between the strict cases of agency, and those of independent contract, license, and lease." *Id.* at 307.

In the actual functioning of the record department, the record seller ordered, purchased and paid for all records. Its employees made all sales. But the store owner was also actively involved in the process. It collected all daily proceeds from the sales, made regular accountings, and deducted its 10% to 12% commission. It also deducted the salaries, Social Security, and withholding taxes of the record seller's employees, then delivered those deductions to the record seller's payroll employee, and the balance to the record seller. Customers who purchased records were given a receipt with the name of the store owner, not the record seller.

The trial court made a finding of fact that the store owner did not participate in the actual sale of the records and had no knowledge of their unauthorized manufacture. But the *Shapiro* court noted that the recordings were suspicious on their face – they bore no name of any manufacturer upon the labels or record jackets, as was customary in the trade, and plaintiff's agent had previously written to the store owner requesting information concerning the sale of unauthorized records.

The *Shapiro* court concluded that "(w)hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials – even in the absence of actual knowledge that the copyright monopoly is being impaired (citations omitted) – the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation." *Shapiro* at 307. Thus, *Shapiro* is often cited for the proposition that a finding of vicarious liability has two requirements: (1) "the right and ability to supervise," and (2) "a direct financial interest" in the profits from the infringing activity. *Banff Limited Ltd. v. Limited, Inc.*, 869 F. Supp. 1103 (SDNY 1994). Some courts have interpreted *Shapiro*'s "right and ability to supervise" test legalistically – that the mere *potential* to control the infringing activity is sufficient. Other courts[1] have indicated that *actual* control, not potential, is necessary for liability.

Interpretation of *Shapiro*'s "right and ability" test to mean the potential to control has caused difficulty, particularly in those cases in which a plaintiff has sought liability against a parent corporation for the infringing activities of a subsidiary. In those cases, plaintiffs have argued that when a parent corporation had a controlling interest in the subsidiary, it had the right and ability to elect the board of directors and, in turn, select the officers. It even had the power to remove the board. Such power gave it the "right and ability to supervise" the activity of the subsidiary and thus the parent was vicariously liable. At least one court agreed with this interpretation of *Shapiro*. *See Broadcast Music, Inc. v. Hartmarx Corp.*, 1988 W.L.

---

[1] An excellent analysis of *Shapiro* and the reasons for a less legalistic approach to the control test may be found in *Banff Limited v. Limited, Inc.*, 869 F. Supp. 1103 (SDNY 1994) and will not be repeated in detail here.

128691 (ND Ill. 1988).  This interpretation inevitably leads to the conclusion that parent corporations are always vicariously liable for the infringements of their subsidiaries regardless of how separate their management.  Recognizing this was not the intended result of the Copyright Act, courts have turned to an interpretation that requires actual control.

The Second Circuit, after its decision in *Shapiro*, stated the test differently:

> All persons and corporations who participate in, *exercise control over*, or benefit from the infringement are jointly and severally liable as copyright infringers.

*Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F. 2d 89, 92 (2d Cir. 1985) (emphasis added).  This later iteration of the test by the Second Circuit better describes the factual analysis required.

Using the *Sygma Photo* analysis of "right and ability" to control, the Court concludes that Klein exercised sufficient control to be vicariously liable regardless of its classification of Bell as an "independent contractor."  It provided Bell office space, held weekly sales meetings, controlled his listings, and in general exercised supervisory control.

Having determined that CoStar has satisfied the "right and ability" requirement, the Court now turns to the other prong – whether Klein received a direct financial benefit from the infringing activity.

## Direct Financial Benefit

CoStar acknowledges that it has not been able to show that Klein made any profit from the infringing material, but argues that is unnecessary.  It contends that it is enough to show that the infringement generally benefitted Klein.  For support, CoStar submits

reasoning from the line of dance hall cases (for example, *Dreamland Ball Room v. Shapiro*, 36 F. 2d 354 (7th Cir. 1929), and *Major Bob Music v. Stubbs*, 851 F. Supp. 475 (S.D. Ga. 1994)), the *Napster* case (*A & M Records, Inc. v. Napster, Inc.*, 239 F. 3d 1004 (9th Cir. 2001)), an in-house copying and sharing case (*Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (N.D. Md. 2003)), a flea market case (*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F. 3d 259 (9th Cir. 1996)), and an AOL on-line case (*Ellison v. Robertson*, 357 F. 3d 1072 (9th Cir. 2004)).

In the dance hall cases, plaintiffs have historically had difficulty in proving profits emanating directly from the playing of the music. The purchase of a drink does not relate directly with the playing of a particular song. Common sense tells us, though, that the owner of a bar, restaurant, or dance hall that plays music to attract customers has a direct financial interest in having the music played. Courts have had no problem in deciding that such businesses are deemed as a matter of law to profit from the playing of the music. *Major Bob Music, supra*. But with businesses other than dance halls, the Court cannot assume that the infringing activity directly affects profits. A closer examination of the facts and circumstances is required.

In *Napster*, the Court addressed an on-line business that allowed its customers to copy copyrighted songs and provide them to others. The trial court had found that Napster's future revenue was directly dependent upon increasing its customer base and that virtually all of Napster's "draw" of customers resulted from it providing access to infringing material. That is not the case here. Klein has not attracted any customers from Bell's infringing activity.

In *Lowry's Reports*, the publisher of a financial newsletter sued Legg Mason, a financial services firm, for copying its newsletter and sharing it with all agents in the firm, both by hard copy and intra-office e-mail. Lowry's offered subscriptions to only individuals, not offices or institutions. Each subscriber had to execute a subscription agreement that prohibited unauthorized copying or dissemination of the report. When Lowry learned of the unauthorized copying, it called Legg Mason and demanded that it cease copying and sharing among agents in the office. The call was followed by a cease and desist letter demanding that all unauthorized copying of the reports cease immediately. Legg Mason stopped providing copies over its intranet e-mail, but continued to provide e-mail copies to all members of its research department.

On the issue of direct financial benefit, the court in *Lowry's Reports* concluded there was no "doubt that Legg Mason had an obvious and direct financial interest in the widespread copying: at the very least, its employees' infringement saved it the cost of additional subscriptions to the *Reports*." 271 F. Supp. 2d at 746. This case is cited for the proposition that the avoidance of subscription fees may be sufficient to constitute "direct financial benefit." But that depends on the facts of each case. Legg Mason perceived Lowry's newsletter to be of benefit to its financial services. Otherwise, it would not have gone to the time, trouble, and expense of copying the reports and providing them to each agent. And Legg Mason continued to copy the reports after being notified of the infringement. Continued use after notice is relevant in weighing the benefit to the infringer. In the case before this Court, Klein did not intentionally make use of CoStar's service, did

not share the use among other agents in the office, did not use the information in making any sales, and immediately stopped upon learning of the infringement. Even the four transactions Bell completed had no connection to CoStar information. In short, unlike Legg Mason, Klein did not receive any obvious and direct financial benefit from the exploitation of the copyrighted material.

*Fonovisa* involved claims of contributory and vicarious liability against the operator of a flea market in which vendors routinely sold counterfeit recordings that infringed on plaintiff's copyrights. The operator knew of the sales because the local sheriff's department had seized more than 38,000 counterfeit recordings in a raid two years previously. The following year, the sheriff sent a letter notifying the flea market of continuing sales of infringing materials. Still the operator would not stop the sales. The complaint alleged that the operator received substantial financial benefits from admission fees, concession stand sales, and parking fees from customers who came to buy counterfeit recordings at bargain basement prices. The Ninth Circuit ruled that this was sufficient to state the financial benefit element of the claim for vicarious liability because the sale of the pirated recordings was a draw for customers similar to that of pirated music in the dance hall cases.

In *Ellison*, the Ninth Circuit was again called upon to consider what benefits were necessary to be deemed "direct financial benefits." Without Ellison's authorization, Robertson posted copies of some of Ellison's copyrighted short stories on a peer-to-peer file sharing network, the USENET. USENET is an abbreviation of "user network" which refers to numerous organizations and individuals whose computers connect and exchange messages

with one another.  Because AOL provided its subscribers access to this USENET group, Ellison sued AOL for vicarious and contributory copyright infringement.

The Ninth Circuit acknowledged that AOL offered access to the USENET groups as part of its service for a reason: it helped to encourage overall subscription to its services. AOL's future revenue was directly dependent upon increases in its user base.  But the Ninth Circuit held that not every  benefit is a "direct financial benefit."  It said, to constitute a "direct financial benefit," the inquiry "is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . ."  357 F. 3d at 1079.

Ellison contended AOL received a direct financial benefit from the infringement because (1) AOL admitted in a securities filing that it was important for it to attract and retain subscribers for its revenue generation, and (2) when AOL blocked access to the USENET group at issue, many subscribers called AOL to inquire why it was blocked.  The Ninth Circuit concluded this did not constitute direct financial benefit:

> We note that there is no evidence that indicates that AOL customers either subscribed because of the available infringing material or cancelled subscriptions because it was no longer available.  While a causal relationship might exist between AOL's profits from subscriptions and the infringing activity taking place on its USENET servers, Ellison has not offered enough evidence for a reasonable juror so to conclude.

*Id.* at 1079.

The reasoning of the *Ellison* court, that not every benefit is a direct financial benefit, applies to the facts of this case.  Bell's infringing use was not of any direct benefit to Klein. No other agents accessed CoStar's website through Bell's computer or password.  And Klein

did not attract any customers or make any sales because of any CoStar information. Thus, there was no "causal relationship" between the infringing activity and a financial benefit reaped by Klein. Therefore, under the facts of this case, Klein is not liable for vicarious infringement.

## Conclusion

Under Florida law on releases and the specific wording of the release in question, CoStar's release of Bell did not release Klein from liability. But Klein is not contributorily liable because it neither had knowledge of nor contributed to the infringement. And Klein is not vicariously liable because it did not receive a "direct financial benefit" from the infringement.

It is therefore ORDERED AND ADJUDGED that:

1.      Klein's Motion for Judgment as a Matter of Law or Alternatively Motion for Judgment on Partial Findings on CoStar's Theory of Vicarious Liability (Dkt. #120) is DENIED.

2.      Final Judgment is rendered in favor of **KLEIN & HEUCHAN, INC.**

3.      The Clerk is directed to enter Judgment in favor of **KLEIN & HEUCHAN, INC.** and against **COSTAR REALTY INFORMATION, INC. and COSTAR GROUP, INC.**

4.      The Court reserves jurisdiction on the issue of costs and attorneys' fees, if applicable.

5. This Judgment in favor of Klein & Heuchan, Inc. does not affect the previously entered Partial Final Judgment against Counter-Defendant Scott Bell (Dkt. #138).

6. The Clerk is directed to close this file.

**DONE** and **ORDERED** in Tampa, Florida on April 19, 2010.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>**Copies furnished to:**</u>
Counsel/Parties of Record

S:\Odd\2008\08-cv-1227.damages.frm